1  Papool Chaudhari (California Bar No. 241346, admitted to this Court)
2  Papool@ChaudhariLaw.com
   Chaudhari Law, PLLC
3  P.O. Box 1863
4  Wylie, Texas 75098
   Telephone: (214) 702-1150
5  Facsimile: (214) 705-3775

6
7  Attorney for Plaintiff,
   **PERSONAL AUDIO, LLC**

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11 PERSONAL AUDIO, LLC,              ACTION NO. 3:14-mc-80025-RS

12          Plaintiff,              **DECLARATION OF PAPOOL S.**
13     v.                          **CHAUDHARI IN SUPPORT OF**
                                    **PLAINTIFF'S OPPOSITION TO**
14 TOGI ENTERTAINMENT, INC. et al.  **THIRD PARTY ELECTRONIC**
15                                  **FRONTIER FOUNDATION'S**
                                    **MOTION TO QUASH AND FOR**
16          Defendant.             **PROTECTIVE ORDER**

17
18                                  Date: Wednesday, Mar. 5, 2014
19                                  Time:  1:00 p.m.
                                    Dept.: Courtroom A,15th Floor
20
21                                  Judge: Honorable Nathanael Cousins

22

23

24

25

26

27

28

I, Papool S. Chaudhari, declare as follows:

1. My name is Papool S. Chaudhari. I am over the age of twenty-one (21) years, am competent to testify on the matters stated herein, have personal knowledge of the facts and statements in this declaration and declare that each of the facts is true and correct.

2. I provide this declaration in support of Plaintiff Personal Audio, LLC's opposition to Third Party Electronic Frontier Foundation's ("EFF") Motion to Quash and for Protective Order.

3. I am a co-counsel for Plaintiff Personal Audio, LLC in litigations pending in the United States District Court, Eastern District of Texas, consolidated for pre-trial into lead case 2:13-cv-13, *Personal Audio, LLC v. Togi Entertainment, Inc. et al.*

4. I have reviewed Third Party Electronic Frontier Foundation's Motion to Quash and for Protective Order and the accompanying affidavits.

5. As discussed in the Opposition to the Motion, I, as counsel for Personal Audio, LLC, am subject to a prosecution bar that prohibits any involvement by myself in the IPR. Accordingly, I have nothing to do with those proceedings.

6. In preparation of this opposition, I examined several webpages belonging to the website of the EFF, located at http://www.eff.org. I searched for pages related to "Personal Audio."

7. The EFF has a webpage dedicated to a "Patent Busting Project – An EFF Initiative To Protect Innovation and Free Expression." On this page, the EFF accuses Personal Audio, as a result of U.S. Patent 8,112,504, of "Crimes Against the Public Domain." Attached to this Declaration as Exhibit 1 is a printout of https://www.eff.org/patent-busting/personal-audio as of February 18, 2014.

8. The EFF has a webpage dated February 12, 2013 that contains quotes from EFF staff attorney Daniel Nazer. It states that Mr. Nazer said "[w]e think Personal Audio's podcasting claims are a classic example of an over-broad software patent . . . [b]ut whether these claims would hold up in court is another question and one that it is too early to speculate on." Attached to this Declaration as Exhibit 2 is a printout of http://www.eff.org/mention/podcasters-prepare-war-against-%E2%80%98podcast-patent%E2%80%99-owner-personal-audio dated February 12, 2013.

9. The EFF has a webpage dated May 30, 2013 authored by Mr. Nazer entitled "Help Save Podcasting!" wherein Mr. Nazer states, "[o]ne way to defeat a troll is to prove— either in court or at the patent office—that the claimed invention was not new (or was obvious)." He later calls for help with prior art and states, "[s]ince all of your submissions will be public, they can also be used by others who are fighting back against Personal Audio in court." Attached to this Declaration as Exhibit 3 is a printout of http://www.eff.org/deeplinks/2013/05/help-save-podcasting dated May 30, 2013.

10. Clicking on the Donate button on the page in Exhibit 3 goes to another page entitled "Save Podcasting – Stop Stupid Patents!" declaring Personal Audio's patent as "bogus" and "overbroad" and that the EFF was "going to get to work bringing the best case we can straight to the US Patent Office to invalidate the podcasting patent and stop the patent troll Personal Audio from doing more damage to online broadcasters. Attached to this Declaration as Exhibit 4 is a printout of http://supporters.eff.org/donate/save-podcasting as of February 18, 2014.

11. The EFF maintains a publicly available privacy policy at its website. It states in part that "[w]e may disclose personally identifiable information about you to third parties in limited circumstances, including: (1) with your consent; or (2) when we have a good faith belief it is required by law, such as pursuant to a subpoena or other judicial or administrative order." Attached to this Declaration as Exhibit 5 is a printout of http://www.eff.org/policy as of February 18, 2014.

12. The EFF maintains a publicly available webpage to assist individuals in resisting discovery in copyright infringement litigation. Attached to this Declaration as Exhibit 6 is a printout of http://www.eff.org/issues/file-sharing/subpoena-defense as of February 18, 2014.

13. A November 3, 2013 article from the website "Natural News" indicated that the "EFF is now fully prepared to take on Personal Audio . . . ." Attached to this Declaration as Exhibit 7 is a printout of http://www.naturalnews.com/042766_patent_trolls_podcasting_eff.html dated November 3, 2013.

14. On October 10, 2013, Defendants in the Texas case served their invalidity contentions as required under the Local Rules of the Eastern District of Texas. Attached to this Declaration as Exhibit 8 is a true and correct copy of excerpts from Defendants' Invalidity Contentions from 2:13-cv-13 (E.D. Tex.) that were served to me by Defendants' counsel on October 10, 2013.

15. On October 16, 2013, the EFF filed an Inter Partes Review on the '504 Patent, the same patent-in-suit in the Texas case. Attached to this Declaration as Exhibit 9 is a true and correct copy of the EFF's IPR Petition.

16. On December 20, 2013, Personal Audio served its original subpoena to the EFF that was withdrawn prior to reissuance as described below. Attached to this Declaration as Exhibit 10 is a true and correct copy of the Original Subpoena Served on the EFF by Personal Audio.

17. On January 17, 2014, Personal Audio served a reissued subpoena to the EFF. Attached to this Declaration as Exhibit 11 is a true and correct copy of the Reissued Subpoena Served on the EFF by Personal Audio.

18. On January 21, 2014, Defendants NBC and CBS served on me their responses to Personal Audio's First Set of Interrogatories in the Texas case. This first set of interrogatories only contained one interrogatory, asking Defendants to "identify and describe all communications between any and all Defendants and any third party regarding the '504 patent and/or any potential or actual prior art, including all communications with the EFF and any potential witness with testimony relating to prior art." Attached to this Declaration as Exhibit 12 is a true and correct copy of these interrogatory responses that were served on me on January 21, 2014.

19. I reviewed the website for the USPTO regarding the PTO's position on who the real party in interest is and how that is determined. Attached to this Declaration as Exhibit 13 is a printout of http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-2 as of February 18, 2014.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on this 18th day of February 2014, in Wylie, Texas.

Papool S. Chaudhari

# EXHIBIT 1



SEARCH

(/)



(/patent-busting)

**An EFF Initiative To Protect Innovation and Free Expression**

## Personal Audio (http://personalaudio.net/)



**Patent Name:** System for disseminating media content representing episodes in a serialized sequence

**Patent Number:** 8,112,504 (http://www.google.com/patents /US8112504)

**Critical Date:** February 10, 1996

**Patent Description:** The patent claims to cover "what is now commonly called podcasting."

### Patents

**Patents Home (/patent)**

**Current Legislative Proposals for Patent Reform (https://www.eff.org /issues/current-legislative-proposals-patent-reform)**

**FAQs for Lodsys Targets (/issues /faqs-lodsys-targets)**

**How Patents Hinder Innovation (Graphic) (/issues /how-patents-hinder-innovation)**

**Patent Busting Project (/patent-busting)**

**Patent Trolls (/issues /resources-patent-troll-victims)**

**Donate to EFF (https://supporters.eff.org /donate)**

### Stay in Touch

SIGN UP NOW

### NSA Spying



**eff.org/nsa-spying** (/nsa-spying)

EFF is leading the fight against the NSA's illegal mass surveillance program. Learn more (/nsa-spying) about what the program is, how it works, and what you can do.

### Follow EFF

American sues Ethiopian Government for wiretapping with malware. EFF to court: illegal surveillance is illegal. https://eff.org/r.u55f (https://eff.org/r.u55f)

FEB 18 @ 11:14AM

AIDS deniers and televangelist videomakers used YouTube copyright takedown notices to silence dissenting views. https://eff.org/r.bzru (https://eff.org/r.bzru)

FEB 18 @ 9:56AM

EFF's @juliepsamuels talks patent trolls and podcasts on the most recent episode of the @AdamCarollaShow: https://eff.org/r.21pk (https://eff.org/r.21pk)

FEB 18 @ 9:35AM

Twitter (https://twitter.com/eff)

## Crimes Against the Public Domain

- Asserting a patent that claims to cover podcasting in general, when numerous examples of what we now call "podcasting" existed before
- Targeting podcasters large (like Adam Carolla) and small, forcing them to pay egregious licensing fees or be scared out of existence

## Prior Art Description

EFF filed a petition for inter partes review, giving the Patent Office numerous examples of prior

art on the basis of which the EFF and its tested clients (https://www.eff.org
/document/podcasting-petition-inter-partes-review) for the filing.

Facebook (https://www.facebook.com/eff)

Identi.ca (https://identi.ca/eff)

## Projects

Bloggers' Rights (/bloggers)

Coders' Rights (/issues/coders)

Follow EFF (/social-networks)

Free Speech Weak Links (/free-speech-weak-link)

Global Chokepoints (https://globalchokepoints.org/)

HTTPS Everywhere (/https-everywhere)

Open Wireless Movement (https://openwireless.org)

Patent Busting (https://w2.eff.org/patent/)

Surveillance Self-Defense (https://ssd.eff.org)

Takedown Hall of Shame (/takedowns)

Teaching Copyright (http://www.teachingcopyright.org)

Transparency Project (https://www.eff.org/issues/transparency)

Trolling Effects (https://trollingeffects.org)

Ways To Help (/helpout)

(https://www.eff.org/copyright)

Thanks (/thanks) | RSS Feeds (/rss) | Copyright Policy (/copyright)

Privacy Policy (/policy) | Contact EFF (/about/contact)

# EXHIBIT 2



**SEARCH**

(/)

## Podcasters Prepare for War Against 'Podcast Patent' Owner Personal Audio

**Related Issues**

Patent Trolls (/issues /resources-patent-troll-victims)

"We think Personal Audio's podcasting claims are a classic example of an over-broad software patent," EFF staff attorney Daniel Nazer wrote in an email to Backstage. "But whether these claims would hold up in court is another question and one that it is too early to speculate on."

Daniel Lehman
Tuesday, February 12, 2013
Article Link (http://www.backstage.com/news/podcasters-prepare-war-against-podcast-patent-owner-personal-audio/)
Backstage
**Related Issues:**
Patent Trolls (/issues/resources-patent-troll-victims)

**Donate to EFF (https://supporters.eff.org /donate)**

## Stay in Touch

**SIGN UP NOW**

## NSA Spying

 **eff.org/nsa-spying (/nsa-spying)**

EFF is leading the fight against the NSA's illegal mass surveillance program. Learn more (/nsa-spying) about what the program is, how it works, and what you can do.

## Follow EFF

American sues Ethiopian Government for wiretapping with malware. EFF to court: illegal surveillance is illegal. https://eff.org/r.u55f (https://eff.org/r.u55f)

FEB 18 @ 11:14AM

AIDS deniers and televangelist videomakers used YouTube copyright takedown notices to silence dissenting views. https://eff.org/r.bzru (https://eff.org/r.bzru)

FEB 18 @ 9:56AM

EFF's @juliepsamuels talks patent trolls and podcasts on the most recent episode of the @AdamCarollaShow: https://eff.org/r.21pk (https://eff.org/r.21pk)

FEB 18 @ 9:35AM

Twitter (https://twitter.com/eff)

Facebook
(https://www.facebook.com/eff)

Identi.ca (https://identi.ca/eff)

## Projects

Bloggers' Rights (/bloggers)

Coders' Rights (/issues
/coders)

Follow EFF (/social–
networks)

Free Speech Weak Links
(/free–speech–weak–link)

Global Chokepoints
(https://globalchokepoints.org/)

HTTPS Everywhere (/https–
everywhere)

Open Wireless Movement
(https://openwireless.org)

Patent Busting
(https://w2.eff.org/patent/)

Surveillance Self–Defense
(https://ssd.eff.org)

Takedown Hall of Shame
(/takedowns)

Teaching Copyright
(http://www.teachingcopyright.org/)

Transparency Project
(https://www.eff.org/issues
/transparency)

Trolling Effects
(https://trollingeffects.org)

Ways To Help (/helpout)

(https://www.eff.org/copyright)

Thanks (/thanks) │ RSS Feeds (/rss) │ Copyright Policy (/copyright)

│ Privacy Policy (/policy) │ Contact EFF (/about/contact)

# EXHIBIT 3

# ELECTRONIC FRONTIER FOUNDATION
## DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

(/)

SEARCH

MAY 30, 2013 | BY DANIEL NAZER (/ABOUT/STAFF/DANIEL-NAZER)

# Help Save Podcasting!

We need your help to save podcasting. EFF is partnering with leading lawyers to bust a key patent (https://www.eff.org/sites/default/files/us8112504_0.pdf) being used to threaten podcasters. But we need your help to find prior art and cover the filing fees for a brand new patent busting procedure.

**SAVE PODCASTING! DONATE** (https://supporters.eff.org/donate/save-podcasting)

**SAVE PODCASTING! PRIOR ART** (http://patents.stackexchange.com/questions/3884/call-for-prior-art-system-for-disseminating-media-content-representing-episodes)

A couple of months ago we wrote (https://www.eff.org/deeplinks/2013/02/podcasting-community-faces-patent-troll-threat-eff-wants-help) that podcasting was under threat from a patent troll. At that time, a patent troll named Personal Audio LLC had sued three podcasters and sent demand letters to a number of others. Since then, Personal Audio has filed two new lawsuits—this time against CBS and NBC. It has also sent additional demand letters to small podcasting operations. We've written often in the past (https://www.eff.org/deeplinks/2013/02/deep-dive-software-patents-and-rise-patent-trolls) about how patent trolls are a drain on innovation, and this latest troll is no exception. Since many podcasters barely make a profit, or simply do it for love, a shakedown from a patent troll threatens to shut down their program.

As with so many patent troll cases, the troll is asking for money despite having contributed nothing to the industry. By its own admission, Personal Audio tried and failed (http://patentexaminer.org/2011/10/as-iphone-4s-debuts-patent-holder-personal-audio-llc-sues-apple-for-the-third-time/) at its attempt to make an audio player. Having failed at actually making something, it became a shell company that does nothing but sue on its patents. And now it wants a handout from those who worked hard to create popular podcasts.

We'd like to enlist your help to fight this troll. One way to defeat a troll is to prove—either in court or at the patent office—that the claimed invention was not new (or was obvious). In other words, show that the patent applicant didn't really invent anything. To do this, we need to find publications from before October 2, 1996 that disclose similar or identical ideas (this also known as prior art (http://patents.stackexchange.com/faq#prior-art)). The best prior art will include publications describing early versions of podcasting or any other kind of episode distribution over the Internet.

EFF is partnering with the Harvard's Cyberlaw Clinic (https://cyber.law.harvard.edu/teaching/cyberlawclinic) to investigate a challenge to this patent at the patent office. The most likely procedure will involve a new legal tool called the "Inter partes review" introduced by the America Invents Act. If we are successful in this process, the patent gets invalidated and Personal Audio would be unable to assert it against anybody.

For us to get started, we need your help—the filing fees charged by the US Patent and Trademark Office for this kind of high-impact challenge are relatively steep and there's no way around them, even for an advocacy non-profit like EFF. If you join us

**Donate to EFF** (https://supporters.eff.org/donate)

**Stay in Touch**

SIGN UP NOW

**NSA Spying**



**eff.org/nsa-spying** (/nsa-spying)

EFF is leading the fight against the NSA's illegal mass surveillance program. Learn more (/nsa-spying) about what the program is, how it works, and what you can do.

**Follow EFF**

American sues Ethiopian Government for wiretapping with malware. EFF to court: illegal surveillance is illegal. https://eff.org/r.u55f (https://eff.org/r.u55f)

FEB 18 @ 11:14AM

AIDS deniers and televangelist videomakers used YouTube copyright takedown notices to silence dissenting views. https://eff.org/r.bzru (https://eff.org/r.bzru)

FEB 18 @ 9:56AM

EFF's @juliepsamuels talks patent trolls and podcasts on the most recent episode of the @AdamCarollaShow: https://eff.org/r.21pk (https://eff.org/r.21pk)

FEB 18 @ 9:35AM

Twitter (https://twitter.com/eff)

(https://supporters.eff.org/donate/mini-bar-2013) in Darl interrupt to podcasting of Cleante, so we'll be able to bring a robust case straight to the US Patent and Trademark Office to stop Personal Audio from doing any more damage to online broadcasters.

We've posted a detailed call for prior art (http://patents.stackexchange.com/questions /3884/call-for-prior-art-system-for-disseminating-media-content-representing-episodes) at Ask Patents. That includes the details about the patent claim being asserted and some examples of prior art we have already located. Please visit that page and review it carefully. If you know of any prior art, submit it there (http://patents.stackexchange.com/questions /3884/call-for-prior-art-system-for-disseminating-media-content-representing-episodes) (or send it via email to podcasting@eff.org). If you think you might be able to find prior art, search for it. <mark>Since all of your submissions will be public, they can also be used by others who are fighting back against Personal Audio in court.</mark> And please forward this message far and wide. The more people that search, the more art we will find.

It is not easy to fight patent trolls, but with your help, we can defeat this patent and save podcasting.

## Files

📄 us8112504.pdf (https://www.eff.org/files/us8112504_0.pdf)

Innovation (/issues/innovation)    Patents (/patent)    Patent Busting Project (/issues/patent-busting-project)

Patent Trolls (/issues/resources-patent-troll-victims)

### MORE DEEPLINKS POSTS LIKE THIS

AUGUST 2013
Pushing for Perfect Forward Secrecy, an Important Web Privacy Protection (/deeplinks/2013/08/pushing-perfect-forward-secrecy-important-web-privacy-protection)

AUGUST 2013
One Key to Rule Them All: Threats Against Service Provider Private Encryption Keys (/deeplinks/2013/08/one-key-rule-them-all-threats-against-service-provider-private-encryption-keys)

AUGUST 2013
An Illustration of How the NSA Misleads the Public Without Technically Lying (/deeplinks/2013/08/illustration-how-nsa-misleads-public-without-actually-lying)

AUGUST 2013
EFF Amicus Asks Supreme Court to Review Warrantless Smartphone Searches (/deeplinks/2013/08/eff-amicus-asks-supreme-court-review-warrantless-smartphone-searches)

AUGUST 2013
Help Send EFF to SXSW (/deeplinks /2013/08/help-send-eff-sxsw)

### RECENT DEEPLINKS POSTS

FEB 18, 2014
New Entrants in the Takedown Hall of Shame: AIDS Deniers and Televangelists (/deeplinks/2014/02/new-entrants-takedown-hall-shame-aids-deniers-and-televangelists)

FEB 18, 2014
Support the Right to Repair in South Dakota (and Everywhere Else) (/deeplinks /2014/02/support-right-repair-south-dakota)

FEB 17, 2014
EFF Calls For the Immediate Release of Vietnamese Blogger Le Quoc Quan (/deeplinks/2014/02/eff-calls-immediate-release-vietnamese-blogger-le-quoc-quan)

FEB 14, 2014
Obama Pushes TPP Negotiations Despite Mounting Opposition at Home and Abroad (/deeplinks/2014/02/obama-pushes-tpp-despite-mounting-opposition)

FEB 14, 2014
TrustyCon Ticket Auction Fundraiser (/deeplinks/2014/02/trustycon-ticket-auction-fundraiser)

Facebook (https://www.facebook.com/eff)

Identi.ca (https://identi.ca/eff)

## Projects

Bloggers' Rights (/bloggers)

Coders' Rights (/issues /coders)

Follow EFF (/social-networks)

Free Speech Weak Links (/free-speech-weak-link)

Global Chokepoints (https://globalchokepoints.org/)

HTTPS Everywhere (/https-everywhere)

Open Wireless Movement (https://openwireless.org)

Patent Busting (https://w2.eff.org/patent/)

Surveillance Self-Defense (https://ssd.eff.org)

Takedown Hall of Shame (/takedowns)

Teaching Copyright (http://www.teachingcopyright.org/)

Transparency Project (https://www.eff.org/issues /transparency)

Trolling Effects (https://trollingeffects.org)

Ways To Help (/helpout)

### DEEPLINKS TOPICS

Analog Hole (/deeplinks /analog-hole)

Encrypting the Web (/deeplinks /encrypting-the-web)

Pen Trap (/deeplinks/pen-trap)

Policy Analysis (/deeplinks

Anonymity (/deeplinks/anonymity)

Anti-Counterfeiting Trade Agreement (/deeplinks/anti-counterfeiting-trade-agreement)

Biometrics (/deeplinks/biometrics)

Bloggers Under Fire (/deeplinks/bloggers-under-fire)

Bloggers' Rights (/deeplinks/bloggers%27-rights)

Broadcast Flag (/deeplinks/broadcast-flag)

Broadcast Flag (/deeplinks/broadcast-flag)

Broadcasting Treaty (/deeplinks/broadcasting-treaty)

CALEA (/deeplinks/calea)

Cell Tracking (/deeplinks/cell-tracking)

Coders' Rights Project (/deeplinks/coders%27-rights-project)

Computer Fraud And Abuse Act Reform (/deeplinks/computer-fraud-and-abuse-act-reform)

Content Blocking (/deeplinks/content-blocking)

Copyright Trolls (/deeplinks/copyright-trolls)

Council of Europe (/deeplinks/council-of-europe)

Cyber Security Legislation (/deeplinks/cyber-security-legislation)

CyberSLAPP (/deeplinks/cyberslapp)

Defend Your Right to Repair! (/deeplinks/defend-your-right-to-repair%21)

Development Agenda (/deeplinks/development-agenda)

Digital Books (/deeplinks/digital-books)

Digital Radio (/deeplinks/digital-radio)

Digital Video (/deeplinks/digital-video)

DMCA (/deeplinks/dmca)

DMCA Rulemaking (/deeplinks/dmca-rulemaking)

Do Not Track (/deeplinks/do-not-track)

DRM (/deeplinks/drm)

E-Voting Rights (/deeplinks/e-voting-rights)

EFF Europe (/deeplinks/eff-europe)

EFF Software Projects (/deeplinks/eff-software-projects)

Export Controls (/deeplinks/export-controls)

Fair Use and Intellectual Property: Defending the Balance (/deeplinks/fair-use-and-intellectual-property%3A-defending-the-balance)

FAQs for Lodsys Targets (/deeplinks/faqs-for-lodsys-targets)

File Sharing (/deeplinks/file-sharing)

Free Speech (/deeplinks/free-speech)

FTAA (/deeplinks/ftaa)

Hollywood v. DVD (/deeplinks/hollywood-v.-dvd)

How Patents Hinder Innovation (Graphic) (/deeplinks/how-patents-hinder-innovation-%28graphic%29)

Innovation (/deeplinks/innovation)

International (/deeplinks/international)

International Privacy Standards (/deeplinks/international-privacy-standards)

Internet Governance Forum (/deeplinks/internet-governance-forum)

Legislative Solutions for Patent Reform (/deeplinks/legislative-solutions-for-patent-reform)

Locational Privacy (/deeplinks/locational-privacy)

Mandatory Data Retention (/deeplinks/mandatory-data-retention)

Mandatory National IDs and Biometric Databases (/deeplinks/mandatory-national-ids-and-biometric-databases)

Mass Surveillance Technologies (/deeplinks/mass-surveillance-technologies)

National Security Letters (/deeplinks/national-security-letters)

Net Neutrality (/deeplinks/net-neutrality)

No Downtime for Free Speech (/deeplinks/no-downtime-for-free-speech)

NSA Spying (/deeplinks/nsa-spying)

OECD (/deeplinks/oecd)

Online Behavioral Tracking (/deeplinks/online-behavioral-tracking)

Open Access (/deeplinks/open-access)

Open Wireless (/deeplinks/open-wireless)

Patent Busting Project (/deeplinks/patent-busting-project)

Patent Trolls (/deeplinks/patent-trolls)

Patents (/deeplinks/patents)

Police analysis

Printers (/deeplinks/printers)

Privacy (/deeplinks/privacy)

Reading Accessibility (/deeplinks/reading-accessibility)

Real ID (/deeplinks/real-id)

RFID (/deeplinks/rfid)

Search Engines (/deeplinks/search-engines)

Search Incident to Arrest (/deeplinks/search-incident-to-arrest)

Section 230 of the Communications Decency Act (/deeplinks/section-230-of-the-communications-decency-act)

Security (/deeplinks/security)

Social Networks (/deeplinks/social-networks)

SOPA/PIPA: Internet Blacklist Legislation (/deeplinks/sopa/pipa%3A-internet-blacklist-legislation)

State Surveillance & Human Rights (/deeplinks/state-surveillance-%26-human-rights)

State-Sponsored Malware (/deeplinks/state-sponsored-malware)

Surveillance Drones (/deeplinks/surveillance-drones)

Terms Of (Ab)Use (/deeplinks/terms-of-%28ab%29use)

Test Your ISP (/deeplinks/test-your-isp)

The "Six Strikes" Copyright Surveillance Machine (/deeplinks/the-%22six-strikes%22-copyright-surveillance-machine)

The Global Network Initiative (/deeplinks/the-global-network-initiative)

Trans-Pacific Partnership Agreement (/deeplinks/trans-pacific-partnership-agreement)

Transparency (/deeplinks/transparency)

Travel Screening (/deeplinks/travel-screening)

Trusted Computing (/deeplinks/trusted-computing)

Uncategorized (/deeplinks/uncategorized)

Video Games (/deeplinks/video-games)

Wikileaks (/deeplinks/wikileaks)

WIPO (/deeplinks/wipo)

PATRIOT Act (/deeplinks
/patriot-act)

(https://www.eff.org/copyright)

**Thanks (/thanks)** | **RSS Feeds (/rss)** | **Copyright Policy (/copyright)**

**Privacy Policy (/policy)** | **Contact EFF (/about/contact)**

# EXHIBIT 4



(https://www.eff.org/)



## DONATE NOW TO SAVE PODCASTING!

- ○ **$2,500** Super Major Donor
- ○ **$1,000** Major Donor
- ○ **$500** Rare Earths Member
- ○ **$250** Titanium Member
- ● **$100** Gold Member
- ○ **$65** Copper Member
- ○ **$25** Silicon/Student Member

Amount $ [ 100 ]

☐ I want to donate this amount every month.

☐ **Keep me updated by email.**

### BE AN EFF MEMBER

☑ I would like to be an
official EFF member (/sites/all/modules/custom/eff_donate_pages
/html/membership_details.html)
.

Wow. In under 10 hours, you met and exceeded our funding goal to bust the bogus, overbroad patent being used to threaten podcasters! Your ongoing support is invaluable– donate to support EFF's commitment to stop trolls and stupid patents for good.

# $85,819 donated

Supporters: **1455**          Goal: **$30,000**

We're going to get to work bringing the best case we can straight to the US Patent Office to invalidate the podcasting patent and stop the patent troll Personal Audio from doing more damage to online broadcasters. But the road ahead will be long, and this patent is not alone. It's clear that much more has to be done to fight stupid patents like this one and to stop patent trolls. Donate now to ensure EFF can continue to lead the charge against trolls and contribute to the growing movement to stop stupid patents.

EFF is a 501 (c) (3) nonprofit organization. Our tax ID number is 04-3091431. Your gift is tax deductible to the full extent provided by law, less the fair market value of any substantial gifts chosen at the time of your donation. To view our financial records, please visit Guidestar (https://www2.guidestar.org/organizations /04-3091431/electronic-frontier-foundation.aspx) or Charity Navigator (http://www.charitynavigator.org/index.cfm?bay=search.summary& orgid=7576).

**CHOOSE YOUR MEMBERSHIP GIFT**

☑ **No thanks, I don't want a gift.**

 **EFF Sticker Pack Premium**

 **Unplug Big Brother T-Shirt**

 **Dark Heather T-Shirt**

 **EFF 'SWAT' Hat Premium**





 



(https://www.eff.org/copyright)

**Thanks (https://www.eff.org/thanks)**

**Privacy Policy (https://www.eff.org/policy)**

**Copyright Policy (https://www.eff.org/copyright)**

**Contact EFF (https://www.eff.org/about/contact)**

# EXHIBIT 5

# ELECTRONIC FRONTIER FOUNDATION
## DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD   (/)

SEARCH

# Privacy Policy

The Electronic Frontier Foundation (EFF) is committed to protecting the privacy of visitors to our website, as well as our members and activists. EFF has established this Privacy Policy to explain what information we collect through our websites and how it is used.

In this policy, "EFF" refers to EFF staff, board members, cooperating attorneys, interns, volunteers, and consultants, all of whom are bound by law or contract to keep confidential information they receive as part of their assistance to EFF.

EFF does not sell or rent member, donor or website visitor information under any circumstances, and we do not share member, donor or visitor information without prior consent except as compelled by law. (See discussion below.)

# Information Gathered by EFF's Site

**Logging:** For visitors to our website, we generally log requests to our website through a program called cryptolog (https://www.eff.org/code/cryptolog) (cryptolog described further below) and do internal analytical logging (also described further below) for up to seven days from when the data was collected.

Circumstances in which EFF may need to log and retain technical information for longer than seven days include when we believe it is reasonably necessary for EFF's mission and functionality, including situations such as:

- site testing,
- diagnosis of technical problems,
- defending against attacks to the site,
- handling a spike in traffic or other abnormal, short-term circumstances, or
- research projects (in anonymized form) that serve our overall mission to defend freedom online.

In those and similar situations we will delete the information as soon as it is apparent that the information is no longer needed for the purpose for which it was retained. For more information on EFF's position on data logging and techniques we use to anonymize, obfuscate, aggregate and delete information, see our Best Practices for Online Service Providers (https://www.eff.org/wp/osp).

**How Cryptolog Works:** Cryptolog takes the IP address portion of the request getting logged and encrypts it, as well as a chunk of random data (the salt), using a cryptographic hash function. The salt changes every night, which should result in making it very difficult for us, or anyone else, to recover IP addresses from our logs.

**How EFF Internal Analytics Works:** EFF endeavors to gather sufficient information for analyzing our website and how visitors move within it without compromising the privacy of our visitors. EFF's internal analytical logging, which is separate from the Cryptolog logs, involves logging for up to seven days a single byte of the IP address, as well as the referrer page, time stamp, page requested, user agent, language header, website visited, and a hash of all of this

## Donate to EFF (https://supporters.eff.org/donate)

## Stay in Touch

SIGN UP NOW

## NSA Spying



**eff.org/nsa-spying (/nsa-spying)**

EFF is leading the fight against the NSA's illegal mass surveillance program. Learn more (/nsa-spying) about what the program is, how it works, and what you can do.

## Follow EFF

American sues Ethiopian Government for wiretapping with malware. EFF to court: illegal surveillance is illegal. https://eff.org/r.u55f (https://eff.org/r.u55f)
FEB 18 @ 11:14AM

AIDS deniers and televangelist videomakers used YouTube copyright takedown notices to silence dissenting views. https://eff.org/r.bzru (https://eff.org/r.bzru)
FEB 18 @ 9:56AM

EFF's @juliepsamuels talks patent trolls and podcasts on the most recent episode of the @AdamCarollaShow: https://eff.org/r.21pk (https://eff.org/r.21pk)
FEB 18 @ 9:35AM

Twitter (https://twitter.com/eff)

Case 3:14-cr-00025-BTC   Document 18-1   Filed 02/18/14   Page 21 of 196

information. After several weeks, we convert the logs to the country. That is, we geolocate IP addresses before anonymizing them and store only the country.

**Decentralized Observatory of HTTPS Everywhere:** If you enable the Decentralized Observatory feature of the downloaded browswer extension HTTPS Everywhere (https://www.eff.org/https-everywhere), we will collect, analyze and publish copies of the certificates of SSL/TLS servers that you connect to. These certificates generally do not identify you and we will take reasonable steps to try to avoid collecting specific certificates that may be used to identify you. In order to help locate man-in-the-middle attacks, the Decentralized Observatory may also log which ISP (https://secure.wikimedia.org/wikipedia/en/wiki/Autonomous_system_%28Internet%29) you observed the certificate through, although you can disable this behavior in the Observatory settings window.

**Cookies:** We do not use persistent ID cookies on this site. We use session cookies on certain portions of the website. Session cookies expire when you close your browser. You can use Tor (https://www.torproject.org/) if you wish to keep your connection information anonymous.

**Voluntarily Submitted Information:** In addition, EFF collects and retains information you voluntarily submit to us. It is up to you whether to submit information to us, and how much information to provide. If you choose to become an EFF member or otherwise donate to EFF, we ask for your name, email address, mailing address and phone number. For online donors and shoppers, we also ask for your credit card number. We also maintain records of our members' use of the Action Center. If you use the EFF Shop, you are asked to provide personal information, such as a shipping address, necessary to complete your transaction.

We may ask for additional personal information when you provide feedback or comments, or otherwise communicate with us. We are pleased to receive anonymous donations in the mail, but please note that your personal information is required if you choose to donate using our online form.

From time to time, we may ask for personal information on other portions of the site, such as asking you to sign a petition, participate in a contest, or provide prior art for a patent busting project.

**EFFector and other Mailing Lists:** If you choose to subscribe to EFFector, our free electronic newsletter or any of our other mailing lists, we collect your email address, and, if you choose to provide it, a zip or postal code.

# EFF's Use of Information

In general, EFF uses the information provided by you to further its mission, including to protect privacy, defend freedom and innovation, and to protect your rights in the digital world.

**Member and Donor Information:** We use member and donor information to process and manage your membership or contribution. If you opt in, we will use your email address to send you updates and alerts on protecting your rights in the digital world, so you may take action, such as contacting your representative in Congress or attending an event. If you choose to complete the "Please tell us why you became a member of EFF" field when donating, this information may be shared with the entire EFF staff and board, and select unattributed quotes may be used to promote our mission, such as including a relevant quote in a grant proposal.

**Invitees to EFF:** If you invite another person to join EFF or take action in one of our alerts, we will ask for that person's name and online contact information. We use this information to contact and, if necessary, remind that person that he or she has been invited to join EFF.

**Publication by EFF:** If you provide information for publication we may use your name and contact information you have provided to us to provide you with attribution.

**Other activities:** We may run surveys, contests, or similar activities through this site. Such information will be used for the purposes for which it was collected. We also look at technical information to diagnose problems with or consider improvements to our servers or related

Facebook (https://www.facebook.com/eff)

Identi.ca (https://identi.ca/eff)

## Projects

Bloggers' Rights (/bloggers)

Coders' Rights (/issues/coders)

Follow EFF (/social-networks)

Free Speech Weak Links (/free-speech-weak-link)

Global Chokepoints (https://globalchokepoints.org/)

HTTPS Everywhere (/https-everywhere)

Open Wireless Movement (https://openwireless.org)

Patent Busting (https://w2.eff.org/patent/)

Surveillance Self-Defense (https://ssd.eff.org)

Takedown Hall of Shame (/takedowns)

Teaching Copyright (http://www.teachingcopyright.org/)

Transparency Project (https://www.eff.org/issues/transparency)

Trolling Effects (https://trollingeffects.org)

Ways To Help (/helpout)

## Third-Party Service Providers to EFF

Portions of the eff.org site, including our individual action alert webpages, are operated by a third-party grassroots campaign service provider or providers. These service providers may place session cookies on your computer. EFF's service providers may also log standard technical information, such as the numerical Internet Protocol (IP) address of the computer you are using; the browser software you use and your operating system; the date and time you access our site; and the Internet address of the website from which you linked directly to our site. Our service providers may also store and organize the personal information collected through this site on our behalf.

EFF also uses a third-party credit card processor and hosting providers.

For all of EFF's service providers, hosting providers and credit card processors and any other providers we may use in the future, the information collected from EFF users remains under our control, and our agreement with each will require the information to be kept confidential and disclosed only to employees who require such access in the course of their assigned duties. EFF also requires all of our third-party service providers to notify EFF if they receive legal process seeking information about visitors to EFF's website.

EFF may change the specific third-party providers from time to time, and will transfer stored information to any new provider subject to similar restrictions and agreements. From time to time, EFF may work with third-party consultants or other service providers who may have access to personally identifiable information. In such cases, we will restrict their use of personally identifiable information in accordance with their assigned tasks.

EFF's site also provides links to a wide variety of third-party websites, including interactive links to sites like Twitter or mapping services. EFF is not responsible for, and does not have any control over, the privacy practices or the content of such third parties. We encourage users to read the privacy policies of any website visited via links from EFF's website.

We do occasionally allow our website to interact with other services, like social networking, mapping, and video hosting websites. It is our policy not to include third-party resources when users initially load our web pages, but we may dynamically include them later after giving the user a chance to opt-in. If you believe a third-party resource is automatically loading, please let us know so we can address it.

## Disclosure of Your Information

While EFF endeavors to provide the highest level of protection for your information, we may disclose personally identifiable information about you to third parties in limited circumstances, including: (1) with your consent; or (2) when we have a good faith belief it is required by law, such as pursuant to a subpoena or other judicial or administrative order.

If we are required by law to disclose the information that you have submitted, we will attempt to provide you with notice (unless we are prohibited) that a request for your information has been made in order to give you an opportunity to object to the disclosure. We will attempt to provide this notice by email, if you have given us an email address, or by postal mail if you have entered a postal address. If you do not challenge the disclosure request, we may be legally required to turn over your information.

In addition, we will independently object to requests for access to information about users of our site that we believe to be improper.

## Updating or Removing Your Information

You may choose to correct, update, or delete the membership information you have submitted to us by sending an email requesting changes to membership@eff.org. Furthermore, if we inadvertently collect more personal information than intended, we endeavor to delete the

extraneous information. Even once deleted, the information may continue to persist on backup media.

# Changes to Our Policies

EFF's Privacy Policy may change from time to time. However, any revised privacy policy will be consistent with EFF's mission. If we make any substantive changes to our policies, we will place notice in EFFector and post notice of changes on this page.

# Security

EFF employs industry standard security measures to protect the loss, misuse, and alteration of the information under our control. EFF has turned on HTTPS (https://en.wikipedia.org /wiki/HTTP_Secure) by default.

Although we make good faith efforts to store information collected by EFF in a secure operating environment, we cannot guarantee complete security. Information collected by EFF will be maintained for a length of time appropriate to our needs. However, we generally do not retain credit card information unless you choose to have us make automatic monthly withdrawals from your account for your donation.

*Updated July 24, 2012 to reflect: a) changing our logging practices and promises to reflect our use of analytics; b) include "research" as a basis for longer logging but on an anonymized basis; c) specifically mention situations in which our website interacts with third-party websites in ways that may allow the third party to gain information about visitors to EFF's website, d) allow for third-party hosting providers and e) eliminate the mention of specific service providers so that we do not need to update the page if we change providers but the policies remain the same, and f) specifically include both donors and website visitors as those whose information we do not sell or rent under any circumstances, or share without prior consent.*

### Previous Privacy Policies

- Feb 26 2007 – Jan 4 2009 (/policy/2007/02/26)
- Jan 5 2009 – Jan 25 2009 (/policy/2009/01/05)
- Jan 26 2009 – Jun 21 2011 (/policy/2009/01/26)
- Jun 22 2011 – Oct 18 2011 (/policy/2011/06/22)
- Oct 19 2011 – Jul 23 2012 (/policy/2011/10/19)

 (https://www.eff.org/copyright)

# EXHIBIT 6

**ELECTRONIC FRONTIER FOUNDATION**
DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD   (/)

SEARCH

# Subpoena Defense Resources

Were you recently notified by your ISP or blogging platform that you have been sued for copyright infringement for your online activity? Were you informed that your ISP would be providing your identity to the lawyers for the person or entity that has sued you shortly (usually within 30 days) unless you took action to stop this from happening by filing a motion to quash or to dismiss the case?If so, this page is to help you find counsel to assist you in sorting out your options.

Attorneys who are interested in joining this list should contact info@eff.org with the subject line "Subpoena Defense Attorney Addition."

*Please note that we do not screen or evaluate the attorneys on the Subpoena Defense Resources list. Each person contacting a lawyer from the list should make their own independent evaluation of whether the referred attorney is the right one for the particular case. In most states you can check with the State Bar website for the current status and record of lawyers in that state, but you should make your own judgment about which attorney is right for you.*

## What's going on?

A series of lawsuits have been filed across the U.S. against thousands of individuals accused of having illegally uploaded and downloaded movies in violation of copyright law. Some of these are independent films such as "The Hurt Locker" and some are for pornographic films.

The plaintiffs in the lawsuits have obtained IP addresses they allege are associated with infringement, and have received permission from the court to issue subpoenas to Internet Service Providers ("ISPs") to obtain the name and address of subscribers associated with those IP addresses.

## What Should I Do?

If you are a target, you probably have questions (http://news.cnet.com /8301-31001_3-20006528-261.html) about how to proceed and may wish to seek legal counsel. **Because individual cases are unique, EFF recommends that defendants contact an attorney in either the state where the lawsuit was filed or their home state for a consultation.** Because so many people need legal help, and usually on a very short time frame, the following attorneys have offered to assist those targeted to understand their options. Fees are negotiable on a case by case basis. These attorneys may, if necessary, file a motion to quash (http://legal-dictionary.thefreedictionary.com/quash) or otherwise intervene on behalf of subpoena targets who retain them as counsel. The attorneys on this list are not affiliated with the Electronic Frontier Foundation in any way and by offering their names EFF does not intend to give any individual endorsement of them.

If you wish to move to quash or dismiss, you (or your attorney) must file a motion with the court. Also be aware that contacting the court or the plaintiff's counsel yourself risks publicly exposing your identity, which would make the subpoena moot. Last, your ISP will not file for you, and simply sending a copy to your ISP is not enough to protect your identity. If possible, it is usually best to retain counsel to assist.

## General Resources

Donate to EFF (https://supporters.eff.org /donate)

**Stay in Touch**

SIGN UP NOW

**NSA Spying**


**eff.org/nsa-spying**
(/nsa-spying)
EFF is leading the fight against the NSA's illegal mass surveillance program. Learn more (/nsa-spying) about what the program is, how it works, and what you can do.

**Follow EFF**

American sues Ethiopian Government for wiretapping with malware. EFF to court: illegal surveillance is illegal. https://eff.org/r.u55f (https://eff.org/r.u55f)
FEB 18 @ 11:14AM

AIDS deniers and televangelist videomakers used YouTube copyright takedown notices to silence dissenting views. https://eff.org/r.bzru (https://eff.org/r.bzru)
FEB 18 @ 9:56AM

EFF's @juliepsamuels talks patent trolls and podcasts on the most recent episode of the @AdamCarollaShow: https://eff.org/r.21pk (https://eff.org/r.21pk)
FEB 18 @ 9:35AM

Twitter (https://twitter.com/eff)

- Frequently Asked Questions for Subpoena Targets (http://www.eff.org/issues /frequently-asked-questions-subpoena-targets)

- Parental Liability for Copyright Infringement by Minor Children (http://www.eff.org /IP/P2P/Parent_Liability_Nov_2005.pdf): A memo helping parents figure out whether they have legal liability when the filesharing is done by their children.

- Memo Re Discharge of Copyright Judgments in Bankruptcy (http://www.eff.org/IP/P2P /RIAA_v_ThePeople/P2P_bktcy_memo.pdf): A memo discussing the possibility of filing bankruptcy in response to a filesharing lawsuit.

- Court-Directed Notice (http://www.eff.org/files/filenode /uscg/40-2%20Exhibit%201.pdf)

# Attorneys offering assistance

## Alaska

- Ben Justus brj@lybeckmurphy.com
- Lory Lybeck lrl@lybeckmurphy.com

## Arizona

- Aaron Kelly aaron@aaronkellylaw.com
- White Berberian PLC sberberian@wbazlaw.com

## California

- Brian Corber corberlaw@aol.com
- Curt Edmondson jcedmondson@edmolaw.com
- Andrew K. Jacobson andrew@bayoaklaw.com
- Stewart Kellar stewart@etrny.com
- David H. Madden dhm@mersenne.com
- Art Neill support@newmediarights.org
- Thomas A. Pedreira tap@lybelderckmurphy.com
- Morgan E. Pietz mpietz@pietzlawfirm.com
- Jack C. Praetzellis jack@mbvlaw.com
- Danny J. Simon danny@lslawpl.com
- Will Skinner will@skinneresq.com
- Steven Yuen syuen@krolaw.com
- Brandon Wiebe wiebe@gamallp.com
- Andrew Winghart drew@WinghartLaw.com

## Colorado

- Matthew B. Aguero maguero@aguerolawpc.com
- Jeffrey Antonelli jeffrey@antonelli-Law.com
- John A. Arsenault john.arsenault@frontrangelegalservices.com
- Lara L. Griffith lara@nouveaulaw.com
- David Kerr dkerr@idea-asset.com
- Charles Mudd cmudd@muddlawoffices.com
- Christina Saunders christina@nouveaulaw.com

## Connecticut

- Christopher M. Hennessey chennessey@cohenkinne.com
- Charles Mudd cmudd@muddlawoffices.com

## Projects

Bloggers' Rights (/bloggers)

Coders' Rights (/issues /coders)

Follow EFF (/social-networks)

Free Speech Weak Links (/free-speech-weak-link)

Global Chokepoints (https://globalchokepoints.org/)

HTTPS Everywhere (/https-everywhere)

Open Wireless Movement (https://openwireless.org)

Patent Busting (https://w2.eff.org/patent/)

Surveillance Self-Defense (https://ssd.eff.org)

Takedown Hall of Shame (/takedowns)

Teaching Copyright (http://www.teachingcopyright.org/)

Transparency Project (https://www.eff.org/issues /transparency)

Trolling Effects (https://trollingeffects.org)

Ways To Help (/helpout)

## Delaware

- John P. Deckers john@johndeckerslaw.com
- Aman K. Sharma k.aman.sharma@gmail.com

## Florida

- Cynthia Conlin cynthiaconlin@cynthiaconlin.com
- Kubs Lalchandani kubs@lslawpl.com
- Carlos A. Leyva cleyva@digitalbusinesslawgroup.com
- David Magana dmagana@addmg.com
- Jeffrey P. Manners lawmanners@aol.com
- Bradford Patrick bap@baplegal.com
- Danny J. Simon danny@lslawpl.com
- Graham Syfert graham@syfert.com
- David Tamaroff david@tamarofflaw.com
- Richard M. Viscasillas rmvpa007@gmail.com
- William R. Wohlsifer william@wohlsifer.com
- Katharine H. Ballingrud khballin@gmail.com

## Georgia

- Blair Chintella bchintel1@gmail.com
- Jay Fisher jumpfish@yahoo.com
- Yasha Heidari yasha@heidariplank.com
- Graham Syfert graham@syfert.com

## Idaho

- John Chandler Meline john@melinelegal.com

## Illinois

- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Edward Bi ebi@sherinianlaw.net
- Andrew Cook acook@saperlaw.com
- Adam J. Gratch gratchlaw@gmail.com
- David Gulbransen david@gulbransenlaw.com
- Chris McElwain chris@saperlaw.com
- William J. Mills billy@firmequity.com
- Charles Mudd cmudd@muddlawoffices.com
- Jonathan LA Phillips jphillips@skplawyers.com
- Michelle Rozovics mrozovics@rozovicslaw.com
- Erin Russell erin@russellfirmchicago.com
- Kevin A. Thompson kthompson@davismcgrath.com
- David Valentine-Elam david@artandtechlaw.com
- Raymond G. Wigell, ndietsch@waaltd.com
- Scott Zambo ScottZambo@kelleykelleykelley.com

## Indiana

- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Kenan Farrell kfarrell@klflegal.com

- Brian Kelly bkelly@panitchlaw.com
- David Lynch dplynch@gmail.com
- Charles Mudd cmudd@muddlawoffices.com
- Paul Overhauser poverhauser@overhauser.com
- William Wilson wilson@aaklaw.com

## Louisiana

- Ryan Goudelocke ryan@dmsfirm.com
- Mark N. Melasky mmelasky@koeppeltraylor.com

## Maryland

- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Christina N. Boffen cboffen@gmail.com
- David A. Burkhouse dburkhouse@hpklegal.com
- Denese Dominguez denesedominguez@gmail.com
- David S. Harvis dharvis@hpklegal.com
- Michael Kushnir mkatlaw@gmail.com
- Kimberly McLean kmayolawub@aol.com
- Tuna Mecit tmecit@gmail.com
- Eric Menhart eric.menhart@cyberlaw.pro
- Shane Nikalao shane@alanlegum.com

## Massachusetts

- Christopher M. Hennessey chennessey@cohenkinne.com
- Eric Menhart eric.menhart@cyberlaw.pro
- Edward Molari edward@molarilaw.com
- Mark Pogue mpogue@eapdlaw.com
- Kevin O'Leary koleary@coughlinbetke.com
- Jason Sweet jsweet@boothsweet.com
- Evan Fray-Witzer evan@cfwlegal.com

## Michigan

- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Steve Glista steve@rationallaw.com
- Eric Grimm ecgrimm@williamshugheslaw.com
- Raymond Harris raymond@raymondaharris.com
- John T. Hermann hermannlawoffices@comcast.net

## Minnesota

- Paul Godfread paul@godfreadlaw.com
- Aaron Hall ahall@TwinCitiesFirm.com
- Chris K. Sandberg cksandberg@locklaw.com
- Mark Santi ms@TwinCitiesFirm.com

## Mississippi

- Stephen P. Ryan subpoenadefense@koeppeltraylor.com

## Missouri

- Eric F. Kayira eric.kayira@kayiralaw.com

- Richard Stevens rstevens14shoc80025-RS   Document8-1   Filed02/18/14   Page29 of 196

## Nevada

- Christina DiEdoardo christina@diedoardolaw.com

## New Hampshire

- Christopher M. Hennessey chennessey@cohenkinne.com
- Jeffrey Techentin jtechentin@apslaw.com
- Evan Fray-Witzer Evan@cfwlegal.com

## New Jersey

- Jonathan Cohen jzcohen@gmail.com
- Leslie A. Farber lfarber@lfarberlaw.com
- Jeffrey C. Neu info@jeffreyneu.com
- Maurice N. Ross mross@bartonesq.com
- Aman K. Sharma k.aman.sharma@gmail.com
- David Wisniewski dwisniewski@me.com

## New York

- Jonathan Askin jonathan.askin@brooklaw.edu
- Ray Beckerman ray@beckermanlegal.com
- Matthew John Burnham attorney@matthewburnham.com
- Robert Cashman rzcashman@gmail.com
- Tudor F. Capusan info@tudorlawfirm.com
- Brian Corber corberlaw@aol.com
- James Gross jgross11@aol.com
- Christopher M. Hennessey chennessey@cohenkinne.com
- Kubs Lalchandani kubs@lslawpl.com
- David D. Lin david@iLawco.com
- Dani Manor danimanor@gmail.com
- Jeffrey C. Neu info@jeffreyneu.com
- Morlan Ty Rogers mtrogers@beckermanlegal.com
- Maurice N. Ross mross@bartonesq.com
- Paul Siepmann pksesq@yahoo.com
- Kelly Talcott kdtlaw@gmail.com

## North Carolina

- Stephen Robertson srobertson@robertsonmedlin.com

## North Dakota

- Joel Fremstad joel@fremstadlaw.com

## Ohio

- David Valentine-Elam david@artandtechlaw.com
- Kubs Lalchandani kubs@lslawpl.com
- Melissa Brabender mbrabender@antonelli-law.com

## Oregon

- Steve Glista steve@rationallaw.com

- Alex Golubitsky alex@jmbm.com Case3:14-mc-80025-RS    Document8-1    Filed02/18/14    Page30 of 196
- Scott Jerger scott@fieldjerger.com
- Ben Justus brj@lybeckmurphy.com
- Lory Lybeck lrl@lybeckmurphy.com
- David H. Madden dhm@mersenne.com
- Rick McLeod richard.mcleod@klarquist.com
- Eric Norman ean@lybeckmurphy.com
- Lake Perriguey lake@law-works.com

## Pennsylvania

- Johnathan Cohan jzcohen@gmail.com
- Leonard J. French ljfrench@leonardjfrench.com
- Jeffrey C. Neu info@jeffreyneu.com
- Steven O'Donnell sodonnell@3cpatents.com
- Charles Thomas ct@thomastrials.com
- Aman Sharma asharma@mwm-law.com
- David Wisniewski dwisniewski@me.com

## Rhode Island

- Neville Bedford nevillebedford@gmail.com
- Mark Pogue mpogue@eapdlaw.com

## Tennessee

- Wilson C. von Kessler, II wvonkessler@markelmajor.com
- Stephen J. Zralek szralek@bonelaw.com

## Texas

- Robert Cashman rzcashman@gmail.com
- W. Scarth Clark subpoenadefense@koeppeltraylor.com
- Eric Grimm ecgrimm@williamshugheslaw.com
- Max Harger max@hargerlawoffice.com
- William Lovin wlovin@williamlovin.com
- John Chandler Meline john@melinelegal.com
- Charles Mudd cmudd@muddlawoffices.com
- Warren V. Norred wnorred@norredlaw.com
- Dan Tamaroff dan@tamarofflaw.com

## Utah

- Seth W. Black sblack@wnlaw.com
- Charles Mudd cmudd@muddlawoffices.com
- Christina Saunders christina@nouveaulaw.com

## Virginia

- Dirk McClanahan dmcclanahan@mcplegal.com
- Robert Powers rpowers@mcplegal.com

## Washington

- Ben Justus brj@lybeckmurphy.com
- Lory Lybeck lrl@lybeckmurphy.com

Case3:14-mc-80025-RS   Document8-1   Filed02/18/14   Page31 of 196

- Gary K. Marshall gary@gkmarshall.com
- Mike Matesky mike@mateskylaw.com
- Rick McLeod richard.mcleod@klarquist.com
- John Chandler Meline john@melinelegal.com
- Eric Norman ean@lybeckmurphy.com
- Bradford Patrick bap@baplegal.com

## Washington D.C.

- Elliott Alderman thecontentlawyer@verizon.net
- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Lisa Dunner ldunner@dunnerlaw.com
- Eric Grimm ecgrimm@williamshugheslaw.com
- David Kerr dkerr@idea-asset.com
- Lory Lybeck lrl@lybeckmurphy.com
- Kimberly McLean kmayolawub@aol.com
- Eric Menhart eric.menhart@cyberlaw.pro
- Tuna Mecit tmecit@gmail.com
- Robert Powers rpowers@mcplegal.com
- William R. Wohlsifer william@wohlsifer.com

## West Virginia

- Richard Smith rich@richsmithlaw.com

## Wisconsin

- Jeffrey Antonelli jeffrey@antonelli-Law.com
- Michelle Rozovics mrozovics@rozovicslaw.com
- Erin Russell erin@russellfirmchicago.com

 (https://www.eff.org/copyright)

# EXHIBIT 7

繁體中文 | 简体中文 | 日本語 | ESPAÑOL | MOBILE SITE

Home    About NaturalNews    Contact Us    Write for NaturalNews    Media Info    Advertise with Natural News



## NATURAL NEWS
### Natural Health News & Scientific Discoveries

ARTICLES | BLOGS | BUZZ | REFERENCE | SCIENCE | REPORTS | VIDEOS | RADIO | PODCASTS | INFOGRAPHICS | CARTOONS | MUSIC | LIBRARY | RSS | STORE

SEARCH



# Electronic Frontier Foundation does battle with insidious patent troll who claims to 'own' all podcasting technology

Sunday, November 03, 2013 by: Jonathan Benson, staff writer
Tags: *patent trolls, podcasting, EFF*

Garcinia Cambogia Warning  We Tried Them All. Here's The Only One We Recommend.  consumersguides.com

Cheap Non-GMO Food Supply Shocking video reveals sneaky trick to getting non-gmo food super cheap  www.crisiseducation.com

Cure Your Prostatitis  I Guarantee You A Better Outcome Free Report On Holistic Cures  cure-prostate.com

Raw Vegan Foods  Experts Teach Raw Food Nutrition. Sample Free Class Now & Learn More!  integrativenutrition.com/RawFood

27    127    5    3
      Tweet    g+1    Save

Print this Article    Email to a Friend    Share





# The 4 BEST foods to eat before bed
## (for a flatter belly)

Click Here to see which food fuels your metabolism, to burn fat while you sleep.

(NaturalNews) They are colloquially known as "patent trolls," or entities that file patents specifically to leverage them rather than actually use them, and a major public advocacy group has decided to take one of these trolls on in court. The *Electronic Frontier Foundation* (EFF), which works to protect online privacy rights, recently filed a petition to stop one particular patent troll that claims to "own" all podcasting technology, and that repeatedly demands royalty fees from people and groups that create and release podcasts online.

Filed under U.S. Patent No. 8,112,504, the "podcasting patent" in question is claimed to be owned by a group called Personal Audio, LLC, which back in January began suing podcasters left and right. Comedian Adam Carolla, for example, as well as several major television networks all received notices from Personal Audio demanding licensing fees for their use of podcast technology. According to EFF, Personal Audio does not actually create or use podcasting technology itself, but rather selectively "trolls" for royalties from entities that do.

After getting word of this activity by Personal Audio, EFF launched a fundraising campaign called "Save Podcasting" that, like its name implies, aimed to stop Personal Audio from leveraging its patent against others that use podcasting technology. According to reports, EFF raised more than twice what it expected as part of the campaign, more than $76,000, which will be used to pay the fees and costs associated with its petition.

With the help of the Cyberlaw Clinic at the *Harvard University* Berkman Center for Internet and Society, as well as a number of pro bono attorneys supportive of the cause, EFF is now fully prepared to take on Personal Audio and defend the cause of open-source, free-use podcasting for information dissemination.

## Podcasting existed years before Personal Audio filed patent, says EFF

A major argument in the EFF petition contends that podcasting was not even invented by Personal Audio. Information gathered by EFF's many supporters and allies reveals that both CNN and the Canadian Broadcasting Corporation (CBC) were creating and distributing podcasts years before Personal Audio filed its patent. Internet pioneer Carl Malamud had also been distributing his "Geek of the Week" podcast prior to the patent's existence.

"As we show in our petition, Personal Audio is not the true inventor of this technology," says EFF Staff Attorney Daniel Nazer. "If you look into the history of podcasting, you won't see anything about Personal Audio."

EFF's ultimate goal with the petition is to reform the patent system and end the practice of trolling, which it says defies the spirit and intent of what the patent system was supposed to represent. Rather than encourage innovation, patent trolling makes it more difficult for the public to utilize new technologies and ideas, stifling progress and thwarting ingenuity.

"Bad patents like this one slow down innovation -- exactly the opposite of what the patent system was




### Most Popular

Today | Week | Month | Year

- Why pot should be decriminalized but never smoked: question your beliefs starting now
- Canola oil: The
- Like that skim milk? You're essentially drinking pig slop
- Studies show that cooking causes lung cancer
- Understanding the misdirection of food labels
- Nascent iodine tinctures found remarkably clean of heavy metals: Health Ranger laboratory analysis published
- BMJ investigation exposes Big Pharma as conspirator in WHO pandemic flu scam
- How drinking coffee can give you a long, healthy life
- Toxic heavy metals in lipsticks threaten health of women and unborn babies
- Study shows inactivity changes the brain, has harmful health consequences
- Mammograms are more harmful than you think
- Thermograms - a safe, accurate and reliable alternative to mammograms

See all Top Headlines...

Advertise with NaturalNews...

Support NaturalNews Sponsors:













intended to do," adds EFF Senior Staff Attorney Julie Samuels, the Mark Cuban Chair to Eliminate Stupid Patents. "We are thrilled to challenge this bad patent and make the world safer for creators and podcasters."

You can view the full EFF petition against Personal Audio's patent here:
https://www.eff.org/document/podcasting-petition-inter-partes-review

You can also learn more about EFF's long-term patent reform goals, which include protecting "infringers" against liability when they independently arrive at patented inventions, by checking out the group's *Defend Innovation* project:
https://defendinnovation.org/

**Sources for this article include:**

www.eff.org

https://www.eff.org/document/podcasting-petition-inter-partes-review

https://defendinnovation.org/

 **Stay informed! FREE subscription to the Health Ranger's email newsletter**

Get breaking news alerts on GMOs, fluoride, superfoods, natural cures and more...

Enter your email address here...    [ SUBSCRIBE ]

Join over four million monthly readers. Email privacy 100% protected. Unsubscribe at any time.

## MORE ARTICLES AND OFFERS

ADVERTISEMENT


How penny stocks make millionaires every day...


Time is running out to apply for Texas program to eliminate your Credit Card Debt.


2013: The Best Sunless Tanners: You Won't Believe The Results


Discover Your Risk of a Heart Attack in Just Minutes. Take Dr. Crandall's Free Online Heart Test!


Surprisingly simple solution to help your joints. See why these ingredients are flying off shelves


FEMA is scared that people will hoard the #1 MOST critical item in a crisis. [VIDEO]


Shocking! Here's What Happened When We Tested The Top Probiotics


Candida is a fungus that's been associated with cancer. Can candida be cleansed from your system?

### Articles Related to This Article:

• Monsanto attempts to claim patent ownership of pigs

• Sanity prevails: US Supreme Court rules that human genes are not eligible for patent protection

• European Patent Office grants Monsanto patent on natural broccoli seeds, florets

• Monsanto now overriding natural law by attempting to patent multiple common vegetables, fruits

• Will US Patent Office end gene patent enslavement of the human race?

• Angelina Jolie, corporate patents on genes, and the U.S. Supreme Court

### Related video from NaturalNews.TV

**Mountain Dew can dissolve a mouse, says PepsiCo lawyers**



*Your NaturalNews.TV video could be here.*
*Upload your own videos at NaturalNews.TV (FREE)*

**GOT A NEWS TIP FOR NATURALNEWS?**
Send us your news tip, and we'll investigate!

[ Click here to submit a news tip to NaturalNews ]

**Have comments on this article? Post them here:**


Health Ranger Approved

Clean Chlorella™

With virtually zero levels of metals, pesticides and other pollutants, our chlorella is laboratory verified as the cleanest and most pure source of chlorella on the planet.




ORDER NOW

Exclusively at ShopNaturalNews.com


FREE WEBCASTS
NATURALNEWS TALK HOUR
REVERSE DISEASE NATURALLY

GET SHOW DETAILS + A FREE GIFT

[ ] YES! Send Me Show Details


INNER CIRCLE
CURRENT EVENTS

CANCER THERAPY
IV VITAMIN C
with Ronald Hunninghake, M.D.

DETOX SOLUTIONS
with Dr. Edward Group

HORMONE BALANCING
with Moshe Dekel, M.D.


SUBSCRIBE TODAY

Now Available at
ShopNaturalNews.com


**O3 Essentials OraJuvenate™**
A powerful, cleansing dental cream for maximum oral/dental health.


**New Cancer Solutions**
Over 3 hours of content covering today's best cancer tests, how to kill cancer cells and the best diets and exercise routines.


**Freeze-Dried 100% Organic Whole Corn**
Our freeze-drying method preserves taste, texture and nutrients better than any other food preservation method ever invented.

 
 
 
 
 

## Most Popular Stories

TED aligns with Monsanto, halting any talks about GMOs, 'food as medicine' or natural healing — 117K

Naked Juice class action settlement announced: Here's how to claim $45 from PepsiCo even without proof of purchase — 83K

Breaking: Courts discreetly confirm MMR vaccine causes autism — 76K

Warning: Enrolling in Obamacare allows government to leak your IP address with your name, social security number, bank accounts and web surfing habits — 52K

USDA to allow U.S. to be overrun with contaminated chicken from China — 40K

Vaccine fraud exposed: Measles and mumps making a huge comeback because vaccines are designed to fail, say Merck virologists — 38K

Patent confirms that aspartame is the excrement of GM bacteria — 37K

Hedge funds, insider traders begin dumping Monsanto stock as reality of GMOs sinks in across Wall Street — 36K

New USDA rule allows hidden feces, pus, bacteria and bleach in conventional poultry — 34K

People who grow their own food labeled 'extremist' by — 34K

**4 Comments** Natural News

Login

Sort by Newest                                                                    Share ⚐ Favorite ★

Join the discussion…

**dbhalling** • 4 months ago

Notice the intellectual slight of hand on the part of EFF. The patent does not purport to cover all podcasting, just some aspect of podcasting. Thus it is irrelevant if podcasting was created years earlier.

The real question is why the EFF and other think they should be able to steal other people's inventions and why they did not do a simple clearance search before using the technology. You would not build a house without doing a title search on the land, the same applies for technology.

> • Reply • Share ›

**UniquenessTemplate** → dbhalling • 3 months ago

Oh, please. The patent in question involves the use of a playlist. Yeah, Personal Audio LLC (which, by the way, has never sold any products or services which utilize any of the patents it owns) was the first to come up with the non-obvious idea of using a playlist in a podcast. In 2009. *rolls eyes*

> • Reply • Share ›

**Dark Eagle** • 4 months ago

At least someone has the interests of the People at heart and are standing up for those who can't defend themselves against corporate, copyright, and patent abuses. God Bless the EFF! With powerful organizations such as these, the days of patent and copyright trolls are indeed numbered.

5   • Reply • Share ›

**Guest** • 4 months ago

Well, you see. Lawyers are really not in the habit of arguing the merits of pending lawsuits on NN.

Thank goodness!

> • Reply • Share ›

ALSO ON NATURAL NEWS                                                         WHAT'S THIS?

**Canola oil: The #1 hidden health 'danger' at the prepared food bar**

70 comments • 2 days ago

Avatar Raven Locks — I now read EVERY ingredient at food bars. As a tip for everyone...Whole Foods' ingredients …

**Marijuana can help decrease the spread of HIV in patients**

2 comments • 13 hours ago

Avatar goodfite — I thought this was going to be about a marijuana based personal lubricant. Lol

**Toxic heavy metals in lipsticks threaten health of women and unborn babies**

3 comments • 13 hours ago

Avatar Skyglider — I think that a lot of men should be more careful where they are putting their mouth. Lipstick should be …

**Grocery Manufacturers Association sues the state of Washington over …**

11 comments • 2 days ago

Avatar Anchor — Oh people will still demand labeling, regardless what the GMA petitions anyone to do about it. The …

✉ Subscribe   Add Disqus to your site

**Related Articles:**

• Monsanto attempts to claim patent ownership of pigs

• Sanity prevails: US Supreme Court rules that human genes are not eligible for patent protection

• European Patent Office grants Monsanto patent on natural broccoli seeds, florets

• Monsanto now overriding natural law by attempting to patent multiple common vegetables, fruits

• Will US Patent Office end gene patent enslavement of the human race?

**Take Action: Support NaturalNews.com**

✉ Email this article to a friend

Permalink to this article:
http://www.naturalnews.com
/042766_patent_trolls_podcasting_EF
F.html

Reprinting this article: Non-commercial use OK, cite NaturalNews.com with clickable link.

Embed article link: (copy HTML code below):

<a href =
"http://www.naturalnews.com
/042766_patent_trolls_podcasting_EF

**Fenix TK35 Flashlight**
Tough, waterproof, extremely bright and it's touted to throw an 800+ lumen beam more than 1,000 feet into the night.

**Inca Treasure Smoothie Pack**
This pack of our four most popular superfoods from South America is the perfect combo pack for smoothie lovers.

**Pink Himalayan Salt**
This salt delivers significant levels of magnesium, zinc and selenium, with trace levels of dozens of other elements.

**Pinhole Glasses - Aviator Style**
Pinhole glasses are becoming famous for helping people improve their vision without the risks of laser surgery.

**Oxy-Rich Facial Serum**
O3 Essentials Jojoba Oxy-Rich Facial Serum is cellular nourishment for your skin. Helps smooth fine lines while enhancing tissue elasticity.

**Freeze-Dried 100% Blackberry Halves**
Our freeze-dried blackberry halves are grown in Serbia under strict organic standards.

Also on NaturalNews:

• Health Ranger Videos
• Activist music
• CounterThink Cartoons
• Food documentaries
• FREE Special Reports
• Podcasts

Dept. of Defense

10 outrageous (but true) facts about vaccines the CDC and the vaccine industry don't want you to know                    31K

EBT card food stamp stealing scandal Wal-Mart stores, stealing carts full of food during federal computer glitch          30K

**25 Amazing Facts About Food**
This FREE downloadable report unveils a collection of astonishing and little-known facts about the food we eat very day. Click here to read it now...

**Resveratrol and its Effects on Human Health and Longevity - Myth or Miracle.**
Unlock the secrets of cellular health with the "miracle" nutrient Resveratrol Click here to read it now...

**Nutrition Can Save America**
FREE online report shows how we can save America through a nutrition health care revolution. "Eating healthy is patriotic!" Click here to read it now...

**The Healing Power of Sunlight and Vitamin D**
In this exclusive interview, Dr. Michael Holick reveals fascinating facts about how vitamin D is created and used in the human body to ward off chronic diseases like cancer, osteoporosis, mental disorders and more. Click here to read it now...

**Vaccines: Get the Full Story**
The International Medical Council on Vaccination has released, exclusively through NaturalNews.com, a groundbreaking document containing the signatures of physicians, brain surgeons and professors, all of whom have signed on to a document stating that vaccines pose a significant risk of harm to the health of children. Click here to read it now...

**Health Ranger Storable Organics**
GMO-free, chemical-free foods and superfoods for long-term storage and preparedness. See selection at www.StorableOrganics.com

Case3:14-mc-80025-RS   Document8-1   Filed02/18/14   Page36 of 196

• Angelina Jolie, corporate patents on genes, and the U.S. Supreme Court

**Recommended Resources On:**

Natural News trends
Health Ranger news
Natural News GMOs
Mike Adams tracker
Natural News photos
Natural News Global
Natural News in focus
Natural News connect
Natural News shocking stories
Natural News radar
GMOs
Quackwatch
Vaccines
Health freedom
Dr. Paul Offit

This site is part of the Natural News Network © 2013 All Rights Reserved. Privacy | Terms All content posted on this site is commentary or opinion and is protected under Free Speech. Truth Publishing International, LTD. is not responsible for content written by contributing authors. The information on this site is provided for educational and entertainment purposes only. It is not intended as a substitute for professional advice of any kind. Truth Publishing assumes no responsibility for the use or misuse of this material. Your use of this website indicates your agreement to these terms and those published here. All trademarks, registered trademarks and servicemarks mentioned on this site are the property of their respective owners.



# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| _____ ) | |
| PERSONAL AUDIO, LLC, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. 2:13-cv-00013-JRG-RSP |
| ) | |
| TOGI ENTERTAINMENT, INC., ) | <u>LEAD CASE</u> |
| ) | |
| *Defendant.* ) | |
| _____ ) | |
| ) | |
| PERSONAL AUDIO, LLC, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. 2:13-cv-00270-JRG-RSP |
| ) | Jury Trial Demanded |
| CBS CORPORATION, ) | |
| ) | |
| *Defendant.* ) | |
| _____ ) | |
| ) | |
| PERSONAL AUDIO, LLC, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. 2:13-cv-00271-JRG-RSP |
| ) | Jury Trial Demanded |
| NBCUNIVERSAL MEDIA, LLC, ) | |
| ) | |
| *Defendant.* ) | |
| _____ ) | |

|  | ) |  |
| --- | --- | --- |
| PERSONAL AUDIO, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13-cv-00015-JRG-RSP |
| | ) | Jury Trial Demanded |
| HOWSTUFFWORKS.COM, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## DEFENDANTS' INVALIDITY CONTENTIONS

## I.    INTRODUCTION

Pursuant to Rule 3-3 of the Local Patent Rules ("P.R.") of the Eastern District of Texas, defendants CBS Corporation, NBCUniversal Media, LLC, Togi Entertainment, Inc., and Howstuffworks.com (collectively "Defendants") hereby provide their joint Invalidity Contentions with respect to the claims identified by plaintiff Personal Audio, LLC ("Plaintiff") in its infringement contentions.  The asserted claims are claims 31-34 of U.S. Patent No. 8,112,504 ("the '504 patent" or "the patent-in-suit") (collectively referred to as the "asserted claims").

With respect to each asserted claim and based on their investigation to date, Defendants hereby:  (a) identify each currently known item of prior art that either anticipates or renders obvious an asserted claim; (b) submit charts identifying where each element in each asserted claim is disclosed, described, or taught in the prior art; and (c) identify the grounds for invalidating asserted claims based on indefiniteness under 35 U.S.C. § 112 ¶ 2 or enablement or written description under 35 U.S.C. § 112 ¶ 1.

In addition, pursuant to P.R. 3-4 (b) and based on their investigation to date, Defendants hereby produce or make available for inspection documents currently in their respective possession, custody, or control required to accompany these Invalidity Contentions.

| Owner/Inventor | System | Publication/Use/ Invention/Offer for Sale Date | Herein Referenced As |
|---|---|---|---|
| Woodrow Wilson International Center for Scholars | Dialogue | Prior to Oct. 1996 | Dialogue |
| C. Malamud | Geek of the Week | Prior to Oct. 1996 | Geek |
| NASA | Space Story | Prior to Oct. 1996 | NASA |
| National Press Club | National Press Club Luncheons | Prior to Oct. 1996 | Club |
| D. Roy | NewsComm System | Prior to Oct. 1996 | Roy |
| Compuserve | Compuserve Music Hall | Prior to Oct. 1996 | Roy |

B.      **Disclosure of Invalidity Due to Anticipation**

Prior art references anticipating or rendering obvious some or all of the asserted claims are listed in the tables below.  The tables identify the claim anticipated or rendered obvious by each reference and the chart that identifies specific examples of where each limitation of the anticipated claims is found in that reference.

The art cited in Exhibit A and Exhibit B is illustrative and not exhaustive.  Further, these claim charts provide illustrative citations to where each element may be found in the prior art references.  The cited references may contain other disclosures of each claim element as well, and Defendants reserve the right to argue any claim elements of the asserted claims are disclosed in non-cited portions of these references.

patent.  The asserted claims of the '504 patent are not entitled to the benefit of U.S. Patent Application Nos. 09/782,546 and 08/724,813 because these applications do not satisfy the written description and enablement requirements of 35 U.S.C. § 112, ¶ 1 with respect to the asserted claims.  See 35 U.S.C. § 120.

## V.  P.R. 3-4 DOCUMENT PRODUCTION

### A.  Documents Related to Accused Instrumentalities Under P.R. 3-4(a)

Based on their investigations to date, Defendants will produce or make available for inspection documents pursuant to P.R. 3-4(a), which directs the production of "[s]ource code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its P.R. 3-1(c) chart."

### B.  Documents Related to Prior Art Under P.R. 3-4(b)

A copy of each item of prior art identified pursuant to P. R. 3-3(a) which does not appear in the file history of the '504 patent and which are within a Defendant's possession, custody, or control are available for inspection and copying upon reasonable request from Rothwell, Figg, Ernst, & Manbeck, P.C., counsel for NBCUniversal Media, LLC and CBS Corporation.


DATED:  October 10, 2013              Respectfully submitted,

                                      */s/ Brian S. Rosenbloom*
                                      Steven Lieberman
                                      Brian S. Rosenbloom
                                      Sharon L. Davis
                                      Jennifer Maisel
                                      ROTHWELL, FIGG, ERNST & MANBECK, P.C.
                                      607 14th Street, N.W.
                                      Suite 800
                                      Washington, DC 20005
                                      Telephone:  (202) 783-6040
                                      Facsimile:  (202) 783-6031

                                      **Attorneys for Defendants, CBS Corporation and NBCUniversal Media, LLC**

*/s/ Josh Krevitt (with permission)*

Josh Krevitt
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Jason Lo
Raymond LaMagna
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile:   (213) 229-7520

**Attorneys for Defendant Howstuffworks.com**

*/s/ Bill Frizzell (with permission)*

Bill Frizzell
Frizzell Law Firm
6653 Oak Hill Blvd
Tyler, TX 75703
903/595-1921
Fax: 9035954383
Email: bfrizzell@tyler.net

**Attorney for Defendant Togi Entertainment, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that all known counsel of record are being served with a copy of this document by electronic mail.

October 10, 2013                    */s/Brian Rosenbloom*
                                   Brian Rosenbloom

# EXHIBIT A

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

## EXHIBIT A: PRIOR ART ANTICIPATING ONE OR MORE CLAIMS OF THE '504 PATENT

### Chart A-1: Surfpunk[1]

Invalidity Claim Chart demonstrating that claims 31-34 of U.S. Patent No. 8,112,504 are anticipated by Surfpunk, BUBBLES: talk radio; A New Age; Clipper Chip, SURFPUNK Technical Journal No. 80 (surfpunk@osc.versant.com) <surfpunk-0080@SURFPUNK.Technical.Journal>, Apr. 23, 1993 ("Surfpunk")[2]

| Claims 31-34 of the '504 Patent | Surfpunk |
| --- | --- |
| **31**. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | Surfpunk discloses an apparatus for disseminating a series of episodes represented by audio files (e.g., ".au" files) via the Internet as the episodes become available.<br><br>For example, Surfpunk discloses a web page (i.e., a web page created from the "radio/radio.html" HTML document available from the www.ncsa.uiuc.edu web server) that provides a list of available "editions" of "Internet Talk Radio."  The web page is reproduced below in Exhibit 1.<br><br>The editions of Internet Talk Radio ("ITR") are represented by digital audio files in the .au audio file format. (pp. 2-3). |
| [1] one or more data storage servers, | Surfpunk discloses one or more data storage servers.<br><br>For instance, Surfpunk discloses storing the digital audio files such that the files are accessible to the www.ncsa.uiuc.edu server.  For example, Surfpunk discloses that the audio file named |

[1] Defendants reserve the right to revise their ultimate contentions concerning the invalidity of the asserted claims, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority date of the asserted claims, and/or positions that Plaintiff or its expert witness(es) may take concerning claim interpretation, construction, infringement, and/or invalidity issues.

[2] Archived copies of Surfpunk can obtained from:
1) www.textfiles.com/magazines/SURFPUNK/surf0080.txt and
2) http://archives.scovetta.com/pub/textfiles/magazines/surfpunk/surf0080.txt.

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Surfpunk |
| --- | --- |
|  | "042193_geek_01_ITR.au" is stored on a storage device accessible to the www.ncsa.uiuc.edu server. (p. 3). |
| [2] one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | Surfpunk discloses one or more communication interfaces connected to the Internet for receiving requests from remotely located client devices and for responding to requests from remotely located client devices by downloading to the requesting client device a data file identified by a URL specified by the given request.<br><br>For example, Surfpunk discloses that a user used the "telnet" program to establish a TCP connection with a process executing on a server identified by the hostname www.ncsa.uiuc.edu and listening for incoming connections on TCP port 80. (p. 2) ("Telnet www.ncsa.uiuc.edu 80<br>Trying 141.142.4.5 …<br>*Connected* to rs5.ncsa.uiuc.edu") (emphasis added).<br><br>Further, Surfpunk discloses that the user, after establishing the connection with the server, sent to the server an HTTP GET request message requesting the radio.html data file, which is identified by the URL http://www.ncsa.uiuc.edu/radio/radio.html. (p. 2) ("GET /radio/radio.html").<br><br>Further, Surfpunk disclose that, in response to the GET request message, the server transmitted the radio.html data file to the user's computer. (pp. 2-4). |
| [3] one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | Surfpunk discloses one or more processors coupled to the one or more data storage servers and to the one or more communications interfaces.<br><br>For example, Surfpunk discloses a server ("rs5.ncsa.uiuc.edu") that receives from a client device a request for an HTML data file, retrieves the HTML data file in response to the request, and then sends the retrieved HTML data file via the Internet to the client device. Thus, the server is coupled to a data storage server and a |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Surfpunk |
|---|---|
| | communication interface. (pp. 2-4). |
| [4] storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | Surfpunk discloses storing one or more audio files representing an episode at a storage location specified by a unique URL as each audio file becomes available.<br><br>For example, Surfpunk discloses an HTML document ("radio.html") containing a list of available episodes of the shows (e.g., Geek of the Week) on the Internet Talk Radio channel. (pp. 2-3). For each episode, there exist one more audio files that represent the episode. For example, as disclosed in Surfpunk, the April 21, 1993, episode of the Geek of the Week program on Internet Talk Radio is represented by the following five audio files:<br><br>"042193_geek_01_ITR.au"<br>"042193_geek_02_ITR.au"<br>"042193_geek_03_ITR.au"<br>"042193_geek_04_ITR.au"<br>"042193_geek_05_ITR.au"<br><br>(p. 3).<br><br>Each audio file is stored at a storage location specified by a unique episode URL of the form: http://www.ncsa.uiuc.edu/radio/[name-of-file]. (pp. 2-4). |
| [5] from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | Surfpunk discloses that as new episodes become available, an updated version of a compilation is stored in a data storage server at a storage location identified by a predetermined URL.<br><br>Specifically, Surfpunk discloses that the radio.html document is updated from time to time as new editions of the Internet Talk Radio show become available. For example, Surfpunk discloses that the radio.html file was last updated on or after April 21, 1993. (pp. 2-4). |
| [6] said updated version of said | Surfpunk discloses an updated version of a compilation file |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Surfpunk |
|---|---|
| compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes; and | containing attribute data describing currently available episodes in the series of episodes, the attribute data for each given one of the currently available episodes including displayable text describing the given one of the currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing the given one of the episodes.<br><br>For example, Surfpunk discloses that the radio.html document contained data describing the April 21, 1993 episode of ITR.  Specifically, the data describes that the April 21, 1993 episode of ITR Geek of the Week included an interview with Steve Deering.  The radio.html file also included a relative URL specifying the file name of the corresponding audio files of the interview with Steve Deering.  For example, part 1 of the interview is contained in the file ""042193_geek_01_ITR.au" which was stored at www.ncsa.uiuc.edu/radio/.  (pp. 2-4). |
| [7] employing one of said one or more communication interfaces to: | Surfpunk discloses employing a communication interface to accomplish the steps described below: |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | Surfpunk discloses employing the communication interface to receive a request from a requesting client device for the updated version of the compilation file located at the predetermined URL.<br><br>For example, Surfpunk discloses that a user used the "telnet" program to establish a TCP connection with a process executing on a server identified by the hostname www.ncsa.uiuc.edu and listening for incoming connections on TCP port 80.  (p. 2).<br><br>Further, Surfpunk discloses that the user, after establishing the connection with the server, sent to the server an HTTP GET request message requesting the radio.html data file, which is identified by the URL http://www.ncsa.uiuc.edu/radio/radio.html.  (p. 2) |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Surfpunk |
|---|---|
| (b) download said updated version of said compilation file to said requesting client device; and | Surfpunk discloses employing the communication interface to download the updated version of the compilation file to the requesting client device. |
| | For example, Surfpunk discloses that a user used the "telnet" program to establish a TCP connection with a process executing on a server identified by the hostname www.ncsa.uiuc.edu and listening for incoming connections on TCP port 80. (p. 2). |
| | Further, Surfpunk discloses that the user, after establishing the connection with the server, sent to the server an HTTP GET request message requesting the radio.html data file, which is identified by the URL http://www.ncsa.uiuc.edu/radio/radio.html. (p. 2). |
| | Further, Surfpunk disclose that, in response to the GET request message, the server transmitted the radio.html data file to the user's computer. (pp. 2-3). |
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | Surfpunk discloses employing the communication interface after downloading the web page to receive and respond to a request from the requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in the updated version of the compilation files. |
| | For example, Surfpunk discloses that the radio.html file includes hyperlinks to the audio files and that when a user clicks on one of the hyperlinks a request for the corresponding audio file is sent to www.ncsa.uiuc.edu, which responds to the request by transmitting the audio file to the user's computer. (pp. 2-4). |
| 32. The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible | Surfpunk discloses that the audio files contain compressed audio recordings that may be reproduced in audible form by a requesting client. |
| | For example, Surfpunk discloses that the audio files are in the ".au" format and can be played by "catting into |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Surfpunk |
| --- | --- |
| form by a requesting client device. | /dev/audio." (pp. 2-3). |
| **33**. The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | At least some of the media files contained text data which may be displayed by a requesting client device.<br><br>For example, Surfpunk discloses that the audio files are in the ".au" format. Audio files that conform to the .au format include not only encoded digital audio data, but also a header for storing text data. |
| **34**. The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | Surfpunk discloses that the attribute data for each given one of the episodes of ITR includes displayable text data describing the episode.<br><br>For example, Surfpunk discloses that the radio.html document contained data describing the April 21, 1993 episode of ITR. Specifically, the data describes that the April 21, 1993 episode of ITR Geek of the Week included an interview with Steve Deering. The radio.html file also included a relative URL specifying the file name of the corresponding audio files of the interview with Steve Deering. For example, part 1 of the interview is contained in the file ""042193_geek_01_ITR.au" which was stored at www.ncsa.uiuc.edu/radio/. (pp. 2-4). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

EXHIBIT 1

# Internet Talk Radio

## General Information

- Introduction to Internet Talk Radio.
- Overview of Geek of the Week.

## April 21, 1993

Here's the overview of the April 21 edition of Internet Talk Radio.

- Steve Deering, Part 1 (5.6 megs)
- The Incidental Tourist (1.6 megs)
- Steve Deering, Part 2 (6.0 megs)
- Book Byte (0.7 megs)
- Steve Deering, Part 3 (5.4 megs)

## April 14, 1993

Here's the overview of the April 14 edition of Internet Talk Radio.

- Daniel Lynch, Part 1 (5.7 megs)
- The Incidental Tourist (0.9 megs)
- Daniel Lynch, Part 2 (5.5 megs)
- Legal Stuff (0.2 megs)
- Daniel Lynch, Part 3 (3.4 megs)

## April 7, 1993

Here's the overview of the April 7 edition of Internet Talk Radio.

- Dr. Erik Huizer, Part 1 (5.4 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Erik Huizer, Part 2 (4.8 megs)
- Book Byte (0.7 megs)
- Dr. Erik Huizer, Part 3 (5.9 megs)
- Name That Acronym (0.5 megs)
- Dr. Erik Huizer, Part 4 (5.2 megs)

## March 31, 1993

Here's the overview of the March 31 edition of Internet Talk Radio.

- Dr. Marshall Rose, Part 1 (5.6 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Marshall Rose, Part 2 (5.1 megs)
- Book Byte (0.6 megs)
- Dr. Marshall Rose, Part 3 (5.6 megs)
- Name That Acronym (0.5 megs)
- Dr. Marshall Rose, Part 4 (4.2 megs)

marca@ncsa.uiuc.edu

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

## EXHIBIT A: PRIOR ART ANTICIPATING ONE OR MORE CLAIMS OF THE '504 PATENT

### Chart A-5:  Patrick[1]

Invalidity Claim Chart demonstrating that claims 31-34 of U.S. Patent No. 8,112,504 are anticipated by Andrew S. Patrick, et. al., "CBC Radio on the Internet: An Experiment in Convergence," Canadian Journal of Communication, vol. 21, No. 1 (1996) ("Patrick")

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| **31**. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | Patrick discloses an apparatus for disseminating a series of episodes represented by audio files via the Internet as the episodes become available. *See e.g.*, P. 2 ("traditional radio broadcasts have been made available on the Internet on a *regular* basis.") (emphasis added); P. 2 ("regular radio programming distributed as digital audio files over the Internet"); P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via FTP, Gopher, and *World Wide Web (WWW)* using standard Internet server software.") (emphasis added); P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks (a science magazine show), an episode of Basic Black (a variety show), sample segments from Sunday Morning (documentaries), Christmas stories read by Fireside |

---

[1] Defendants reserve the right to revise their ultimate contentions concerning the invalidity of the asserted claims, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority date of the asserted claims, and/or positions that Plaintiff or its expert witness(es) may take concerning claim interpretation, construction, infringement, and/or invalidity issues.

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
| --- | --- |
| | Al, and Ideas of Canada (a documentary about Canada)."); |
| | P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); |
| | P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server."); |
| | P. 5 ("*Quirks & Quarks* … was also regularly updated on the server."); |
| | P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."). |
| [1] one or more data storage servers, | Patrick discloses one or more data storage servers. |
| | *See e.g.,* |
| | P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks (a science magazine show), an episode of Basic Black (a variety show), sample segments from Sunday Morning (documentaries), Christmas stories read by Fireside Al, and Ideas of Canada (a documentary about Canada)."). |
| | P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); |
| | P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server."); |
| | P. 5 ("*Quirks & Quarks* … was also regularly updated on the server."). |
| [2] one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | Patrick discloses one or more communication interfaces connected to the Internet for receiving requests from remotely located client devices and for responding to requests from remotely located client devices by downloading to the requesting client device a data file identified by a URL specified by the request. <br><br> *See, e.g.,* <br><br> P. 1 ("material that in the past has been broadcast, such as radio and television programming, may now be distributed via telecommunications links and *made available on-demand and interactively*.") (emphasis added); <br><br> P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); <br><br> P. 5 ("The news audio files (the twice-daily newscasts) were |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); <br><br> P. 8 ("The on-demand nature of the service allows people to listen without being constrained by the broadcaster's schedule"). |
| [3] one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | Patrick discloses one or more processors coupled to the one or more data storage servers and to the one or more communications interfaces. <br><br> *See, e.g.,* <br><br> P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software."); <br><br> P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks (a science magazine show), an episode of Basic Black (a variety show), sample segments from Sunday Morning (documentaries), Christmas stories read by Fireside Al, and Ideas of Canada (a documentary about Canada)."); <br><br> P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| [4] storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | Patrick discloses that one or more audio files, which may represent an episode, are stored at a storage location on a server and are specified by a unique URL as each audio file becomes available.<br><br>*See e.g.*,<br><br>P. 1 ("… regular radio programs were digitized using computer sound equipment and made available via [the] World Wide Web.");<br><br>P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via … World Wide Web (WWW) using standard Internet server software.");<br><br>P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks ….");<br><br>P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time.");<br><br>P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server.");<br><br>PP. 4-5 ("Overall, the most common access method was the HTTP protocol used by the World Wide Web (WWW).");<br><br>P. 5 ("The news audio files (the twice-daily newscasts) were very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
|  | the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); <br><br> P. 5 (*"Quirks & Quarks* … was also regularly updated on the server."); <br><br> P. 7 ("The most frequent access method for the programs was the World Wide Web."). |
| [5] from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | Patrick discloses that as new episodes become available, an updated version of a compilation is stored in a data storage server at a storage location identified by a predetermined URL. <br><br> *See e.g.,* <br><br> P. 2 ("traditional radio broadcasts have been made available on the Internet on a *regular* basis.") (emphasis added); <br><br> P. 2 ("regular radio programming distributed as digital audio files over the Internet"); <br><br> P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software."); <br><br> P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks (a science magazine show), an episode of Basic Black (a variety show), sample segments from Sunday Morning (documentaries), Christmas stories read by Fireside Al, and Ideas of Canada (a documentary about Canada)."); <br><br> P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); <br><br> P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server."); <br><br> P. 5 ("*Quirks & Quarks* … was also regularly updated on the server."); <br><br> P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."). |
| [6] said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media | Patrick discloses an updated version of a compilation file containing attribute data describing currently available episodes in the series of episodes, the attribute data for each given one of the currently available episodes including displayable text describing the given one of the currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing the given one of the episodes. <br><br> *See e.g.,* <br><br> P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software."); |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| files representing said given one of said episodes; and | P. 3 ("The initial files made available on the server were samples of CBC Radio programs. These included an episode of Quirks & Quarks (a science magazine show), an episode of Basic Black (a variety show), sample segments from Sunday Morning (documentaries), Christmas stories read by Fireside Al, and Ideas of Canada (a documentary about Canada).");<br><br>P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted.");<br><br>P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server.");<br><br>P. 5 ("The news audio files (the twice-daily newscasts) were very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service.");<br><br>P. 6 ("[Quirks & Quarks] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | download the appropriate audio file."). |
| [7] employing one of said one or more communication interfaces to: | Patrick discloses employing a communication interface to accomplish the steps described below: |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | Patrick discloses employing a communication interface to receive a request from a requesting client device for the updated version of the compilation file located at the predetermined URL. *See e.g.,* P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via … World Wide Web (WWW) using standard Internet server software."); P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server."); P. 5 ("The news audio files (the twice-daily newscasts) were very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
| --- | --- |
| | limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); <br><br> P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."). |
| (b) download said updated version of said compilation file to said requesting client device; and | Patrick discloses employing the communication interface to download the updated version of the compilation file to the requesting client device. <br><br> *See e.g.,* <br><br> P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via … World Wide Web (WWW) using standard Internet server software."); <br><br> P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted."); <br><br> P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | the server."); |
| | P. 5 ("The news audio files (the twice-daily newscasts) were very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); |
| | P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."). |
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | Patrick discloses employing the communication interface after downloading the web page to receive and respond to a request from the requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in the updated version of the compilation files. *See e.g.,* P. 3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via … World Wide Web (WWW) using standard Internet server software."); P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
| | wanted."); |
| | P. 4 ("Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast. Also, the Quirks & Quarks science magazine show was recorded each week, broken down into its component parts, and made available on the server."); |
| | P. 5 ("The news audio files (the twice-daily newscasts) were very popular and it was necessary to limit the number of simultaneous downloads from the server in order to maintain a functional bandwidth for the research campus. To apply these limits the news audio files were made available only via the FTP protocol and the FTP server parameters were set to limit the traffic to five simultaneous downloads (the mirror sites had unrestricted transfer ability). WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); |
| | P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."); |
| **32**. The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | Patrick discloses that the audio files may be digital compressed audio recordings. *See e.g.*, P. 2 ("Each minute of audio on a CD requires approximately 10 megabytes of storage. Transmission of the uncompressed digital audio signal, in real time, would require a channel data rate of approximately 1,280 kilobits per second (Kbps) or 1.2 megabits per second (Mbps). Given that typical Internet link rates are often much less than |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Patrick |
|---|---|
|  | 1.2 Mbps, and users' disk capacity is often limited, an audio format that uses a much lower frequency of sampling (8 kHz) and a much lower precision (8-bits mono) was chosen for this trial. In this format each minute of audio requires approximately 0.5 megabytes of storage, and it can be transmitted over a 64 Kbps channel in 'real time.'") |
| **33**. The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | At least some of the media files contained text data which may be displayed by a requesting client device.<br><br>For example, Patrick discloses that the audio files are in the "basic audio" format (i.e., 8-bit, 8 kHz). Audio files that conform to this format, such as the ".au" format, include not only encoded digital audio data, but also a header for storing text data. |
| **34**. The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | Patrick discloses that attribute data for each given one of the episodes further includes displayable text data describing the given one of the episodes<br><br>*See e.g.,*<br><br>P. 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted.");<br><br>P. 6 ("[*Quirks & Quarks*] was automatically recorded each week and then manually broken into five to ten minute segments at the natural boundaries. The content of each segment was described in enough detail so that users could select those portions of the show that interested them and download the appropriate audio file."). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

## EXHIBIT A: PRIOR ART ANTICIPATING ONE OR MORE CLAIMS OF THE '504 PATENT

### Chart A-14: Compton Thesis[1]

Invalidity Claim Chart demonstrating that claims 31-34 of U.S. Patent No. 8,112,504 are anticipated by Charles L. Compton, "Internet CNN NEWSROOM: The Design of a Digital News Magazine," Thesis. Mass. Inst. Tech., Aug. 10, 1995. Print. ("Compton Thesis")

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| **31**. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | The Compton Thesis discloses an apparatus for disseminating a series of episodes represented by video files via the Internet as the episodes become available. |
| | For example, the Compton Thesis illustrates a web page providing an index of available CNN Newsroom video programs. (p. 13). As described in the Compton Thesis, selection of an episode on the CNN Newsroom index of episodes will cause the user's computer to automatically send a request to the Networked Multimedia Information Services ("NMIS") server, which responds to the request by transmitting to the user's computer video data corresponding to the selected episode and stored in a file accessible to the NMIS server. (p. 14). |
| | *See also*: |
| | "Internet CNN NEWSROOM is a digital video news magazine based on content from CNN NEWSROOM, an educational news program produced by Turner Educational Services, Inc. Internet CNN NEWSROOM is automatically |

---

[1] Defendants reserve the right to revise their ultimate contentions concerning the invalidity of the asserted claims, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority date of the asserted claims, and/or positions that Plaintiff or its expert witness(es) may take concerning claim interpretation, construction, infringement, and/or invalidity issues.

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| | generated and distributed each day. Internet CNN NEWSROOM uses MPEG digital video and is distributed via the World Wide Web on the Internet." (Abstract).<br><br>"Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is shown in Figure 1." (p. 14).<br><br>"With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 25) |
| [1] one or more data storage servers, | The Compton Thesis discloses one or more data storage servers.<br><br>For example, Compton discloses storing video files such that the video files are accessible to the NMIS server.<br><br>*See also:*<br><br>"One of the major NMIS deliverables is Internet CNN NEWSROOM, a networked multimedia program based on the CNN NEWSROOM program. With Turner Broadcasting, a complete multimedia news program is automatically generated from CNN NEWSROOM content on a daily basis and made available on the Internet via the World Wide Web." (p. 10).<br><br>"The first mechanism, Hierarchical Media Distribution, consists of placing caches that are closer in the network to the end user than to the NMIS main server. These caches will satisfy as many requests as possible rather than have all |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  | requests travel further up the network to the main NMIS server." (p. 23). <br><br> *2.3.3.2 Video Reception and Processing* <br><br>  <br> **Figure 4 Video Processing for Internet NEWSROOM** |
| [2] one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | The Compton Thesis discloses one or more communication interfaces connected to the Internet for receiving requests from remotely located client devices and for responding to requests from remotely located client devices by downloading to the requesting client device a data file identified by a URL specified by the request. <br><br> For example, the Compton Thesis discloses a "digital video news magazine distributed via the Internet." (p. 10). Accordingly, the NMIS server has a network interface. <br><br> The Compton Thesis also discloses that "The World-Wide-Web is used to present and deliver the digital video news magazine to end users. Custom software agents have been developed to automatically generate the WWW user interface for the service based on daily content." (pg. 7). Web sites receive requests and respond to such requests |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| | by downloading to the requesting device data identified in the request. |
| | *See also*: |
| | "The two primary requirements for the distribution channel in an Interactive video news service such as Internet CNN NEWSROOM is interactivity (i.e., low latency) and capability to carry video (throughput). The latency of the communications system manifests itself in the responsiveness of the system to users' requests." (p. 8). |
| |  |
| | **Figure 1: CNN NEWSROOM Video Magazine** |
| | "Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  | of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is shown in Figure 1." (p. 14).<br><br><br><br>Figure 2: Results of a CNN NEWSROOM Library search for the word "school"<br><br>"With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 25) |
| [3] one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | The Compton Thesis discloses one or more processors coupled to said one or more data storage servers to said one or more communication interfaces.<br><br>*See, e.g.,*<br><br>"In addition, Sun recently announced a next-generation processor that is capable of decoding two MPEG video streams real-time in software." (p. 14). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| | "Generation of the Internet NEWSROOM digital video magazine is completely automated. An automatic sequence of processes executes in the early morning hours to assemble the required video, images, and textual information for the Internet-delivered news magazine. The CNN NEWSROOM program is broadcast via satellite at 3:45 AM each morning. Multiple sources of information must be processed and merged each night into the digital video magazine described in section 2.3.1. (p. 17). |
| [4] storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | The Compton Thesis discloses that one or more video files, which represent a program episode, are stored at a storage location on the NMIS server and are specified by a unique URL as each video file becomes available. <br><br> For example, the Compton Thesis discloses that "[w]hen the video and closed caption text have been captured, the encoding server uses the ftp protocol to deliver the MPEG system files and closed-caption text files to our server." (p. 22). Compton discloses that "when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 25). Accordingly, each video file is stored at a storage location specified by a unique episode URL (link). <br><br> *See also*: <br><br> "Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is shown in Figure 1." (p. 14). <br><br> "Currently we anticipate archiving at least six months of Internet NEWSROOM programs on the server. The Internet NEWSROOM program uses |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
| --- | --- |
| | approximately 150 megabytes per day, so 6 months will be approximately 27 gigabytes, well within the capacity of the NMIS program news and information server's 80 gigabytes of magnetic disk storage." (pp. 14-15). <br><br>  <br><br> **Figure 1: CNN NEWSROOM Video Magazine** |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  |  2.3.3.2 *Video Reception and Processing*  Figure 4 Video Processing for Internet NEWSROOM |
| [5] from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | The Compton Thesis discloses that as new episodes become available, an updated version of a compilation is stored in a data storage server at a storage location identified by a predetermined URL.  For example, Figures 1 and 2 show a webpage listing available episodes. |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| |  Figure 1: CNN NEWSROOM Video Magazine |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| | <br>Figure 2: Results of a CNN NEWSROOM Library search for the word "school" |
| [6] said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes; and | The Compton Thesis discloses an updated version of a compilation file containing attribute data describing currently available episode in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes.<br><br>*See, e.g.*,<br><br>Figures 1 and 2 (showing the web page displaying text describing the available episode and an episode URL specifying the storage location of the corresponding episode). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  | <br>Figure 1: CNN NEWSROOM Video Magazine |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| |  Figure 2: Results of a CNN NEWSROOM Library search for the word "school" "Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is shown in Figure 1." (p. 14). "Internet NEWSROOM also provides the text of each program which is searchable by keyword. This text is obtained from the closed caption text that is part of the video program. A link to this text is placed in the table of contents next to each story. This text consists of every word uttered during the story, and, as such, provides a complete textual representation of the story." (p. 14). "The Table of Contents (contents.html) is generated |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| | from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each segment that display the video for the segment when selected. If there is not an icon for a particular segment, the segment's title is used to form a link to the video." (p. 18). |
| [7] employing one of said one or more communication interfaces to: | The Compton Thesis discloses employing a communication interface to accomplish the steps described below. |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | The Compton Thesis discloses employing a communication interface to receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL.<br><br>*See, e.g.,*<br><br>Compton Thesis Figure 1 showing the Table of Contents web page that identifies the available episode.<br><br>Compton Thesis Figure 2 showing search results that identifies available episodes.<br><br>"The Table of Contents (dontents.htm1) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  | segment that display the video for the segment when selected. If there is not an icon for a particular segment, the segment's title is used to form a link to the video." (p. 18).<br><br>"The first mechanism, Hierarchical Media Distribution, consists of placing caches that are closer in the network to the end user than to the NMIS main server. These caches will satisfy as many requests as possible rather than have all requests travel further up the network to the main NMIS server." (p. 23). |
| (b) download said updated version of said compilation file to said requesting client device; and | The Compton Thesis discloses employing the communication interface to download said updated version of said compilation file to said requesting client device.<br><br>*See, e.g.,*<br><br>Compton Thesis Figure 1 showing the Table of Contents web page that identifies the available episode.<br><br>Compton Thesis Figure 2 showing search results that identifies available episodes.<br><br>"The Table of Contents (contents.html) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each segment that display the video for the segment when selected. If there is not an icon for a particular segment, the segment's title is used to form a link to the video." (p. 18). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | Compton discloses employing a communication interface to after downloading the web page to receive and respond to a request form said requesting client device for one or more video files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files.<br><br>*See, e.g.*,<br><br>Figures 1 and 2.<br><br>"With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 25).<br><br>"The first mechanism, Hierarchical Media Distribution, consists of placing caches that are closer in the network to the end user than the NMIS main server. These caches will satisfy as many requests as possible rather than have all requests travel further up the network to the main NMIS server." (p. 23). |
| **32**. The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | The Compton Thesis discloses that the media files may contain digital compressed video and audio recordings that may be reproduced in audible form by a requesting client device.<br><br>*See, e.g.*,<br><br>"When compared with the other software-based video compression schemes discussed here, MPEG is a relatively aggressive video compression scheme, requiring specialized hardware for both compression and decompression. MPEG decoding cards are readily available and are inexpensive." (p. 42).<br><br>"MPEG-1 video is be used for the video component of the program. MPEG (Motion Pictures Expert |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
|  | Group) is an established standard, with cross-platform support. VHS-like quality is achieved with 30fps, - 1.5Mbit MPEG video. Decoding this video with current technology requires a hardware MPEG decode board. MPEG-1 video compression is performed using the Optibase MPEG Lab Suite system and a Sony Beta SP video deck. Automatic generation and delivery of the video for the Internet CNN NEWSROOM will require custom network and control software which has been written as part of this thesis." (p. 7). |
| **33**. The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | The Compton Thesis discloses that at least some of said media files contain text data which may be displayed.<br><br>*See, e.g.,*<br><br>"Internet NEWSROOM also provides the text of each program which is searchable by keyword. This text is obtained from the closed caption text that is part of the video program. A link to this text is placed in the table of contents next to each story. This text consists of every word uttered during the story, and, as such, provides a complete textual representation of the story." (p. 14).<br><br>"Several html documents are generated for each Internet NEWSROOM program. These include the Table of Contents, the Curriculum Guide, and an html document for each video segment's closed caption text, for search and reference purposes." (p. 17).<br><br>"In addition to a link to the video, there is a link for each segment's closed caption text. This gives users the capability to view (or print, if their WWW browser supports it) the closed caption text for a segment." (p. 19). |
| **34**. The apparatus set forth in claim 33 | Compton discloses that a written description may be |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton Thesis |
|---|---|
| wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | displayed with the video file.<br><br>*See, e.g.,*<br><br>"The Table of Contents (contents.html) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents." (p. 18). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

T    P          T    T C P T                    C           T    '504
                    P   T    T

## Cha t  -15  Compton[1]

Invalidity Claim Chart demonstrating that claims 31-34 of U.S. Patent No. 8,112,504 are anticipated by Charles L. Compton, Paul D. Bosco,  *e   e          S          g          e   e     g     e*          , Proceedings of the International Conference on Multimedia Computing and Systems, at 296-301 (1995), ("Compton")

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| **31**. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | Compton discloses an apparatus for disseminating a series of episodes represented by video files via the Internet as the episodes become available. |
| | For example, Compton illustrates a web page providing an index of available CNN Newsroom video programs. (p. 297).  As described in Compton, selection of an episode on the CNN Newsroom index of episodes will cause the user's computer to automatically send a request to the Networked Multimedia Information Services ("NMIS") server, which responds to the request by transmitting to the user's computer video data corresponding to the selected episode and stored in a file accessible to the NMIS server.  (  .). |
| | *See*       : |
| | "One or the major NMIS deliverables is Internet CNN NEWSROOM, a networked multimedia program based on the CNN NEWSROOM program. With Turner Broadcasting, a complete multimedia news program is automatically generated from CNN |

[1] Defendants reserve the right to revise their ultimate contentions concerning the invalidity of the asserted claims, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority date of the asserted claims, and/or positions that Plaintiff or its expert witness(es) may take concerning claim interpretation, construction, infringement, and/or invalidity issues.

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
|  | NEWSROOM content on a daily basis and made available on the Internet via the World Wide Web." (p. 296). |
|  | "The multimedia program is assembled automatically on a daily basis as a digital video news magazine distributed via the Internet. High quality 1.5 Mbit/second MPEG-1 video is used in the program, giving the video clips VHS level quality." (p. 296). |
|  | "When the video and closed caption text have been captured, the encoding server uses the ftp protocol to deliver the MPEG system files and closed-caption text files to our server. Use of the ftp protocol means that results can be delivered to any host on the Internet supporting the ftp protocol." (p. 299). |
|  | "With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 300). |
| [1] one or more data storage servers, | Compton discloses one or more data storage servers. |
|  | For example, Compton discloses storing video files such that the video files are accessible to the NMIS server. |
|  | *See* |
|  | "The system leverages existing industry standard systems (MPEG audio/video, HTTP, Caching Proxy Servers) to create a cross-platform video intensive interactive service with VHS quality video." (p. 301). |
|  | "Currently we anticipate archiving at least six months of Internet NEWSROOM programs on the server. The Internet NEWSROOM program uses approximately 150 megabytes per day, so 6 months will be approximately 27 gigabytes, well within the |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| | capacity of the NMIS program news and information server's 80 gigabytes of magnetic disk storage." (p. 297).<br><br>"The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server." (p. 298).<br><br>"In addition to the links to the video segments, a link to the curriculum guide is placed at the top of the table of contents, and standard links to other parts of the server are placed at the bottom of the table of contents." (p. 298).<br><br><br><br>**Figure 3 Video Processing for Internet NEWSROOM** |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| |  **Figure 4: Media Distribution Hierarchy** |
| [2] one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | Compton discloses one or more communication interfaces connected to the Internet for receiving requests from remotely located client devices, and responding to requests from remotely located client devices by downloading to the requesting client device a data file identified by a URL specified by the request. For example, Compton discloses "a digital video news magazine distributed via the Internet." (p. 296). Accordingly, the NMIS server has a network interface. Compton also discloses that "[w]ith Turner Broadcasting, a complete multimedia news program is automatically generated from CNN NEWSROOM content on a daily basis and made available on the Internet via the World Wide Web. ( .). Web sites receive requests and respond to such requests by downloading to the requesting device data identified in the request. *See* : "With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 300). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| | "The first mechanism, Hierarchical Media Distribution, consists of placing caches that are closer in the network to the end user than the NMIS main server. These caches will satisfy as many requests as possible rather than have all requests travel further up the network to the main NMIS server." (p. 299). "In addition, because results of searches are unlikely to be cached has been taken into account in the design of the user interface; when a segment from a search result is selected, the closed caption text for the segment is first shown, with a link to the actual video at the top of the screen. This allows the user to verify the contents of a segment before a time-consuming download of the video over the network. The prototype deployment of the Internet NEWSROOM digital video magazine will allow us to trace and capture usage patterns and to aid in the development of architectures for Internet video distribution." (p. 300). |
| [3] one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | Compton discloses one or more processors coupled to said one or more data storage servers to said one or more communication interfaces. *See, e.g.,* "An automatic sequence of processes executes in the early morning hours to assemble the required video, images, and textual information for the Internet-delivered news magazine." (p. 298). "The curriculum guide itself is processed minimally by a C program (guide.c), creating a html document (guide.htm1) that is largely made of preformatted text from the original Curriculum Guide." (p. 298). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.  Defendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of Defendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Defendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| |  Figure 3 Video Processing for Internet NEWSROOM |
| [4] storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | Compton discloses that one or more video files, which represent a program episode, are stored at a storage location on the NMIS server and are specified by a unique URL as each video file becomes available.<br><br>For example, Compton discloses that "[w]hen the video and closed caption text have been captured, the encoding server uses the ftp protocol to deliver the MPEG system files and closed-caption text files to our server."  (p. 299).  Compton discloses that "when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 300).  Accordingly, each video file is stored at a storage location specified by a unique episode URL (link).<br><br>*See also*:<br><br>"Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.   efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.   efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.   112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.   112.

| Claims 31-34 of the '504 Patent | Compton |
| --- | --- |
| | shown in Figure 1." (p. 29 ).<br><br>"Currently we anticipate archiving at least six months of Internet NEWSROOM programs on the server. The Internet NEWSROOM program uses approximately 150 megabytes per day, so 6 months will be approximately 2  gigabytes, well within the capacity of the NMIS program news and information server's  0 gigabytes of magnetic disk storage." (p. 29 ).<br><br>"In addition, because results of searches are unlikely to be cached has been taken into account in the design of the user interface; when a segment from a search result is selected, the closed caption text for the segment is first shown, with a link to the actual video at the top of the screen." (p. 300).<br><br>"With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 300). |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.    efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.    efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.    112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.    112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| |  Figure 1: CNN NEWSROOM Video Magazine<br><br>Figure 3 Video Processing for Internet NEWSROOM |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.     efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.     efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.    112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.    112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
|  |  Figure 4: Media Distribution Hierarchy |
| [5] from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | Compton discloses that as new episodes become available, an updated version of a compilation is stored in a data storage server at a storage location identified by a predetermined URL.<br><br>For example, Figure 1 shows a webpage listing available episodes. |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.     efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that     efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of     efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.     efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.    112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.    112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| | <br><br>**Figure 1: CNN NEWSROOM Video Magazine** |
| [6] said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes; and | Compton discloses an updated version of a compilation file containing attribute data describing currently available episode in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes.<br><br>*See  e  ,*<br><br>Figure 1 (showing the web page displaying text describing the available episode and an episode URL specifying the storage location of the |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.     efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.     efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.    112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.    112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| | corresponding episode).<br><br><br>**Figure 1: CNN NEWSROOM Video Magazine**<br><br>"Internet NEWSROOM consists of several major components. The "table of contents" for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program. (A segment corresponds to a single news story.) An example of the Table of Contents is shown in Figure 1." (p. 29  ).<br><br>"Internet NEWSROOM also provides the text of each program which is searchable by keyword. This text is obtained from the closed caption text that is part of the video program. A link to this text is placed in the table of contents next to each story. This text consists of every word uttered during the |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.   efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.   efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.   112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.   112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
|  | story, and, as such, provides a complete textual representation of the story." (p. 29  ).<br><br>"The Table of Contents (dontents.htm1) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each segment that display the video for the segment when selected. If there is not an icon for a particular segment, the segment's title is used to form a link to the video." (p. 29  ). |
| [  ] employing one of said one or more communication interfaces to: | Compton discloses employing a communication interface to accomplish the steps described below. |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | Compton discloses employing a communication interface to receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL.<br><br>*See  e  ,*<br><br>Compton Figure 1 showing the Table of Contents web page that identifies the available episode.<br><br>"The Table of Contents (dontents.htm1) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each segment that display the video for the segment when selected. If there is not an icon for a particular |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms. efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of efendants' accused technology meets any limitations of the claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C. 112, including by arguing that they are indefinite, not supported by the written description and or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. 112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
| | segment, the segment's title is used to form a link to the video." (p. 29 ). "The first mechanism, ierarchical Media istribution, consists of placing caches that are closer in the network to the end user than the NMIS main server. These caches will satisfy as many requests as possible rather than have all requests travel further up the network to the main NMIS server." (p. 299). |
| (b) download said updated version of said compilation file to said requesting client device; and | Compton discloses employing the communication interface to download said updated version of said compilation file to said requesting client device. *See e ,* Compton Figure 1 showing the Table of Contents web page that identifies the available episode. "The Table of Contents (dontents.htm1) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents. The titles of the segments are correlated with icons from a library of CNN NEWSROOM icons that are kept on the server. These icons are used to make buttons for each segment that display the video for the segment when selected. If there is not an icon for a particular segment, the segment's title is used to form a link to the video." (p. 29 ). |
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | Compton discloses employing a communication interface to after downloading the web page to receive and respond to a request form said requesting client device for one or more video files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.   efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that   efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.   efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.   112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.   112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
|  | *See e* ,<br><br>Figure 1.<br><br>"With today's WWW clients, when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk." (p. 300).<br><br>"The first mechanism,   ierarchical Media   istribution, consists of placing caches that are closer in the network to the end user than the NMIS main server. These caches will satisfy as many requests as possible rather than have all requests travel further up the network to the main NMIS server." (p. 299). |
| **3** . The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | Compton discloses that the media files may contain digital compressed video and audio recordings that may be reproduced in audible form by a requesting client device.<br><br>*See e* ,<br><br>"The audio and video encoding is achieved using the Optibase MPEG Lab Pro system.  This system consists of two ISA bus boards and Windows software. The Optibase system is capable of encoding MPEG at data rates from 1 to 4 Mbit second in real-time. The audio can be encoded at rates ranging from 4   to 256   bit second, in stereo or monaural. Currently, the NEWSROOM audio is encoded at 192   bit second, in monaural. The Optibase system encodes and stores audio and video interleaved in an MPEG system file. MPEG system files are defined in the IS0 MPEG standards and provide complete cross-platform support for playback in variety of consumer and computer video systems" (p. 299).<br><br>"The system leverages existing industry standard |

Plaintiff's Infringement Contentions are based on an apparent construction of the claim terms.    efendants may disagree with these apparent constructions. Nothing stated herein shall be treated as an admission or suggestion that    efendants agree with Plaintiff regarding either the scope of any of the asserted claims or the claim constructions advanced by Plaintiff in its Infringement Contentions or anywhere else, or that any of   efendants' accused technology meets any limitations of the claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.    efendants also reserve all their rights to challenge any of the claim terms herein under 35 U.S.C.    112, including by arguing that they are indefinite, not supported by the written description and or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C.    112.

| Claims 31-34 of the '504 Patent | Compton |
|---|---|
|  | systems (MPEG audio video,    TTP, Caching Proxy Servers) to create a cross-platform video-intensive interactive service with      S quality video."  (p. 301). |
| **33**. The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | Compton discloses that at least some of said media files contain text data which may be displayed.<br><br>"Internet NEWSROOM also provides the text of each program which is searchable by keyword. This text is obtained from the closed caption text that is part of the video program. A link to this text is placed in the table of contents next to each story. This text consists of every word uttered during the story, and, as such, provides a complete textual representation of the story." (p. 29  ).<br><br>"In addition to a link to the video, here is a link for each segment's closed caption text. This gives users the capability to view (or print, if their WWW browser supports it) the closed caption text for a segment. This feature also allows users with low bandwidth connections to "preview" the segment by reading its closed caption text before downloading the potentially very large MPEG file associated with the segment."  (p. 29   ) |
| **34**. The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | Compton discloses that a written description may be displayed with the video file.<br><br>"The Table of Contents (contents.htm1) is generated from the NEWSROOM Curriculum Guide. The program section of the guide, which lists each segment with a short description of its contents, is parsed by a C program (contents.c) to generate the html table of contents." (p. 29  ). |

# EXHIBIT 9

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Electronic Frontier Foundation
Petitioner,

v.

Personal Audio, LLC
Patent Owner

Patent No. 8,112,504 (Claims 31-35)
Issued: Feb. 7, 2012
Filed: Mar. 4, 2009
Inventors: James D. Logan, Daniel F. Goessling, Charles G. Call
Title: SYSTEM FOR DISSEMINATING MEDIA CONTENT REPRESENTING
EPISODES IN A SERIALIZED SEQUENCE

_____

*Inter Partes* Review No. _____

i

# TABLE OF CONTENTS

I.   Mandatory Notices and Payment of Fees ...................................................... 1

   A.   Certification of Grounds for Standing ..................................................... 1

   B.   Real Party-In-Interest ............................................................................. 1

   C.   Related Matters ....................................................................................... 1

   D.   Counsel and Service Information ............................................................ 2

   E.   Fee for *Inter Partes* Review ................................................................... 3

   F.   Service of Petition and Service Information ........................................... 3

II.  Introduction ............................................................................................... 3

III. The Challenged "Podcasting Patent" .......................................................... 5

   A.   The Alleged Invention ............................................................................ 5

   B.   The Person of Ordinary Skill in the Art ................................................. 7

   C.   Claim Construction ................................................................................. 8

      1.   Summary of Claim 31 ................................................................... 9

      2.   Summary of Dependent Claims 32-35 ........................................ 11

      3.   Constructions for Specific Claim Terms ..................................... 11

IV.  Requested Grounds for Rejection ............................................................... 15

   A.   Claims 31-35 are anticipated by the Geek of the Week web page
        published at www.ncsa.uiuc.edu/radio/radio.html in April 1993. ......... 17

      1.   The NCSA's Geek of the Week Page is a printed publication .... 19

      2.   Claim 31 is anticipated by the NCSA GotW page. ..................... 20

      3.   Claims 32-35 are anticipated by the NCSA GotW page. ............ 25

   B.   Claims 31-35 are anticipated by SurfPunk, which republished the NCSA
        GotW page .............................................................................................. 26

   C.   Claims 31-35 are obvious based on Geek of the Week Publications .... 26

   D.   Claim Chart showing the NCSA GotW page and SurfPunk each
        anticipate Claims 31-35, and that the Geek of the Week publications
        render Claims 31-35 obvious. ................................................................. 28

   E.   Claims 31-35 are anticipated by the CBC Radio Article ....................... 35

      1.   Claim 31 is anticipated by the CBC Radio Article ..................... 35

Petition for *Inter Partes* Review of U.S. Pat. No. 8,112,504

2.  Claims 32-35 are anticipated by the CBC Radio Article ............ 39

3.  Claim Chart showing CBC Radio Article anticipates Claims 31-35. ............................................................................... 39

F.  Claims 31-35 are obvious based on the Internet CNN Newsroom........ 45

1.  Claim 31 is obvious based on the Internet CNN Newsroom ...... 45

2.  Claims 32-35 are obvious based on the Internet CNN Newsroom ............................................................................... 51

3.  Claim Chart Showing Internet CNN Newsroom renders obvious Claims 31-35. ............................................................................... 53

V.   Conclusion .................................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*In re Baxter Travenol Labs*,
   952 F.2d 388 (Fed. Cir. 1991) ................................................................... 21, 22

*In re Hall*, 781 F.2d 897 (Fed. Cir. 1986) ........................................................ 45

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004) ...................................................................... 19

*Mass. Inst. of Tech. v. AB Fortia*,
   774 F.2d 1104 (Fed. Cir. 1985) ...................................................................... 19

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 8

*Voter Verified, Inc. v. Premier Election Sol'ns*,
   698 F.3d 1374 (Fed. Cir. 2012) ................................................................ 19, 26

## Statutes

35 U.S.C. § 102 ............................................................................................. 5, 45

35 U.S.C. § 103 .................................................................................................. 5

35 U.S.C. § 311 .................................................................................................. 1

## Other Authorities

Changes to Implement *Inter Partes* Review Proceedings, Post-Grant Review
   Proceedings, and Transitional Program for Covered Business Method Patents,
   77 Fed. Reg. 48699 (2012) ............................................................................... 8

MPEP § 2128 ............................................................................................. 19, 26

MPEP § 2131.01 ........................................................................................ 21, 22

## Rules

37 C.F.R. § 42.10 ............................................................................................... 3

37 C.F.R. § 42.100 ........................................................................................ 1, 8

37 C.F.R. § 42.104 ................................................................................................ 1

37 C.F.R. § 42.15 ................................................................................................. 3

37 C.F.R. § 42.8 ................................................................................................... 1

## EXHIBIT LIST

| Exhibit | Description |
|---|---|
| 1001 | U.S. Patent No. 8,112,504 |
| 1002 | Declaration of Chris Schmandt with Curriculum Vitae |
| 1003 | Declaration of Carl Malamud |
| 1004 | Personal Audio, LLC, *US Patent Office issues Podcasting Patent to Personal Audio*, Press Release, Feb. 7, 2012 |
| 1005 | Personal Audio, LLC, *Personal Audio Asserts Podcasting Patent Against Media Companies*, Press Release, Jan. 7, 2013 |
| 1006 | *Personal Audio, LLC v. Fox Broadcasting Co. et al.*, Complaint For Patent Infringement (E.D. Tex. Aug. 6, 2013) |
| 1007 | Markoff, J., *Turning the Desktop PC Into a Talk Radio Medium*, N.Y. TIMES, Mar. 3, 1993, at A1 |
| 1008 | Hafner, K., *The Man With Ideas*, NEWSWEEK, July 24, 1995 |
| 1009 | Schwartz, J., *Superhighway Routed Through Capitol Hill; Network Plans to Deliver Sound Bites as Bytes*, WASH. POST, Sept. 19, 1994, at A3 |
| 1010 | Sandberg, J., *On-Line Internet Expo Will Promote Cyberspace to the Whole Wired World*, WALL ST. J., Mar. 14, 1995, at B6. |
| 1011 | Grossman, W., *The Frontier of Broadcasting Radio Programs are Going On-Line*, INT'L HERALD TRIBUNE, Mar. 8, 1995, at 20 |
| 1012 | Patrick, A. et al, *CBC Radio on the Internet: An Experiment in Convergence*, 21 CANADIAN J. OF COMM'N 1, 125-140, Jan. 1, 1996 |
| 1013 | *CBC Radio on the Internet: An Experiment in Convergence*, Indexing Metadata, available at www.cjc-online.ca/index.php/journal/rt/metadata/926/832 (last accessed Sept. 21, 2013) |
| 1014 | Personal Audio, LLC, *Episodic Content*, available at http://personalaudio.net/patents/episodic-content/ (last accessed Oct. 11, 2013) |
| 1015 | U.S. App. No. 12/380,955, now U.S. Patent No. 8,112,504, *Notice of Allowability*, Oct. 24, 2011 |
| 1016 | *Merriam Webster's Colligiate Dictionary*, Definition of Episode (10th Ed. 1996) |
| 1017 | Berners-Lee, T. (Ed.), *Uniform Resource Locators (URLs)*, Network Working Group, Dec. 1994 |

| 1018 | Andreessen, M., *World Wide Web access to ITR*, posted to alt.radio.internet, Apr. 13, 1993 |
|------|--------------------------------------------------------------------------------------------|
| 1019 | Browser rendering of HTML web page located at http://www.ncsa.uiuc.edu/ radio/radio.html, as it existed on April 22, 1993, as rendered from the contents of Ex. 1021 |
| 1020 | *[surfpunk-0080] BUBBBLES: talk radio; _A New Age_; clipper chip*, SURFPUNK TECHNICAL JOURNAL, Apr. 22, 1993. |
| 1021 | The HTML file that existed at http://www.ncsa.uiuc.edu/ radio/radio.html, as of April 22, 1993, reproduced from the contents of Ex. 1020 |
| 1022 | Compton, C., *Internet CNN NEWSROOM: The Design of a Digital Video News Magazine*, Massachusetts Institute of Technology, Aug. 10, 1995 |
| 1023 | Web page located at http://www.ncsa.uiuc.edu/ radio/radio.html, as it existed on Dec. 20, 1996, available at http://web.archive.org/web/19961220063151/http://www.ncsa. uiuc.edu/radio/radio.html (last accessed Oct. 11, 2013) |
| 1024 | Web page located at http://www.cmf.nrl.navy.mil/radio/geek_ITR.html, as it existed on April 18, 1999, available at http://web.archive.org/web/19990418034612/http://www.cmf. nrl.navy.mil/radio/geek_ITR.html (last accessed Oct. 11, 2013) |
| 1025 | Savetz, K., *Plug In, Log On, Tune In*, Microtimes, May 31, 1993 |
| 1026 | Weber, M. H., *Steve Deering, Geek of the Week, April 21, 1993*, posted to alt.internet.talk-radio, Apr. 21, 1993 |
| 1027 | Weber, M.H., *Brewster Kahle, Geek of the Week, April 27, 1993*, posted to alt.internet.talk-radio, Apr. 27, 1993 |
| 1028 | Malamud, C., *Weekly "Geek of the Week" Interviews to Air on Internet Talk Radio in March*, Press Release, Mar. 1, 1993, as posted by Cooper, R. to alt.internet.services, Mar. 17, 1993 |
| 1029 | Vetter, R. et al, *Mosaic and the World Wide Web*, IEEE COMPUTER VOL. 27, No. 10, 49-57, October 1994 |
| 1030 | King, L., *Directory Of Electronic Journals, Newsletters And Academic Discussion Lists*, Office of Scientific and Academic Publishing Association of Research Libraries, May, 1994 |

On behalf of Petitioner Electronic Frontier Foundation ("EFF"), and in accordance with 35 U.S.C. § 311 and 37 C.F.R. § 42.100, *inter partes* review is respectfully requested for claims 31, 32, 33, 34, and 35 of U.S. Patent No. 8,112,504 ("the '504 patent"). The '504 patent is submitted as Exhibit 1001.

## I.     Mandatory Notices and Payment of Fees

### A.     <u>Certification of Grounds for Standing</u>

Pursuant to 37 C.F.R. § 42.104(a), Petitioner EFF certifies that the '504 patent is eligible for *inter partes* review and that EFF is not barred or estopped from requesting an *inter partes* review challenging '504 patent claims 31-35 on the grounds identified in this petition.

### B.     <u>Real Party-In-Interest</u>

Petitioner Electronic Frontier Foundation, located at 815 Eddy Street, San Francisco, CA 94109, is the sole real party in interest.

### C.     <u>Related Matters</u>

On information and belief, Personal Audio is asserting the '504 patent against several parties in several United States District Courts. EFF is currently aware of the following related matters under 37 C.F.R. § 42.8(b)(2):

(i)     *Personal Audio, LLC v. CBS Corp.*, 2:13-cv-270 (E.D. Tex. Apr. 11, 2013);

(ii)    *Personal Audio, LLC v. NBCUniversal Media, LLC*, 2:13-cv-271 (E.D. Tex. Apr. 11, 2013);

(iii)   *Personal Audio, LLC v. Ace Broadcasting Network, LLC*, 2:13-cv-14 (E.D. Tex. Jan. 7, 2013);

(iv)   *Personal Audio, LLC v. Howstuffworks.com*, 2:13-cv-15 (E.D. Tex. Apr. 10, 2013);

(v)   *Personal Audio, LLC v. Togi Entertainment, Inc.*, 2:13-cv-13 (E.D. Tex. Jan. 7, 2013);

(vi)   *Fox Networks Group, Inc. v. Personal Audio, LLC*, 1:13-cv-11794 (D. Mass. July 26, 2013); and

(vii)   *Personal Audio, LLC v. Fox Broadcasting Co.*, 2:13-cv-577 (E.D. Tex. Aug. 6, 2013).

### D.   Counsel and Service Information

| Lead Counsel | Backup Counsel |
|---|---|
| Richard C. Pettus (Reg. No. 45,935) Greenberg Traurig LLP 200 Park Avenue New York, NY 10166 pettusr@gtlaw.com; tel. (212) 801-9387; fax. (212) 801-6400 | Nicholas A. Brown (*pro hac vice req.*) Greenberg Traurig LLP 4 Embarcadero Center Suite 3000 San Francisco, CA 94114 brownn@gtlaw.com; tel. (415) 655-1271; fax. (415) 707-2010 |

Petitioner EFF hereby requests authorization to file a motion for Nicholas A. Brown to appear *pro hac vice*. Mr. Brown, an experienced litigator, is counsel for Petitioner EFF in this matter. Mr. Brown has an established familiarity with the podcasting subject matter at issue in this proceeding. Petitioner EFF intends to file such a motion once authorization is granted.

A Power of Attorney under 37 C.F.R. § 42.10 accompanies this Petition.

### E.      Fee for *Inter Partes* Review

The Director is authorized to charge the fee specified by 37 C.F.R. § 42.15(a) to Account No. 50-2638, which fee is believed to be $23,000. Any necessary additional fees may be charged to Account No. 50-2638.

### F.      Service of Petition and Service Information

Proof of service of this petition is provided in the concurrently filed Certificate of Service. EFF consents to service via email to: pettusr@gtlaw.com and brownn@gtlaw.com.  Service may also be made by mail or hand delivery to: Greenberg Traurig LLP, 4 Embarcadero Center Suite 3000, San Francisco, CA 94111.

## II.   Introduction

Personal Audio owns the '504 patent. On the day the '504 patent issued, Personal Audio put out a press release announcing that it had obtained a "Podcasting Patent." (Ex.1004). In that press release, Personal Audio asserted that it "invented what is now commonly called podcasting back in 1996," and that this accomplishment had been recognized by the Patent Office's decision to allow the '504 patent. Personal Audio has since filed several lawsuits, claiming that its "patented technology is used by several media companies offering podcasting," and alleging infringement of claims 31-35 of its so-called "Podcasting Patent." (Ex. 1005; Ex. 1006).

Personal Audio, however, did not invent podcasting in 1996. What Personal Audio calls "podcasting"—distributing episodes of media content on the Internet—had been known for at least three years at that point. On March 3, 1993, The New York Times published a story about Carl Malamud's plan "to begin broadcasting a weekly 30-minute radio talk show on the Internet." (Ex. 1007). The show was to be "built around an interview with a person widely known in the computer network field," and was to be called "Geek of the Week." (*Id.*). The New York Times also reported that many experts believed that "listening to such a program via computer instead of a radio" signaled "the first step in a transformation" towards broadcasting via computer networks, instead of traditional television and radio networks. (*Id.*).

Mr. Malamud's Geek of the Week broadcasts began on March 31, 1993, and they "were a hit, with more than 100,000 listeners the first year." (Ex. 1008). Mr. Malamud became "known among Internet cognoscenti for popularizing audio on the Net." (*Id.*). The Washington Post, The Wall Street Journal, and The International Herald Tribune wrote features covering the show and its popularity. (Exs. 1009; 1010; 1011).

Geek of the Week was not the only "podcast" released prior to 1996. For example, the Canadian Broadcasting Corporation ("CBC") ran a year-long Internet radio trial starting in December, 1993. (Ex. 1012 at 2). The CBC's radio shows

4

were made available through a website after they aired on traditional radio. (*Id.* at 3). The CBC added brief summaries of each show to the website and regularly updated the website when new content was available. (*Id.*). This trial confirmed the public's substantial demand for "podcasts," and the CBC decided to continue offering them after the trial period ended. (*Id.* at 1, 6-7). CNN also aired "podcasts" before 1996: it made its news segments available on the Internet using a method that was expressly suitable for various types of episodic content. (*See* Ex. 1022).

Personal Audio did not invent "podcasting." As explained below, what Personal Audio claimed in claims 31-35 of the '504 patent had been described in printed publications years earlier. Thus, claims 31-35 of the '504 patent should be cancelled pursuant to 35 U.S.C. § 102 and § 103.

## III.   The Challenged "Podcasting Patent"

Claims 31-35 of the '504 patent are challenged in this petition.[1]

### A.   The Alleged Invention

Personal Audio's '504 patent relates generally to the distribution of "episodes" of media content over the Internet.

---

[1] EFF believes that all of the claims in the '504 patent are invalid but has elected to challenge only claims 31-35 in this petition.

The '504 patent allegedly invented an improvement to how episodes of media content were distributed over the Internet: using a "compilation file" to identify new episodes in a series as those episodes became available. The '504 patent explains that while the existence of "Internet radio" meant that "files of audio program material [were] available for downloading on the World Wide Web using conventional Web browsers to locate and request specific files," this was "impractical for routine desktop use." (Ex. 1001 at 1:64-67, 2:6-10). According to the '504 patent, a problem with existing technology was that it searched for "individual program selections one at a time." (*Id.* at 2:7-8). The invention addressed this problem by providing a mechanism that compiled available episodes in a series, and identified new episodes in the series as they became available. (*Id.* at claim 31).

Personal Audio's website also describes the improvement of the '504 patent as the use of a "compilation file." Personal Audio explains that the '504 patent discloses a "novel mechanism for automatically identifying and retrieving media files representing episodes in a series." (Ex. 1014). This supposedly-novel mechanism is "a compilation file." (*Id.*). The "compilation file" describes the media files that represent the episodes in a series, is "updated as new episodes became available," and is available at a "predetermined URL." (*Id.*; *see also* Ex.

1001 at claim 31). According to Personal Audio, this "compilation file" mechanism was widely adopted and is now called "podcasting." (Ex. 1014).

The prosecution history of the '504 patent shows that the "compilation file" was considered by the Patent Office to be the novel aspect of the '504 patent at the time the patent was allowed. The primary reason for allowance provided by the patent examiner was that "the prior art does not provide for nor suggest for updating/downloading current version of a <u>compilation file</u> containing (1) attribute data describing episodes and (2) including one or more episode URLs identifying one or more corresponding media files representing said given one of said episodes." (Ex. 1015 at 2, *numbering and emphasis added*).

Notably, the patent examiner's reasons for allowance do not suggest that there was anything inventive about the computers or networks used to distribute the compilation file and the episodes. (*Id.*). Indeed, the '504 patent expressly acknowledges that the FTP and World Wide Web (HTTP) servers were previously known, and relies on that preexisting knowledge in describing how to operate a server for distributing the claimed "episodes" and "compilation file" over the Internet. (Ex. 1001 at 5:57-6:2; 6:48-7:30; 18:55-60).

### B.      The Person of Ordinary Skill in the Art

The '504 patent claims priority to an application filed on Oct. 2, 1996. (Ex. 1001 at cover). The '504 patent identifies the field of the invention as "electronic

information distribution systems." (Ex. 1001 at 1:19-22). The challenged claims involve the distribution of media content over the Internet. (*Id.* at 50:34-52:11). The person of ordinary skill in the art for the '504 patent is a person who, as of 1996, had a bachelor's degree in computer science or engineering and at least 3-5 years of experience in the field of electronic information distribution systems, including distribution of media content over the Internet, or who had an equivalent combination of education and experience. (*See* Declaration of Chris Schmandt, Ex. 1002 ("Schmandt Decl."), ¶¶ 18-19).

### C.   Claim Construction

The terms of the '504 patent receive their broadest reasonable construction in light of the specification of the patent. 37 C.F.R. § 42.100(b). Also, claim terms, unless given different meaning by the patent specification, should be given their ordinary and accustomed meaning as would be understood by one of ordinary skill in the art. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (*en banc*); Changes to Implement *Inter Partes* Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48699 (2012), Response to Comment 35.

The challenged claims describe an Internet server (e.g. a web server) that is operated to distribute an "episode" through the use of a "compilation file." Claim

31 is the only independent claim challenged. It is reproduced in full in the claim charts of this petition.

### 1.    Summary of Claim 31

Claim 31 recites an apparatus for disseminating "a series of episodes represented by media files via the Internet," i.e. a server. (Ex. 1001 at claim 31). The distribution of media files is accomplished using a "compilation file" that is updated "from time to time as new episodes … become available." (*Id.*).

The claimed apparatus includes a processor, a communication interface, and a data storage server. It stores each media file at a location specified by an "episode URL." Similarly, it stores the compilation file at a location specified by "a predetermined URL." And it is capable of downloading these data files to a client device in response to a request that specifies the appropriate URL. These components and capabilities are all part of a standard FTP or World Wide Web (HTTP) server. (Schmandt Decl. ¶¶ 20-23; *see also* Ex. 1001 at 5:56-6:2; 6:48-59).

The compilation file contains at least two types of "attribute data" for each currently available episode: "displayable text" describing the episode, and episode URL(s) specifying the location of the media file(s) representing that episode.

In operation, the claimed server receives a request from a client device for the compilation file, which is located at the predetermined URL. The server then downloads the compilation file to the client. Finally, the server receives and

responds to a request from the client for the media file identified by one of the episode URLs that was provided in the compilation file.

In summary, Claim 31 has the following requirements:

*(a)*   An apparatus for disseminating, via the Internet, a series of episodes represented by media files.

*(b)*   A processor, a communication interface, and a data storage server being part of the apparatus.

*(c)*   A "compilation file" that is updated "from time to time as new episodes … become available."

*(d)*   The compilation file and each media file are stored at "predetermined URLs" and "episode URLs," respectively, on the server.

*(e)*   "Attribute data," including "displayable text" and media file URLs for each episode, are contained within the compilation file.

*(f)*   The apparatus operates to (1) receive a request for the updated compilation file at the predetermined URL from a client; (2) download the requested file to the client.

*(g)*   The apparatus further operates to (3) receive and respond to a request from the client that downloaded the compilation file for a media file identified by a URL in the compilation file.

These requirements *(a)* to *(g)* are used below in discussing the prior art.

### 2.      Summary of Dependent Claims 32-35

Dependent claims 32-35 specify additional details of this apparatus. Claim 32 requires at least some of the media files to "contain digital compressed audio recordings." Claim 33 adds that "at least some of said media files contain text data." Claim 34 requires the "attribute data" for each episode to "include displayable text data." Finally, claim 35 requires the "compilation file" to include "displayable text."[2]

### 3.      Constructions for Specific Claim Terms

Specific claim constructions for terms not having their plain and ordinary meaning are provided and explained below.

#### a.      "episode"

The challenged claims require a "series of episodes" in which "new episodes" become available over time. In this context, the specification explains, an episode is a program segment that is part of a series (i.e. a sequence of related segments). (Ex. 1001 at 19:35-42). This is consistent with the ordinary English meaning of "episode." (*See* Ex. 1016). Thus, "episode" includes such concepts as chapters in a

---

[2] Claim 35 refers to "the audio program player set forth in claim 34", however no such player is described in claim 34 or its base claim 31.  For purposes of this petition, EFF has assumed the claim refers to "the apparatus of claim 34". (*See* Ex. 1001 at claim 35).

11

book, or a series of lessons, which the specification states may be "readily handled by the invention." (Ex. 1001 at 39:46-57). "Episode" also includes content about an evolving topic, such as "a news story." (*Id.* at 20:5-12, 6:32-35). The claims also require each "episode" to be represented by one or more media files. Thus, an "episode" is a program segment, represented by one or more media files, that is part of a series of related segments, e.g. a radio show or a newscast.

> b.    *"data file," "compilation file," and "media file"*

Claim 31 specifies that the claimed server is capable of receiving requests from remotely located client devices, and responding to those requests by downloading "a data file" that is identified by a URL in the request. (Ex. 1001 at 50:40-44). The claim also requires, more specifically, that the server receive and respond to client requests containing URLs for (a) the "compilation file" (*Id.* at 51:1-2) and (b) "one or more media files." (*Id.* at 51:6-7).

"Data file": The ordinary meaning of the term "data file" includes both "compilation files" and "media files." This is confirmed by the claim language, which uses the general term "data file" in describing the capabilities of the server's communication interface. Thus, "data file" should be given its ordinary meaning.

"Compilation file": In the claims, the "compilation file" contains information about each currently-available episode, is stored at a predetermined URL, and is updated from time to time. The specification describes the

"compilation file" in terms that show it is simply an ordinary file that contains the information required by the claim. (*See, e.g.*, Ex. 1001 at 6:60-64, 7:10-22). Thus, "compilation file" refers to any file that contains information about multiple episodes and satisfies the other claim requirements.

"Media file": In the claims, one or more "media files" represent an episode that is downloaded so it can be played/viewed at the client device. This shows that a "media file" is a file that has media content, e.g. video, audio, and/or text. Dependent claims 32 and 33 show that the claimed media files may contain "digital compressed audio" and/or "text data." (Ex. 1001 at claims 32-33). Thus, "media file" refers to a file with content that can be reproduced as video, audio, and/or text.

> c.      *"client device"*

In the claims, the "client devices" send requests for files over the Internet, and then receive downloads of those files from the server. The specification describes the "client" as "a conventional laptop or desktop personal computer." (*See, e.g.*, Ex. 1001 at Fig. 1 and 4:44-46 (describing the processor in a conventional laptop or desktop as "client CPU 105")). Thus, a "client device" is a device, such as a laptop or desktop computer, that can request and receive files using the Internet.

> d.      *"URL", "predetermined URL" and "episode URL"*

13

"URL": "URL" is a term of art: it is an acronym for "Universal Resource Locator." (Schmandt Decl. ¶ 24; Ex. 1017 at 1; *see also* Ex. 1029 at 4). A URL is a string of characters that follow the URL syntax and which is used to locate and access resources, such as files. (Schmandt Decl. ¶ 25; *see also* Ex. 1029 at 4).

"Predetermined URL": The broadest reasonable construction of "predetermined URL" is a URL that is known in advance.  The specification confirms this interpretation. (*See, e.g.*, Ex. 1001 at 6:60-64, 7:23-26, 13:30-33).

"Episode URL": The broadest reasonable construction of "episode URL" is "a URL that provides location and access information for an episode." This would include, for example, a URL such as "www.ncsa.uiuc.edu/radio/ 033193_geek_01 _ITR.au", which can also be written as "HREF = "033193_ geek_ 01_ ITR.au"" within an HTML page located at "www.ncsa.uiuc.edu/radio/"and provides location and access information for the "033193_ geek_ 01_ ITR.au" audio file. (*See* Schmandt Decl. ¶¶ 26-35).

         *e.*     *"attribute data"*

The broadest reasonable interpretation of "attribute data" is "values of data fields which are stored in the compilation file." This could include, for example, values about the duration of an episode or the description of the episode. The specification confirms this, explaining that the "attributes" of a "program segment" are "described in the data fields of each record (row) in the Program Table 303."

(Ex. 1001 at 17:22-25). Those data fields include one for "URL," showing that a URL is an attribute. They also include "SubjectDesc" and "TopicDesc," which the specification describes as identifying "displayable text descriptions of subjects and topics." (*Id.* at 19:6-21). Claim 31 of the '504 itself specifies that the "attribute data" must include "displayable text describing [the available episodes]" and "episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes." (*Id.* at claim 31).

### f.   *"displayable text data"*

The specification describes "displayable text data" as text that is "displayable by the player 103 as part of descriptive catalog entries which enable the user to choose desired segments." (Ex. 1001 at 19:22-23). It uses HTML as an example of how to provide "displayable text" describing audio content. (*See id.* at 43:42-45:10 ("Defining Audio Programming with HTML …")). Thus, the broadest reasonable construction of "displayable text data" is "data that can be displayed as human-legible text, such as the displayable components of HTML."

## IV.   Requested Grounds for Rejection

Personal Audio claims to have invented "podcasting," but it did not. Multiple printed publications demonstrate that what Personal Audio claims to have invented—Internet distribution of media content using a "compilation file" that identifies episodes in a series, and is updated with new episodes as they became

available—was known long before Personal Audio applied for its patent. Five

specific grounds for rejection are identified below. They are:

(a)     Ground 1:  Claims 31-35 are unpatentable under 35 U.S.C. § 102(b)

as being anticipated by the web page www.ncsa.uiuc.edu/radio/radio.html as it

appeared on April 22, 1993. ("NCSA GotW page", Ex. 1019 (rendered version),

1021 (HTML version)).

(b)     Ground 2: Claims 31-35 are unpatentable under 35 U.S.C. § 102(b) as

being anticipated by the April 22, 1993 edition of the SurfPunk Technical Journal

("SurfPunk", Ex. 1020).

(c)     Ground 3: Claims 31-35 are unpatentable under 35 U.S.C. § 103 as

being obvious over all of the Geek of the Week publications cited herein,

considered collectively with their supporting evidence. ("Geek of the Week

publications", Exs. 1003, 1007-1011, 1018-1028).

(d)     Ground 4: Claims 31-35 are unpatentable under 35 U.S.C. § 102(a) as

being anticipated by Patrick, A. et al, *CBC Radio on the Internet: An Experiment in

Convergence*, 21 Canadian J. of Comm'n 1, 125-140 (Jan. 1, 1996) (the "CBC

Radio Article", Ex. 1012).

(e)     Ground 5: Claims 31-35 are unpatentable under 35 U.S.C. § 103 as

being obvious based on Compton, C., *Internet CNN NEWSROOM: The Design of a

Digital Video News Magazine*, Massachusetts Institute of Technology (Aug. 10,

1995) ("Internet CNN Newsroom", Ex. 1022) and the knowledge of one of ordinary skill.

Supporting evidence for each of these grounds, including the Schmandt Declaration, is also identified and explained. Petitioner also submits the declaration of Carl A. Malamud, the publisher of the Geek of the Week program that was incorporated into the NCSA GotW page and is described in the numerous publications regarding the same. (Ex. 1003). None of the prior art presented below was considered by the Patent Office when it allowed the '504 patent.

**A.   Claims 31-35 are anticipated by the Geek of the Week web page published at www.ncsa.uiuc.edu/radio/radio.html in April 1993.**

Carl Malamud began publishing his "Geek of the Week" Internet talk radio show on March 31, 1993. (Ex. 1003 ¶¶ 6-7). "Geek of the Week" was published using a web page, and was also distributed using FTP. (*Id.* ¶¶ 9-12). It was "a hit, with more than 100,000 listeners the first year." (Ex. 1008).

One Geek of the Week web page, www.ncsa.uiuc.edu/radio/radio.html, was hosted by the National Center for Supercomputing Applications at the University of Illinois—the same organization where Marc Andreessen created the Mosaic web browser before leaving to found Netscape. (Ex. 1018; *see also* Ex. 1029 at 1). A rendering of this web page as it existed on April 22, 1993 is shown on the next page. (*See* Schmandt Decl. ¶¶ 34-35, Ex. 1019). While the web page www.ncsa.uiuc.edu /radio/radio.html that existed in April, 1993 (the "NCSA

GotW page") no longer exists at that location, it was copied on that date, and published in SurfPunk Technical Journal. (Ex. 1020; Schmandt Decl. ¶ 43; *see* Ex. 1021). This copy proves the content of the NCSA Geek of the Week web page as of April 22, 1993.

As of that date, this web page, which had been updated, contained four weekly episodes of Geek of the Week—the March 31, April 7, April 14, and April 21 editions. (Ex. 1019, Ex. 1021). The web page also included text describing each episode, with links to the audio files that made up each episode. (*Id.*). In short, this Geek of the Week web page from April 1993 had all the features of the "compilation file" that Personal Audio claims it invented in 1996, and that the patent examiner believed were not previously known when he explained his reasons for allowing the '504 patent.

*See supra*, Section III.A. As further explained below, the NCSA GotW page was a printed publication that anticipates



**Internet Talk Radio**

**General Information**

- Introduction to Internet Talk Radio.
- Overview of Geek of the Week.

**April 21, 1993**

Here's the overview of the April 21 edition of Internet Talk Radio.

- Steve Deering, Part 1 (5.6 megs)
- The Incidental Tourist (1.6 megs)
- Steve Deering, Part 2 (6.0 megs)
- Book Byte (0.7 megs)
- Steve Deering, Part 3 (5.4 megs)

**April 14, 1993**

Here's the overview of the April 14 edition of Internet Talk Radio.

- Daniel Lynch, Part 1 (5.7 megs)
- The Incidental Tourist (0.9 megs)
- Daniel Lynch, Part 2 (5.5 megs)
- Legal Stuff (0.2 megs)
- Daniel Lynch, Part 3 (3.4 megs)

**April 7, 1993**

Here's the overview of the April 7 edition of Internet Talk Radio.

- Dr. Erik Huizer, Part 1 (5.4 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Erik Huizer, Part 2 (4.8 megs)
- Book Byte (0.7 megs)
- Dr. Erik Huizer, Part 3 (5.9 megs)
- Name That Acronym (0.5 megs)
- Dr. Erik Huizer, Part 4 (5.2 megs)

**March 31, 1993**

Here's the overview of the March 31 edition of Internet Talk Radio.

- Dr. Marshall Rose, Part 1 (5.6 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Marshall Rose, Part 2 (5.1 megs)
- Book Byte (0.6 megs)
- Dr. Marshall Rose, Part 3 (5.6 megs)
- Name That Acronym (0.5 megs)
- Dr. Marshall Rose, Part 4 (4.2 megs)

*marca@ncsa.uiuc.edu*

claims 31-35 of the '504 patent.

### 1. The NCSA's Geek of the Week Page is a printed publication

The Geek of the Week web page www.ncsa.uiuc.edu/radio/radio.html that existed on April 22, 1993 is a printed publication. The NSCA GotW page was publicly available and known to those of skill in the relevant field, because on April 13, 1993, Marc Andreessen, the maker of Mosaic, announced the public availability of Geek of the Week through this web page. (Ex. 1018). There were no prohibitions on its being copied. (*See id.* (containing no restriction on the website's dissemination); Ex. 1019 (same)). Moreover, the SurfPunk Technical Journal article (Ex. 1020) shows that on April 22, 1993 this specific page was actually copied, and the copy republished. (*See* Schmandt Decl. ¶ 50).

Accordingly, the NCSA GotW page qualifies as a printed publication. *See* MPEP § 2128; *In re Klopfenstein*, 380 F.3d 1345, 1350-52 (Fed. Cir. 2004) (finding that a printed slide presentation on display for 3 days without confidentiality restrictions was a "printed publication"); *see also Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104 (Fed. Cir. 1985) (distribution of six copies of a presentation that had been delivered orally was enough to make the copies "printed publications"); *Voter Verified, Inc. v. Premier Election Sol'ns*, 698 F.3d 1374, 1380-81 (Fed. Cir. 2012) (magazine distributed via a subscription mailing list and available for download was a printed publication).

## 2. Claim 31 is anticipated by the NCSA GotW page.

### a. The NCSA GotW page discloses requirement (a): an apparatus for disseminating, via the Internet, a series of episodes represented by media files.

The NCSA GotW page disseminated the Geek of the Week ("GotW")
Internet talk radio show. Each weekly GotW show is an "episode." A set of weekly
shows—e.g. the March 31, April 7, April 14, and April 21, 1993 episodes that
were available on April 22, 1993 on the NCSA server—is the claimed "series of
episodes."

Each GotW episode was broken into segments, and each segment is
represented by a compressed audio file with the file extension ".au." For example,
the March 31, 1993 episode of GotW available on the NCSA server included the
seven files from 033193_geek_01_ITR.au through 033193_geek_07_ITR.au.
(Schmandt Decl. ¶¶ 29-34). These compressed audio files are the claimed "media
files."

An ordinary artisan understood in 1993 that a web page such as the NCSA
GotW page was necessarily published by a web server (HTTP server). (Schmandt
Decl. ¶¶ 46-51; *see also* Ex. 1029 at 5). That web server is the claimed "apparatus
for disseminating … episodes." (Schmandt Decl. ¶ 46). In other words, the server
that responded to the public's requests for the NCSA GotW web page, including
for example SurfPunk's "telnet www.ncsa.uiuc.edu port 80" and "GET
/radio/radio.html" requests on April 22, 1993 (the "NCSA GotW server"), is the

claimed apparatus. (Schmandt Decl. ¶ 51). *See In re Baxter Travenol Labs*, 952

F.2d 388, 390 (Fed. Cir. 1991) ("extrinsic evidence may be considered when it is

used to explain, but not expand, the meaning of a reference"); MPEP § 2131.01.

> b.   *The NCSA GotW page discloses requirement (b): the apparatus for disseminating episodes includes a processor, a communication interface, and a data storage server.*

The NCSA GotW page was necessarily published by a web server that

necessarily included the claimed processor, interface, and data storage. (Schmandt

Decl. ¶ 47; *see also* Ex. 1029 at 5, 7). The standard capabilities and components of

web servers were known to those of ordinary skill as of 1996. (*See* Schmandt Decl.

¶¶ 19-23; *see also* Ex. 1029 at 5, 7). Indeed, as mentioned above, the '504 patent

expressly acknowledges that the FTP and World Wide Web (HTTP) servers were

previously known, and relies on that preexisting knowledge in describing how to

operate a server for distributing the claimed "episodes." All web servers

necessarily include and have included the claimed "processor," "communication

interface," and "data storage server." (Schmandt Decl. ¶¶ 47-49). Thus, while the

NCSA GotW page is not itself a web server, any person of ordinary skill reviewing

the NCSA GotW page would understand it to reveal all the standard components of

a web server, including the processor, communication interface, and data storage

server. (*Id.*). The web page could not have been published without these three

components.

   c.  *The NCSA GotW page discloses requirement (c): a "compilation file" that is updated "from time to time as new episodes … become available."*

  The NCSA GotW page discloses—indeed exemplifies—the claimed "compilation file." The NCSA GotW page, i.e. www.ncsa.uiuc.edu/ radio/radio.html, was updated "from time to time as new episodes … bec[a]me available." This is shown by the fact that on April 22, 1993, it contained four weekly episodes, one for each week since it launched (March 31, April 7, April 14, and April 21). (Schmandt Decl. ¶ 34; Ex. 1019; Ex. 1021). An ordinary artisan would have understood from the disclosure of the April 21, 1993 episode of Geek of the Week that the page had been updated, since the artisan would have known that the page existed before the April 21 episode was released. (*See* Ex. 1018 (announcing the page prior to April 22, 1993); *see generally* Ex. 1028 (press release entitled "*Weekly 'Geek of the Week' Interviews to Air on Internet Talk Radio in March*" and discussing the program); *see also* Ex. 1023 (showing that at later times, the radio.html file hosted by the GotW NCSA server included many more episodes with later dates)). Thus, the NCSA GotW page is the "updated compilation file." *See In re Baxter Travenol Labs.*, 952 F.2d at 390-91 (evidence may be used in an anticipation analysis to show how a prior art disclosure would have been understood by one of ordinary skill in the art); MPEP § 2131.01.

> d. *The NCSA GotW page discloses requirement (d): the compilation file and each media file are stored at "predetermined URLs" and "episode URL," respectively.*

The NCSA GotW page was stored at a "location identified by a predetermined URL": www.ncsa.uiuc.edu/radio/radio.html. (Schmandt Decl. ¶ 51; Ex. 1003 ¶ 9; Ex. 1018; Exs. 1019-21). In addition, the compressed audio files for each GotW episode were stored at a location specified by an "episode URL", as described above in requirement (a). For example, the episode segment for Dr. Marshall Rose could be found at the episode URL "HREF = "033193_ geek_ 01_ ITR.au"". (Schmandt Decl. ¶ 34; Ex. 1020).

> e. *The NCSA GotW page discloses requirement (e): that the compilation file contains "attribute data," including "displayable text" and media file URLs for each episode*

The NCSA GotW page discloses the claimed "compilation file," as explained above. It contains the claimed "attribute data describing currently available episodes," including both "displayable text describing" the episodes and "episode URLs specifying the storage locations of one or more corresponding media files."

For example, it contained HMTL that renders as shown in the image on the right. (Schmandt Decl. ¶¶ 27-35). The HMTL that renders into this image includes the string "<LI> <A NAME



**March 31, 1993**

Here's the overview of the March 31 edition of Internet Talk Radio.

- Dr. Marshall Rose, Part 1 (5.6 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Marshall Rose, Part 2 (5.1 megs)
- Book Byte (0.6 megs)
- Dr. Marshall Rose, Part 3 (5.6 megs)
- Name That Acronym (0.5 megs)
- Dr. Marshall Rose, Part 4 (4.2 megs)

= 1 HREF = "033193_ geek_ 01_ ITR.au" > Dr. Marshall Rose, Part 1</A> (5.6 megs)." (*Id.*). This string contains both displayable text ("Dr. Marshall Rose, Part 1 (5.6 megs)") and a URL ("HREF = "033193_ geek_ 01_ ITR.au""). (Schmandt Decl. ¶¶ 27-33). The displayable text describes the episode in question, which included an interview of Dr. Marshall Rose. The URL specifies the location of one of the media files representing the episode. (*Id.*).

> f.   *The NCSA GotW page discloses requirement (f): operating the apparatus to (1) receive a request for the updated compilation file at the predetermined URL, and (2) download the requested file to the client.*

The NCSA GotW page was published by a web server to requesting clients, which an ordinary artisan understood in 1993 were typically browsers. To obtain a web page, the browser on the client computer requests the HMTL file representing that page from the server, and the server responds by downloading that file to the browser. (Schmandt Decl. ¶ 27; *see also* Ex. 1029 at 4). For example, when a browser accessed the 1993 NCSA server hosting the GotW page "radio.html," the browser requests the file at www.ncsa.uiuc.edu/radio/radio.html, and the web server responds by downloading that file to the browser. (*Id.*).

> g.   *The NCSA GotW page discloses requirement (g): operating the apparatus to (3) receive and respond to a request from the client for a media file identified by a URL in the compilation file.*

As explained above, the NCSA GotW page included URLs (displayed as links) for the media files representing each Geek of the Week episode. An ordinary

artisan understood in 1993 that after a browser has requested, received, and then displayed the radio.html page, the user could click one of the links to the media files. When that happened, the browser transmitted a request for the media file identified by that URL to the web server, and the web server downloaded that file to the browser. (Schmandt Decl. ¶¶ 27, 34; *see also* Ex. 1029 at 4).

### 3. *Claims 32-35 are anticipated by the NCSA GotW page.*

The NCSA GotW page discloses all of the limitations of the dependent claims as well. Dependent claim 32 requires that the media files contain compressed audio. (Ex. 1001 at claim 32). The NCSA GotW page discloses ".au" files, which are compressed audio files. (Ex. 1019; Schmandt Decl. ¶ 54).

Dependent claim 33 requires that "some of the media files contain text data which may be displayed or reproduced in spoken audible form." These "text data" media files would have been apparent to the ordinary artisan from the NCSA GotW page. (Ex. 1019 (linking to an "overview" text file); Schmandt Decl. ¶ 55).

Dependent claims 34 and 35 were similarly disclosed by the NCSA GotW page. The publication disclosed attribute data (e.g. the date, the size of the media file, and the name of the segments) which described each episode. And finally, the NCSA GotW page included a text file which provided an overview of the Geek of the Week series of episodes. (Ex. 1019; Ex. 1021; Schmandt Decl. ¶ 57).

**B.** **Claims 31-35 are anticipated by SurfPunk, which republished the NCSA GotW page**

The web page www.ncsa.uiuc.edu/radio/radio.html that existed on April 22, 1993 was copied, and the copy was republished in the April 22, 1993 edition of SurfPunk Technical Journal ("SurfPunk"). The SurfPunk Technical Journal is listed in the 1994 edition of the Directory Of Electronic Journals, Newsletters, and Academic Discussion Lists. (Ex. 1030 at 6). SurfPunk is a printed publication. *See Voter Verified, Inc.*, 698 F.3d at 1380-81 (magazine distributed via a subscription mailing list and available for download was a printed publication); MPEP § 2128.

SurfPunk contains all of the content identical of the NCSA GotW page, and thus anticipates the '504 patent for at least the reasons described above. To the extent there is any doubt that the NCSA GotW page is a printed publication, SurfPunk also anticipates.

**C.** **Claims 31-35 are obvious based on Geek of the Week Publications**

The NCSA GotW page was far from the only web page that published "Geek of the Week" prior to January 1, 1996. Nor were web pages the only printed publications describing GotW—many others have already been described, including SurfPunk, articles in Newsweek, The New York Times, and The Washington Post, as well as USENET posts. Claims 31-35 are obvious in light of the NCSA GotW page, in combination with other web pages at www.ncsa.uiuc.edu/radio/ as well as at www.cmf.nrl.navy.mil/radio/, both of

26

which published Geek of the Week prior to 1996, and with other printed

publications demonstrating the public distribution of Geek of the Week Internet

radio shows prior to 1996. (*See* Exs. 1003, 1007-1011, 1018-1028; *see also*

Schmandt Decl. ¶¶ 44-45).

    As explained above, many of the elements of the claims are disclosed by the

NCSA GotW page not in the words of the web page, but by virtue of its existence

as a published web page: a web page is necessarily published by a web server that

has a processor, communication interface, data storage, ability to receive and

respond to requests for files, etc. While Petitioner believes that the NCSA GotW

page is an anticipatory reference, to the extent there is any doubt that any of the

elements of the challenged claims are disclosed, expressly or inherently, those

doubts can be removed by considering collectively, under 35 U.S.C. §103, the

Geek of the Week printed publications identified above. As shown in more detail

in the claim chart below, those publications disclose *expressly* all the limitations of

the challenged claims. For example, several publications explain that servers

hosted the web pages. (*See, e.g.*, Ex. 1008). It would have been obvious to a person

of ordinary skill in the art to combine the disclosures of these publications because

they were all describing the same thing: the Geek of the Week Internet radio show.

**D.** **Claim Chart showing the NCSA GotW page and SurfPunk each anticipate Claims 31-35, and that the Geek of the Week publications render Claims 31-35 obvious.**

| Claim Limitation | The NCSA GotW page (Ex. 1019 (rendered); Ex. 1021 (HTML)); SurfPunk (Ex. 1020); Geek of the Week publications (Exs. 1003, 1007-1011, 1018-1028). |
|---|---|
| **31.** Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | "Apparatus for disseminating … via the Internet": A person of ordinary skill would understand that the NCSA GotW page was available through a web server (HTTP server), which is the claimed apparatus. (Schmandt Decl. ¶ 45; Ex. 1019; Ex. 1020). For example, the server that responded to SurfPunk's "telnet www.ncsa.uiuc.edu port 80" and "GET /radio/radio.html" requests on April 22, 1993 (the "1993 NCSA server") was an "apparatus for disseminating … episodes." (Schmandt Decl. ¶ 51; Ex. 1019; Ex. 1020; Ex. 1021).<br><br>"a series of episodes represented by media files…as said episodes become available": It was also understood that Geek of the Week was a weekly series of "Internet Talk Radio" shows. (*See generally* Ex. 1028 ("Internet Talk Radio will begin airing a weekly half-hour interview program, 'Geek of the Week,' over the Internet in late March."); Ex. 1003 ¶ 5). Each weekly show, including each of its parts, is a claimed "episode." A set of weekly shows is the claimed "a series of episodes." Each GotW episode was represented by compressed audio files with the file extension ".au." For example, the March 31, 1993 episode of GotW included the seven files 033193_geek_01_ITR.au … 033193_geek_07_ITR.au. (Schmandt Decl. ¶¶ 34, 48). It would have been understood from the NCSA GotW page that new files were added as |

| | |
|---|---|
| | they became available. (Schmandt Decl. ¶¶ 48-49). In addition, the NCSA GotW page, prior to April 22, 1993, was known to have Geek of the Week content, also showing that it would be understood to be updated as files became available. (*See* Ex. 1018). |
| one or more data storage servers, | An artisan would have understood the NCSA GotW page to disclose a data storage server, i.e. the 1993 NCSA server, because it needed to store the content to make it available. (Schmandt Decl. ¶¶ 47-49). |
| one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, | In order to retrieve a web page, a communications interface at the server is needed to receive a request for the page. (*See* Schmandt Decl. ¶ 51). Thus the fact that a person could retrieve the NCSA GotW page over the Internet disclosed that the NCSA server included the claimed "communication interface" and received "requests" (e.g. GET) from "remotely located client devices." (Schmandt Decl. ¶¶ 51-52; Ex. 1020 (disclosing port 80)). |
| and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | A web server that made the NCSA GotW page available on the Internet responded to "requests" (e.g. GET) by "downloading a data file identified by a URL" as claimed. (Schmandt Decl. ¶ 51; *see also* Ex. 1019; Ex. 1020). For example, the web server would provide the file 033193_geek_01_ITR.au in response to a GET request containing the URL "www.ncsa.uiuc.edu/radio/033193_geek_01_ITR.au". Thus, the NCSA GotW paged disclosed a data file identified by a URL specified by a request, as claimed. |
| one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | By disclosing a web page, the NCSA GotW page disclosed a server, e.g. the 1993 NCSA server, that necessarily included the claimed "one or more processors," which were necessarily "coupled" to the "data storage server" and "communication interfaces." (Schmandt Decl. ¶¶ 46-47; *see also* Ex. 1020 (disclosing the "GET" |

29

| | |
|---|---|
| | command)). |
| storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | The NCSA GotW page disclosed storing the "media files representing each episode" as they became available, as claimed. The NCSA GotW page disclosed media files specified by a unique episode URL. (Ex. 1021 (disclosing at least the media files 040793_geek_01_ITR.au … 040793_geek_07_ITR.au, each stored at a unique location); Schmandt Decl. ¶¶ 30-31 (describing the use of HREF); *see also* Ex. 1019; Ex. 1020). Due to the use of dates on the page, an artisan would thus have understood from the NCSA GotW page that new episodes were added as they became available. (Schmandt Decl. ¶ 48; Ex. 1019; Ex. 1020). In addition, an artisan would have known the website to have existed before the April 22, 1993 publication, leading to the conclusion that the files were stored when they became available. (*See* Ex. 1018; Schmandt Decl. ¶ 49). |
| from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | The NCSA GotW page, e.g. www.ncsa.uiuc.edu/radio/radio.html, discloses—indeed exemplifies—the claimed "compilation file." It was stored at a "location identified by a predetermined URL," as claimed.<br><br>It would have been understood that the NCSA GotW page was updated regularly, as shown by the fact that it contained four weekly episodes (March 31, April 7, April 14, and April 21) when it was published at www.ncsa.uiuc.edu/radio/radio.html as of April 22, 1993. (Schmandt Decl. ¶ 49; Ex. 1019; Ex. 1003 ¶ 11). In addition, it would have been known that the site previously did not contain the April 21, 1993 episode, as the site was known to exist before then. (Schmandt Decl. ¶¶ 49-50; *see also* Ex. 1018). Thus the NCSA GotW page disclosed that the web server stored "an updated version of a compilation file … at a storage |

| | |
|---|---|
| | location identified by a predetermined URL," as claimed, and it did so "as new episodes … become available." |
| said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes,<br><br>said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes<br><br>and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes, and | The NCSA GotW page, i.e. "radio.html" discloses the claimed "updated version of said compilation file." It contains the claimed "attribute data describing currently available episodes," including both "displayable text describing" the episodes and "episode URLs specifying the storage locations of one or more corresponding media files." The web page published at www.ncsa.uiuc.edu/radio/radio.html as of April 22, 1993 contained html that renders as shown in this image:<br><br>**March 31, 1993**<br><br>Here's the overview of the March 31 edition of Internet Talk Radio.<br><br>• Dr. Marshall Rose, Part 1 (5.6 megs)<br>• The Incidental Tourist (1.5 megs)<br>• Dr. Marshall Rose, Part 2 (5.1 megs)<br>• Book Byte (0.6 megs)<br>• Dr. Marshall Rose, Part 3 (5.6 megs)<br>• Name That Acronym (0.5 megs)<br>• Dr. Marshall Rose, Part 4 (4.2 megs)<br><br>(Schmandt Decl. ¶¶ 48-50, 34-35). The HMTL that renders into this image includes the string "<LI> <A NAME = 1 HREF = "033193_ geek_ 01_ ITR.au" > Dr. Marshall Rose, Part 1</A> (5.6 megs)." (*Id.* ¶ 34-35). This string contains both displayable text ("Dr. Marshal Rose, Part 1 (5.6 megs)") and a URL ("HREF = "033193_ geek_ 01_ ITR.au""). (*Id.* ¶ 34-35). The displayable text describes the episode in question, which included an interview of Dr. Marshal Rose. The URL specifies the location of one of the media files representing the episode. (*Id.* ¶¶ 30-31; *see also id.* ¶ 49; Ex. 1019; Ex. 1020). |
| employing one of said one or more communication | As described above, a web server, e.g. the 1993 NCSA server, included the claimed |

| | |
|---|---|
| interfaces to: | "communication interface." That interface was used in performing the steps that follow. (*See* Ex. 1020 (showing a connection to a communication interface)). |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | The NCSA GotW page discloses the existence of the NCSA server, that would receive from a "client device" the claimed "request … for the updated version of said compilation file" whenever it received a request for the NCSA GotW page (i.e. the claimed "updated … compilation file"). (Schmandt Decl. ¶ 46). As another example, the "GET /radio/radio.html" request issued to "www.ncsa.uiuc.edu port 80" on April 22, 1993 was such a request. (Schmandt Decl. ¶ 51; Ex. 1019; Ex. 1020). |
| (b) download said updated version of said compilation file to said requesting client device; and | By its nature, the NCSA GotW page disclosed that whenever the GotW web server received a request as described in the previous step, it would respond by downloading the file representing the requested web page, (i.e. the claimed "updated … compilation file"). (Schmandt Decl. ¶ 51). As an example, after receiving the "GET /radio/radio.html" request on April 22, 1993, the GotW web server at "www.ncsa.uiuc.edu port 80" responded by downloading the html file whose contents are shown in the text of the April 22, 1993 edition of SurfPunk Technical Journal. (Schmandt Decl. ¶ 51; Ex. 1019; Ex. 1020). |
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | As described above, the NCSA GotW page included URLs specifying the locations of the media files representing each episode of GotW. Whenever the NCSA server received a request for a URL specifying the location of one of these media files, it would respond by downloading the specified file. (Schmandt Decl. ¶ 53; Ex. 1019; Ex. 1020). |
| | |

| | |
|---|---|
| **32.** The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | As described above, each GotW episode was represented by compressed audio files with the file extension ".au." For example, the March 31, 1993 episode of GotW included the seven files 033193_geek_01_ITR.au … 033193_geek_07_ITR.au. These files are the claimed "digital compressed audio recordings." (Schmandt Decl. ¶54; Ex. 1019; Ex. 1020). |
| | |
| **33.** The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | The NCSA GotW page disclosed GotW episodes described by an "overview" that was linked from the main web page, as shown by the image below of a portion of the radio.html page on the NCSA server: |

**March 31, 1993**

Here's the overview of the March 31 edition of Internet Talk Radio.

- Dr. Marshall Rose, Part 1 (5.6 megs)
- The Incidental Tourist (1.5 megs)
- Dr. Marshall Rose, Part 2 (5.1 megs)
- Book Byte (0.6 megs)
- Dr. Marshall Rose, Part 3 (5.6 megs)
- Name That Acronym (0.5 megs)
- Dr. Marshall Rose, Part 4 (4.2 megs)

(Schmandt Decl. ¶ 55). This is confirmed by the string "Here's the <A NAME=8 HREF="033193_geek_ITR.readme.txt">overvie w</A> of the March 31 edition of Internet Talk Radio" in "radio.html."

This "overview" was a "media file" that contained "text data which may be displayed," as required by the claim. For example, the text in the "overview" for the March 31, 1993 episode of GotW (033193_geek_ITR.readme.txt) included the following: "On this week's "Geek of the Week," hosted by Dr. Moira Gunn: Carl Malamud interviews Dr. Marshall T. Rose of Dover Beach Consulting." (*See* Schmandt Decl. ¶ 55; Ex. 1019; Ex. 1020).

| | |
|---|---|
| **34.** The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | As described above, the NCSA GotW page contains the claimed "attribute data," including "displayable text" describing the episodes. The image below (Ex. 1019) shows there is displayable text describing each of four weekly episodes:<br><br>**Internet Talk Radio**<br><br>**General Information**<br>   • Introduction to Internet Talk Radio.<br>   • Overview of Geek of the Week.<br><br>**April 21, 1993**<br>Here's the overview of the April 21 edition of Internet Talk Radio.<br>   • Steve Deering, Part 1 (5.6 megs)<br>   • The Incidental Tourist (1.6 megs)<br>   • Steve Deering, Part 2 (6.0 megs)<br>   • Book Byte (0.7 megs)<br>   • Steve Deering, Part 3 (5.4 megs)<br><br>**April 14, 1993**<br>Here's the overview of the April 14 edition of Internet Talk Radio.<br>   • Daniel Lynch, Part 1 (5.7 megs)<br>   • The Incidental Tourist (0.9 megs)<br>   • Daniel Lynch, Part 2 (5.5 megs)<br>   • Legal Stuff (0.2 megs)<br>   • Daniel Lynch, Part 3 (3.4 megs)<br><br>**April 7, 1993**<br>Here's the overview of the April 7 edition of Internet Talk Radio.<br>   • Dr. Erik Huizer, Part 1 (5.4 megs)<br>   • The Incidental Tourist (1.5 megs)<br>   • Dr. Erik Huizer, Part 2 (4.8 megs)<br>   • Book Byte (0.7 megs)<br>   • Dr. Erik Huizer, Part 3 (5.9 megs)<br>   • Name That Acronym (0.5 megs)<br>   • Dr. Erik Huizer, Part 4 (5.2 megs)<br><br>**March 31, 1993**<br>Here's the overview of the March 31 edition of Internet Talk Radio.<br>   • Dr. Marshall Rose, Part 1 (5.6 megs)<br>   • The Incidental Tourist (1.5 megs)<br>   • Dr. Marshall Rose, Part 2 (5.1 megs)<br>   • Book Byte (0.6 megs)<br>   • Dr. Marshall Rose, Part 3 (5.6 megs)<br>   • Name That Acronym (0.5 megs)<br>   • Dr. Marshall Rose, Part 4 (4.2 megs)<br><br>*marca@ncsa.uiuc.edu*<br><br>(*See also* Schmandt Decl. ¶ 56). |
| **35.** The audio program player set forth in claim 34 wherein said updated version of said compilation file further includes displayable text describing said series of episodes. | As described above and in connection with claim 34, the NCSA GotW page discloses the claimed "updated compilation file," and it contains "displayable text describing [the] series of episodes," as required by claim 35. For example, as shown above, it contains the title "Internet Talk Radio" as well as the text "Overview of Geek of the Week," both of which describe the |

|  | series of episodes. (Schmandt Decl. ¶ 57; Ex. 1019; Ex. 1020; Ex. 1021). |
|---|---|

### E.   Claims 31-35 are anticipated by the CBC Radio Article

The CBC Radio Article, which was published on January 1, 1996, describes an Internet radio trial that was run by the Canadian Broadcasting Corporation. (Ex. 1012; Ex. 1013 (article metadata)). This trial made CBC broadcast content available on demand and over the Internet, beginning in December, 1993. (Ex. 1012 at 2; Schmandt Decl. ¶ 59). The CBC Radio Article describes the CBC Radio program, including the availability of regularly-updated episodic radio programs on a web page at a predetermined location. (Ex. 1012 at 2-3).

#### 1.   *Claim 31 is anticipated by the CBC Radio Article*

The CBC Radio Article describes how the CBC's radio programs were made available on the Internet using a web page (i.e. HTML file), initially on a server that was "already well known" and later at the website of the CBC. (Ex. 1012 at 3, 7; Schmandt Decl. ¶ 64). The CBC trial was widely publicized and used. (Ex. 1012 at 4, 7; Schmandt Decl. ¶ 64).

> *a.* *The CBC Radio Article discloses requirement (a): an apparatus for disseminating, via the Internet, a series of episodes represented by media files.*

The CBC Radio Article describes in detail an apparatus used to disseminate copies of its "radio broadcasts" over the Internet. (Ex. 1012 at 2; Schmandt Decl. ¶ 60). These broadcasts included regular news programming and a weekly science

show called "Quirks & Quarks," both of which are series of episodes represented by media files as that term is used in the '504 patent. (Ex. 1012 at 2-3 ("Installing the Server" and "Initial Program Offerings"); Schmandt Decl. ¶¶ 60, 62-63).

> b.   *The CBC Radio Article discloses requirement (b): the apparatus for disseminating episodes includes a processor, a communication interface, and a data storage server.*

The CBC Radio Article specifically describes how "the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet." (Ex. 1012 at 2-3; Schmandt Decl. ¶¶ 62-64). Recorded programs were placed on a "well known" web server that was "listed in many network directories as an interesting site to visit." (Ex. 1012 at 3; Schmandt Decl. ¶ 64). Any server storing media files that is accessible by the public via the Internet would necessarily include a processor, communication interface, and a data storage server. (*See* Schmandt Decl. ¶¶ 22-23; 63-64).

> c.   *The CBC Radio Article discloses requirement (c): a "compilation file" that is updated "from time to time as new episodes … become available."*

The CBC Radio Article explains that the Quirks & Quarks program and the CBC's daily radio newscasts were made available on a website via the server immediately after the broadcast. (Ex. 1012 at 5). The website described each show's contents. (*Id.*; *see also* Schmandt Decl. ¶ 64). This website is the claimed "compilation file." (Schmandt Decl. ¶ 64). It was regularly updated as new content

became available. (*See, e.g.*, Ex. 1012 at 5 ("there were no new *Quirks & Quarks*

files on the server during the summer because the show was in hiatus, so this

section of the trial was not updated during this time")).

> d.    *The CBC Radio Article discloses requirement (d):the*
> *compilation file and each media file are stored at*
> *"predetermined URLs" and "episode URLs,"*
> *respectively.*

The CBC Radio compilation file was stored at a "location identified by a

predetermined URL," as claimed. (*See* Schmandt Decl. ¶ 64). In addition, the audio

files for each episode were stored at a location specified by an "episode URL." For

example, the CBC Radio website featured a menu for each episode, describing its

contents. (Ex. 1012 at 5). Listeners selected programs by clicking on the links

contained in that description. (Schmandt Decl. ¶ 65). Each link was a claimed

"predetermined URL" that specified the storage location on the server of the file

representing each episode (or, in the case of a segment or chapters of a larger

episode, that segment or chapter). (*Id.*; *see also* Ex. 1012 at 4).

> e.    *The CBC Radio Article discloses requirement (e): the*
> *compilation file contains "attribute data," including*
> *"displayable text" and media file URLs for each episode.*

The compilation files disclosed in the CBC Radio Article included

"displayable text describing" the episodes and "episode URLs specifying the

storage locations of one or more corresponding media files." For example, the

CBC Radio Article discloses an HTML file containing "in-line" images that were

included on the website and augmented the textual information in the menus that

described the episodes in question and included newscast episodes and episodes of

the science show Quirks & Quarks. (Ex. 1012 at 4). With respect to Quirks &

Quarks, the text was used to describe "the content of each segment [] in enough

detail so that users could select those portions of the show that interested them and

download the appropriate audio file." (*Id.* at 5). Each individual episode or

segment was identified by a "link", i.e. a URL, that specified the location of the

media file representing it. (*Id.* at 4; *see also* Schmandt Decl. ¶¶ 65-67).

> f.   **The CBC Radio Article discloses requirement (f):**
> **operating the apparatus to (1) receive a request for the**
> **updated compilation file at the predetermined URL, and**
> **(2) download the requested file to the client.**

Like GotW, the CBC Radio Article discloses that users would go to a

website to see new content available from the CBC. (Ex. 1012 at 3, 5). By visiting

a website, the user would download the HTML file located there. (Schmandt Decl.

¶¶ 65-67). This is simply the ordinary operation of a web server. (*Id.*).

> g.   **The CBC Radio Article discloses requirement (g):**
> **operating the apparatus to (3) receive and respond to a**
> **request from the client for a media file identified by a**
> **URL in the compilation file.**

As explained above, the CBC Radio web page included URLs (displayed as

"links") for the media files representing each newscast episode or Quirks & Quarks

episode. After a listener's browser displayed the CBC Radio web page, the listener

clicked on the links to the media files in order to listen to the audio. (Schmandt

Decl. ¶ 67). The listener's browser then automatically transmitted a request for the media file identified by the URL in the clicked link to the web server, and the web server responded by downloading the file to the user. (*Id.* ¶ 67). The CBC Radio Article explains that this occurred thousands of times per day during the trial. (Ex. 1012 at 4).

### 2.    *Claims 32-35 are anticipated by the CBC Radio Article*

The additional elements of claims 32-35 were all disclosed by the CBC Radio Article. The article specifically discussed using compressed audio files due to the limitations in bandwidth. (Ex. 1012 at 2). The article also discussed supplemental material, including text files. (*Id.* at 5). The article further discussed that media files would be described in the compilation file with text to allow a user to select which show she wanted to listen to. (*Id.* at 3). Finally, the article discussed a "greeting page," which an artisan understood to mean text describing the media available. (Schmandt Decl. ¶ 71). In sum, everything claimed in the dependent claims was disclosed in the CBC Radio Article.

### 3.    *Claim Chart showing CBC Radio Article anticipates Claims 31-35.*

| Claim Limitation | CBC Radio Article (Ex. 1012) |
| --- | --- |
| **31.** Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become | The CBC Radio Article discloses an apparatus for disseminating media files over the Internet as the episodes become available. (*See, e.g.*, Ex. 1012 at 2 ("The trial to be described here is the first time that audio programs produced for traditional radio broadcasts have been made available on the Internet on a regular basis"); |

| | |
|---|---|
| available, said apparatus comprising: | *id.* ("The purpose of this experimental trial was to determine: (1) if there was interest in, and demand for, regular radio programming distributed as digital audio files over the Internet, (2) if CBC was willing to regularly distribute programming in this format, and (3) what implications such a service would have for the corporation."); *id.* at 5 ("*Quirks & Quarks*, a science magazine show, was also regularly updated on the server…. there were no new *Quirks & Quarks* files on the server during the summer because the show was in hiatus, so this section of the trial was not updated during this time."); *see also* Schmandt Decl. ¶ 60). |
| one or more data storage servers, | A web server is disclosed and discussed in detail. *See, e.g.*, Ex. 1012 at 2-3 ("INSTALLING THE SERVER" and associated text) |
| one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, | By allowing access to the website containing the media files, a communication interface is disclosed. (*See, e.g.*, Ex. 1012 at 2-3 ("The trial began in December 1993 when the first CBC Radio programs were prepared on a computer in the laboratory and made available through the Internet. The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software. The trial was conducted on a server that was already well known as a source of Canadian government documents and a test site for a natural language information retrieval system"); *see also* Schmandt Decl. ¶¶ 60, 62-64). |
| and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | The CBC Radio article discloses that listeners visited the CBC website on the world wide web. In doing so, a communication interface would respond by downloading an HTML file. (Ex. 1012 at 2 ("program files were made available via FTP, Gopher, and World Wide Web using standard Internet server software."); *id.* at 3 (users accessed documents by visiting a "well known" website); *see also* Schmandt Decl. ¶ 66). |
| one or more processors coupled to said one or | A server necessarily includes processors. (Ex. 1012 at 2-3 ("INSTALLING THE SERVER" and associated text); |

| | |
|---|---|
| more data storage servers and to said one or more communications interfaces for: | *see also* Schmandt Decl. ¶¶ 63-64). The CBC Radio Article also discloses how the processors were used in accordance with the claim as described below. |
| storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | The CBC Radio Article describes how media files were stored on the server and made available to listeners over the web as they were broadcast. (Ex. 1012 at 3 ("The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software"); *see also id.* ("The trial was conducted on a server that was already well known as a source of Canadian government documents and a test site for a natural language information retrieval system. This site is listed in many network directories as an interesting site to visit."); *id.* at 3 ("An FM radio receiver was installed in the laboratory to constantly monitor the CBC broadcasts. Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server . . . the *Quirks & Quarks* science magazine show was recorded each week, broken down into its component parts, and made available on the server."); *id.* at 5 ("there were no new Quirks & Quarks files on the server during the summer because the show was in hiatus, so this section of the trial was not updated during this time"); *id.* ("The number of accesses per month for the *Quirks & Quarks* section of the trial is shown in Figure 4. This data represents all the transfer protocols (FTP, Gopher, & WWW) and all the file types (menus, text, images, and audio)"); Schmandt Decl. ¶¶ 63-64). <br><br> By referring to "links", the Article disclosed that the files were at unique episode URLs. (Ex. 1012 at 4 ("WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); Schmandt Decl. ¶ 67). |
| from time to time, as new episodes represented in said | As discussed above, the CBC Radio Article discloses that the media files were stored as they became available, and the website would be updated to reflect the availability of |

| | |
|---|---|
| series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, | the new media files. (Ex. 1012 at 3 ("An FM radio receiver was installed in the laboratory to constantly monitor the CBC broadcasts. Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server. Two newscasts (8:00 a.m. International and 5:00 p.m. Domestic, eastern times) were recorded each day and made available on the server immediately after the broadcast."); *id.* at 3 ("An FM radio receiver was installed in the laboratory to constantly monitor the CBC broadcasts. Using a 'cron' program, a Sun computer automatically recorded programs and transferred them to the server . . . . the *Quirks & Quarks* science magazine show was recorded each week, broken down into its component parts, and made available on the server."); *id.* at 7 ("Each show has a menu attached to it to describe the contents of the various parts."); *id.* at 5 ("there were no Quirks & Quarks files on the server during the summer because the show was in hiatus, so this section of the trial was not updated during this time"); *see also* Schmandt Decl. ¶¶ 63-66). |
| said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and | The CBC Radio Article discloses that newly available radio broadcasts were accompanied by text describing the episodes which allowed users to pick what they wanted to listen to. (Ex. 1012 at 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted. They also had control over the order of the programs, and they could select material based on the content that interested them.") *see also* Schmandt Decl. ¶ 65). |
| one or more episode URLs specifying the storage locations of | The CBC Radio discloses that users could select "links" (i.e. URLs) in order to retrieve the media files. (Ex. 1012 at 4 ("WWW and Gopher users could still access the |

| one or more corresponding media files representing said given one of said episodes; and | news programs, but the menus and links pointed to the FTP service."); *id.* at 3 ("users could select only the parts of the program that were of interest to them."); *see also* Schmandt Decl. ¶¶ 24-31). |
|---|---|
| employing one of said one or more communication interfaces to: | As discussed above, the CBC Radio Article disclosed communication interfaces. (Ex. 1012 at 3 (discussing the server made available to the public); Schmandt Decl. ¶¶ 63-64). |
| (a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL; | The CBC Radio Article discloses that listeners visit a well-known website, and later the CBC radio website, to download the HTML (i.e. compilation) file. By disclosing this functionality, the article discloses a communication interface that receives request for an updated version of a compilation file located at the predetermined URL. (Ex. 1012 at 3 ("The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software. The trial was conducted on a server that was already well known as a source of Canadian government documents and a test site for a natural language information retrieval system."); *id.* at 7 ("the CBC server can be reached at ftp://www.radio.cbc.ca or http://www.radio.cbc.ca/"); Schmandt Decl. ¶¶65-67). |
| (b) download said updated version of said compilation file to said requesting client device; and | The CBC Radio Article discloses a web server. In doing so, it discloses that the HTML (i.e. compilation) file would be downloaded to the client device when the page was visited. (Ex. 1012 at 3 ("The program files were made available via FTP, Gopher, and World Wide Web (WWW) using standard Internet server software. The trial was conducted on a server that was already well known as a source of Canadian government documents and a test site for a natural language information retrieval system."); *id.* at 7 ("the CBC server can be reached at ftp://www.radio.cbc.ca or http://www.radio.cbc.ca/"); Schmandt Decl. ¶¶65-67). |
| (c) thereafter receive and respond to a request from said | The CBC Radio Article discloses that the files were made available "on demand", i.e. after a request for the file, which, as already discussed, was located at URLs |

| | |
|---|---|
| requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files | includes in the attribute data of the compilation file. (Ex. 1012 at 3 ("These radio programs were made available 'on demand' in that users could request them from the server at any time. The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them. The result was that users could listen to the programs when they wanted. They also had control over the order of the programs, and they could select material based on the content that interested them."); *id.* at 4 ("WWW and Gopher users could still access the news programs, but the menus and links pointed to the FTP service."); Schmandt Decl. ¶ 65). |
| | |
| **32.** The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | The CBC Radio Article discloses that the files were sampled at a lower rate in order to compress the files for easier distribution. (*See, e.g.*, Ex. 1012 at 2 ("Transmission of the uncompressed digital audio signal, in real time, would require a channel data rate of approximately 1,280 kilobits per second (Kbps) or 1.2 megabits per second (Mbps). Given that typical Internet link rates are often much less than 1.2 Mbps, and users' disk capacity is often limited, an audio format that uses a much lower frequency of sampling (8 kHz) and a much lower precision (8-bits mono) was chosen for this trial."); *see also id.* ("Faster Internet links and/or a compression system for the audio files would help."); *see also* Schmandt Decl. ¶ 68; *id.* ¶¶ 36-40 (audio compression). |
| | |
| **33.** The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | The CBC Radio Article discloses that there were also text media files available for download from the web server. *See, e.g.*, Ex. 1012 at 5 ("The server also contained supplemental information about CBC programs and the trial Internet Service.")); Schmandt Decl. ¶ 69. |

| | |
|---|---|
| **34.** The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said episodes. | The CBC Radio Article also discloses that episodes were described so that listeners could decide whether or not to download the episode (or segment of the episode). (Ex. 1012 at 3 ("The larger programs were broken into segments that were described in accompanying text so users could select only the parts of the program that were of interest to them."); *id.* at 7 ("Each show has a menu attached to it to describe the contents of the various parts"); *see also* Schmandt Decl. ¶ 65-67). |
| **35.** The audio program player set forth in claim 34 wherein said updated version of said compilation file further includes displayable text describing said series of episodes. | The CBC Radio Article discloses a "greeting page", which would inform users of the content available. (Ex. 1012 at 3 (noting the existence of a "greeting page"); *id.* at 7 ("Each show has a menu attached to it to describe the contents of the various parts"); Schmandt Decl. ¶¶66). |

## F.   Claims 31-35 are obvious based on the Internet CNN Newsroom

Internet CNN Newsroom was a master's thesis submitted to MIT in May 1995 and made available at the MIT library on August 10, 1995 (Ex. 1022 at cover), and is thus a prior art publication under 35 U.S.C. § 102. *See In re Hall*, 781 F.2d 897 (Fed. Cir. 1986). Claims 31-35 are obvious based on Internet CNN Newsroom, which included disclosures which would have made an "updated" compilation file obvious and a mere design choice, making obvious the feature determined to be lacking in the prior art references cited during the prosecution of the '504 patent.

### 1.   *Claim 31 is obvious based on the Internet CNN Newsroom*

Internet CNN Newsroom describes an apparatus that delivered episodic audio and video over the Internet to client devices located in schools. (Ex. 1022 at Abstract, 11; Schmandt Decl. ¶ 74). The system included processors coupled to a web server that stored media files in MPEG-1 format with interleaved video and audio. (*See* Ex. 1022 at 7, 22; Schmandt Decl. ¶¶ 77-78). Each MPEG-1 file corresponded to a particular news story, or "segment." (Ex. 1022 at 14; Schmandt Decl. ¶ 81). The processors ran software that automatically generated a compilation file (an HTML "Table of Contents") including HTML links to each segment, as well as a text summary of each segment's content. (Ex. 1022 at 13, Fig. 1, 17-19; Schmandt Decl. ¶¶ 77-80). Using a web browser, clients downloaded a new compilation file each day as the Newsroom was updated and used the provided links to fetch a desired segment by downloading its corresponding media file. (Ex. 1022 at 13, Fig. 1; Schmandt Decl. ¶¶ 78, 80). Thus Internet CNN Newsroom described all the elements of claim 31 except an *updated* compilation file.  Instead the designers chose to create a new compilation file each day.  But as discussed below, creating an updated compilation file would have been obvious and trivial change over the disclosures of Internet CNN Newsroom.

> a.   *Internet CNN Newsroom discloses requirement (a): an apparatus for disseminating, via the Internet, a series of episodes represented by media files.*

The NMIS Media Server and caching proxy servers disclosed in Internet CNN Newsroom are examples of the claimed "apparatus." (Ex. 1022 at 24, Fig. 6; Schmandt Decl. ¶ 76). An ordinary artisan understood in 1995 that such servers were used for "disseminating" data "via the Internet." (Schmandt Decl. ¶¶ 49, 76-77). The data disseminated by Internet CNN Newsroom included a series of CNN Newsroom news segments or other episodic content (including "other news programs, sitcoms, soap operas"). (Ex. 1022 at 79). These segments collectively represent the claimed "series of episodes." (Schmandt Decl. ¶ 78).

> b.   *Internet CNN Newsroom discloses requirement (b): the apparatus for disseminating episodes includes a processor, a communication interface, and a data storage server.*

The apparatus described in Internet CNN Newsroom includes one or more data storage servers, including the NMIS Data Server and proxy servers on which media files were stored. (Ex. 1022 at 15, describing the NMIS "server's 80 gigabytes of magnetic disk storage," as well as the possible future use of "hierarchical storage devices," such as a "terabyte automated tape array"; *see also id.* at 23; Schmandt Decl. ¶¶ 77-78). These servers were connected to the Internet. (Ex. 1022 at 7 ("The World-Wide-Web is used to present and deliver the digital video news magazine to end-users."); Schmandt Decl. ¶ 80). An ordinary artisan would have understood this to mean that the Internet CNN Newsroom web server necessarily contained the claimed "processor" and "communications interface" to

process requests for media files and send the appropriate files to a remote user over the Internet. (Ex. 1022 at 20, Fig. 4; *id.* at 22 ("[T]he encoding server uses the ftp protocol to deliver the MPEG system files and closed-caption text files to our server. This means that results can be delivered to any host on the Internet supporting the ftp protocol.") (internal citation omitted); Schmandt Decl. ¶ 76).

> c. **Internet CNN Newsroom disclosures render obvious requirement (c): a "compilation file" that is updated "from time to time as new episodes … become available."**

Internet CNN Newsroom describes automatically generating a "table of contents" file ("contents.html") for CNN Newsroom episodes. (Ex. 1022 at 17). This "contents.html" file is the claimed compilation file. Internet CNN Newsroom states that the disclosed compilation file was generated "each night" from the satellite broadcast of the latest CNN Newsroom content. (*Id.*). This nightly satellite broadcast contained the "new episodes" of CNN Newsroom segments that Internet CNN Newsroom incorporated into the "contents.html" file. The regular, automatic process of generating a new "contents.html" file renders an "updated" compilation file obvious. It would have been a trivial modification for an ordinary artisan to use the described system to create an updated table of contents HTML file to reflect that days' news and place it at the same location as the old file, instead of creating a different file at a different location. (Schmandt Decl. ¶ 75). Indeed, Internet CNN Newsroom itself discloses alternative uses for the system, including the

organization of other episodic content, such as sitcoms or soap operas, which due to their serialized nature would have logically been compiled at a consistent URL, meaning the compilation file would be "updated." (*Id.* ¶ 75).

> d.   *Internet CNN Newsroom discloses requirement (d): the compilation file and each media file are stored at "predetermined URLs" and "episode URLs," respectively*

The "contents.html" file described above included HTML links to video episodes in MPEG-1 format which were the claimed "media files." (Ex. 1022 at 18). Unique URLs would necessarily have been required to store compilation files and media files individually. (Schmandt Decl. ¶ 77). Internet CNN Newsroom also discloses an example of a table of contents file as it would have been presented by the WWW browser NCSA Mosaic in 1995. (Ex. 1022 at 13, Fig. 1; Schmandt Decl. ¶ 78). The example makes clear that "contents.html" was automatically stored at a URL structured in a predetermined way based upon the date of its episodic content, as follows:

"http://www.nmis.org/NewsInteractive/CNN/Newsroom/DATE/contents.html," where "DATE" represents the date of the episode. (*See* Ex. 1022 at 13; Schmandt Decl. ¶ 78). This regular structure would have permitted Internet CNN Newsroom users to access the daily compilation file at the claimed "predetermined URL." (Schmandt Decl. ¶ 78). To the extent this structure may nevertheless be considered insufficiently "predetermined" because the "contents.html" file is located at a new

(albeit predetermined) URL each day, as discussed above, it would have been a trivial modification to place the URL at a consistent web address.

> e.  *Internet CNN Newsroom discloses requirement (e): that the compilation file contains "attribute data," including "displayable text" and media file URLs for each episode.*

The "contents.html" compilation file in Internet CNN Newsroom was automatically created each day and presented attribute data describing each episode (in this case, the episodes were news segments). (Ex. 1022 at 13-14, 17-19). The contents.html document included a "short summary" (*id.* at 14) of each news segment and its respective run time, as well as other such "attribute data" as is claimed. (*Id.* at 13, Fig. 1 (showing run times of 3:30 and 0:45 for particular episodes)). The disclosed "icons" and/or "links" to each segment within the table of contents html file would necessarily have directed users to the URL specifying the storage location of the "media file" (in this case, an MPEG-1 file with interleaved audio and video) for each episode. (Schmandt Decl. ¶ 78).

> f.  *Internet CNN Newsroom discloses requirement (f): operating the apparatus to (1) receive a request for the updated compilation file at the predetermined URL, and (2) download the requested file to the client.*

As discussed above, Internet CNN Newsroom discloses a "compilation file" (i.e. contents.html) that was created nightly to reflect new CNN Newsroom content, but it would have been obvious to merely "update" a previous version. This file was stored at a "predetermined URL" for the date of that broadcast, as claimed.

The system in Internet CNN Newsroom received the claimed "requests" for the "updated" contents.html file when end-users (i.e. "clients") navigated to the predetermined URL. The request was answered by making the compilation file available for download by the requesting client. (Schmandt Decl. ¶ 80).

> g.   *Internet CNN Newsroom discloses requirement (g): operating the apparatus to (3) receive and respond to a request from the client for a media file identified by a URL in the compilation file.*

The Internet CNN Newsroom apparatus would have been similarly capable of "receiving and responding to request[s]" from the end-user (i.e. "client") for media files. End-users accessed episode videos, constituting the claimed "media files," by clicking HTML links—necessarily containing embedded URLs for the individual episodes—that were displayed in the contents.html compilation file. (*Id.* ¶ 81). The server responded to requests for individual media files by making them available for download by the requesting client. (*Id.* ¶¶ 80-81).

### 2.   *Claims 32-35 are obvious based on the Internet CNN Newsroom*

The dependent claims add nothing to the purported invention that was not disclosed in Internet CNN Newsroom, and thus are only obvious as they rely on Claim 31. The apparatus described in Internet CNN Newsroom delivered "audio and video interleaved in an MPEG system file." (Ex. 1022 at 22). The use of the MPEG-1 format necessarily required audio compression. (*See* Schmandt Decl. ¶

82). Thus Internet CNN Newsroom disclosed digital compressed audio recordings of claim 32.

As to claim 33, Internet CNN Newsroom described a Table of Contents file that included text descriptions of each episode that would be displayed by the client device. (Ex. 1022 at 13-14; Schmandt Decl. ¶ 83). Further, the system included the complete text of each program (obtained from closed caption text) and a link to that text was included in the Table of Contents file. A user could click on that link to display the complete text. (Ex. 1022 at 14; Schmandt Decl. ¶ 83). Thus Internet CNN Newsroom disclosed media files with text data that could be displayed.

The elements of claim 34 are also disclosed by Internet CNN Newsroom. The Table of Contents file in Internet CNN Newsroom included summaries of each news segment. (Ex. 1022 at 13-14; Schmandt Decl. ¶ 84). These summaries were text data included in the Table of Contents displayable by the client device. Thus the addition of text to describe an episode was not new.

Finally, the Table of Contents file in Internet CNN Newsroom included a brief textual description of the particular news magazine. (Ex. 1022 at 13-14; Schmandt Decl. ¶ 85). Further, Internet CNN Newsroom explains that the apparatus could be extended to distribute any kind of program, including episodic content such as sitcoms or soap operas. (Ex. 1022 at 29; Schmandt Decl. ¶ 85). In

such a case, rather than describe the particular news magazine, the displayable text at the beginning of the Table of Contents file would describe the series of episodes disclosed in claim 35 (such as the sitcom or soap opera).

### 3.   *Claim Chart Showing Internet CNN Newsroom renders obvious Claims 31-35.*

| Claim Limitation | Internet CNN Newsroom (Ex. 1022) |
|---|---|
| **31**. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising: | An apparatus for disseminating media is disclosed. (Ex. 1022 at 8 (disclosing a "digital video news magazine distributed via the Internet."); *id.* at Fig. 6 and associated text (dissemination of media files via the Internet from an "NMIS Web server" to "WWW Browsers" through "Caching Proxy Servers")).  Internet CNN Newsroom describes a system for distributing a "video magazine" via the Internet. (*Id.* at 13). The video broadcast each day by CNN Newsroom is broken out into segments that each "corresponds to a single news story." (*Id.* at 14). These segments were encoded in MPEG-1 media files. (*Id.* at 7). "[W]hen a user clicks on a link to a MPEG video, the entire MPEG file [] is downloaded onto their local hard disk." (*Id.* at 25). The same system could be used for "any other program for which users might want to be able to see past episodes (i.e., other news programs, sitcoms, soap operas ...." (*Id.* at 29). The processors ran software that automatically generated a compilation file (an HTML "Table of Contents") including HTML links to each segment, as well as a text summary of each segment's content. (*Id.* at 13, |

| | |
|---|---|
| | 17-19). Thus the paper discloses that the apparatus disseminated episodes as they became available. |
| one or more data storage servers, | The paper discloses data servers being used. (Ex. 1022 at 15 (noting that the "capacity of the NMIS program news and information server [is] 80 gigabytes of magnetic disk storage"); *id.* at Fig. 6 and associated text).<br><br> |
| one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, | Internet CNN Newsroom describes a web server, e.g. the NMIS Web server, that necessarily included the claimed "communication interface" and received "requests" from "remotely located client devices" such as the client devices with WWW browsers. (Schmandt Decl. ¶ 76; *see* Ex. 1022 at 51 (content "sent over the Internet from the NMIS video archive to the customer site on demand")). |
| and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device, | Internet CNN Newsroom describes how a client device could download material via the communication interface. (Ex. 1022 at 25 ("[W]hen a user clicks on a link to a MPEG video, the entire MPEG file [] is downloaded onto their local hard disk."); *see* Schmandt Decl. ¶¶ 77-78 (clicking on a link refers to HTML links; URLs are embedded in HTML links, so the relevant media files would have necessarily been stored at URLs, with a unique URL necessarily required to store files individually)). |
| one or more | The NMIS web server described in Internet CNN |

| | |
|---|---|
| processors coupled to said one or more data storage servers and to said one or more communications interfaces for: | Newsroom necessarily included the claimed "one or more processors," which were necessarily "coupled" to the "data storage server" and "communication interfaces." (Schmandt Decl. ¶¶ 76-78). |
| storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL; | The paper describes how web pages were automatically generated and used to store files at unique episode URLs. (Ex. 1022 at 7 ("Custom software agents have been developed to automatically generate the WWW user interface for the service based on daily content."); *id.* at 22 ("When the video and closed caption text have been captured, the encoding server uses the ftp protocol[14] to deliver the MPEG system files and closed-caption text files to our server. This means that results can be delivered to any host on the Internet supporting the ftp protocol."); *also* Schmandt Decl. ¶ 77 (explaining that the links would have been understood to be at unique episode URLs)). |
| from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or more data storage servers at a storage location identified by a predetermined URL, |  The Table of Contents html file is the "compilation file." (*See* Schmandt Decl. ¶ 78). It is necessarily displayed at a location identified by a predetermined URL associated with that day's news magazine. (*Id.* at 78). For example, the compilation file dated May 19, 1995 would be stored at the following predetermined URL: /home/www/NewsInteractive/CNN/19940519. (Ex. 1022 at 13, Fig. 1 and 21, Fig. 5). |

| | | |
|---|---|---|
| said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes,<br><br>said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes,<br><br>and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes, and |  | The Table of Contents (i.e. compilation file) in Figure 1 contained html that renders as shown in this image:<br><br>The displayable text describes the episode (in this case, each episode or segment is a news story). The URL specifies the location of one of the media files representing the episode. (*See* Schmandt Decl. ¶¶ 24-33 (explaining |
| | | links and HREF); *see also* Ex. 1022 at 25 ("when a user clicks on a link to a MPEG video, the entire MPEG file, which can be quite large, is downloaded onto their local hard disk"); *id.* at 18 ("The titles of the segments are correlated with icons….these icons are used to make buttons for each segment that display the video for the segment when selected.")). |
| employing one of said one or more communication interfaces to: | As described above, the Internet CNN Newsroom web server included the claimed "communication interface." That interface was used in performing the steps that follow. | |
| (a) receive a request from a requesting client device for the updated version of said compilation | An Internet CNN Newsroom web server received from a "client device" the claimed "request … for the updated version of said compilation file" whenever it received a request for the Table of Contents html file (i.e. the claimed "updated … compilation file"). (Ex. 1022 at 13-14; | |

| | |
|---|---|
| file located at said predetermined URL; | Schmandt Decl. ¶ 80). |
| (b) download said updated version of said compilation file to said requesting client device; and | Whenever the Internet CNN Newsroom web server received a request as described in the previous step, it would respond by downloading the file representing the requested web page, (i.e. the claimed "updated … compilation file"). (Ex. 1022 at 14 ("The 'table of contents' for a particular day's program is a html document that consists of a short summary and an icon or title for each segment of the program."); Schmandt Decl. ¶ 80). |
| (c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files. | The Internet CNN Newsroom web server would download a media file to the client when requested by the client when she "clicked" on a link. (Ex. 1022 at 25 ("[W]hen a user clicks on a link to a MPEG video, the entire MPEG file [] is downloaded onto their local hard disk."); *id.* at 18 ("The titles of the segments are correlated with icons….these icons are used to make buttons for each segment that display the video for the segment when selected."); Schmandt Decl. ¶¶77, 24-33). |
| | |
| **32.** The apparatus as set forth in claim 31 wherein at least some of said media files contain digital compressed audio recordings that may be reproduced in audible form by a requesting client device. | The Internet CNN Newsroom apparatus made media files, including audiovisual files with encoded audio, available on its server for requesting client devices. The encoded audio was compressed. (Ex. 1022 at 7 ("MPEG-1 video compression is performed using the Optibase MPEG Lab Suite system and a Sony Beta SP video deck."); *id.* at 21 ("Currently, the NEWSROOM audio is encoded at 192 Kbit/second, in monaural. The Optibase system encodes and stores audio and video interleaved in an MPEG system file. MPEG system files are defined in the ISO MPEG standards and provide complete cross-platform support for |

|  | playback in a variety of consumer and computer video systems."); s*ee* Schmandt Decl. ¶ 82 (use of the MPEG-1 format necessarily involved audio compression)). |
|---|---|

| **33.** The apparatus as set forth in claim 31 wherein at least some of said media files contain text data which may be displayed or reproduced in spoken audible form by a requesting client device. | Internet CNN Newsroom disclosed that each segment in the video magazine was briefly described by text data displayed on the Table of Contents page, as shown in Figure 1, Ex. 1022 at 13: For example, in Figure 1 of the publication, one of the segments is described by the text: "First Genetically Engineered Vegetable Scheduled to Hit Supermarkets …." (*Id.*)  Further, the apparatus described in Internet CNN Newsroom "also provides the text of each program … obtained from the closed caption text that is part of the video program … a link to this text is placed in the table of contents next to each story." (*Id.* at 14). This closed caption text is also a "media file" that may be displayed by a client device. (Schmandt Decl. ¶ 83). |
|---|---|

| **34.** The apparatus set forth in claim 33 wherein said attribute data for each given one of said episodes further includes displayable text data describing said given one of said | As described above, Internet CNN Newsroom's automatically generated Table of Contents web page contains the claimed "attribute data," including "displayable text" describing the episodes. (Ex. 1022 at 18). More specifically, there is displayable text describing each of the episodes (in this case, each individual news program), as required by claim 34. For example, Figure 1 of Internet CNN Newsroom shows displayable text for each of the segments that describes the segment. (*Id.* at 13; Schmandt Decl. ¶ 84). |
|---|---|

| | |
|---|---|
| episodes. | |
| | |
| **35.** The audio program player set forth in claim 34 wherein said updated version of said compilation file further includes displayable text describing said series of episodes. | As described above and in connection with claim 34, the Table of Contents web page is an "updated compilation file," and it contains "displayable text describing [the] series of episodes," as required by claim 35. For example, as shown above, it contains the title "CNN News Room Thursday, May 19, 1994." (Ex. 1022 at 13, Fig. 1; *see* Schmandt Decl. ¶ 85). |

## V.    Conclusion

In view of the foregoing, it is respectfully submitted that there is a reasonable likelihood that Petitioner would prevail with respect to at least one of the claims 31, 32, 33, 34, and 35 challenged in this petition. Accordingly, the Office is requested to grant this petition and to initiate an *inter partes* review. The Office should review claims 31, 32, 33, 34, and 35, find them unpatentable, and cancel the claims, rendering them null, void and otherwise unenforceable.

Dated: October 16, 2013          Respectfully submitted,

By: /s/ Richard C. Pettus_____

Richard C. Pettus (Reg. No. 45,935)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
pettusr@gtlaw.com
Tel. (212) 801-9387
Fax. (212) 801-6400

Nicholas A. Brown (*pro hac vice req.*)
Greenberg Traurig LLP
4 Embarcadero Center Suite 3000
San Francisco, CA 94114
brownn@gtlaw.com
Tel. (415) 655-1271
Fax. (415) 707-2010

## UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

Electronic Frontier Foundation
Petitioner,

v.

Personal Audio, LLC
Patent Owner

Patent No. 8,112,504 (Claims 31-35)
Issued: Feb. 7, 2012
Filed: Mar. 4, 2009
Inventors: James D. Logan, Daniel F. Goessling, Charles G. Call
Title: SYSTEM FOR DISSEMINATING MEDIA CONTENT REPRESENTING
EPISODES IN A SERIALIZED SEQUENCE

Petition for Review Filed: October 16, 2013

---

## **Certificate of Service**

I hereby certify, pursuant to 37 CFR sections 42.6 and 42.105, that a complete copy of the **PETITION FOR INTER PARTES REVIEW, EXHIBITS 1001 through 1030,** and all other associated documents are being served via Federal Express on the 16th day of October, 2013, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, upon the patent owner:

Charles G. Call                    Charles G. Call
3323 Carriage Trail                20 E. Goethe Street, CH1
Hillsborough, NC 27278-9554        Chicago, IL 60610-2382

i

By: /s/ Richard C. Pettus

Richard C. Pettus (Reg. No. 45,935)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
pettusr@gtlaw.com
Tel. (212) 801-9387
Fax. (212) 801-6400

Nicholas A. Brown (*pro hac vice req.*)
Greenberg Traurig LLP
4 Embarcadero Center Suite 3000
San Francisco, CA 94114
brownn@gtlaw.com
Tel. (415) 655-1271
Fax. (415) 707-2010

# EXHIBIT 10

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Northern District of California

| | |
|---|---|
| PERSONAL AUDIO, LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   2:13-cv-13 consolidated ED Tex |
| TOGI ENTERTAINMENT, INC. ET AL. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            ELECTRONIC FRONTIER FOUNDATION, 815 Eddy Street, San Francisco, CA 94109

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See attachment

| Place: Veritext - San Francisco<br>101 Montgomery St., Suite 450<br>San Francisco, CA 94104 | Date and Time:<br><br>01/10/2014 9:00 am |
|---|---|

          The deposition will be recorded by this method:   Stenography and videotape

❒ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

          The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      12/20/2013

                    *CLERK OF COURT*
                                                            OR
                                                                          /s/ Jeremy S. Pitcock
_____                    _____
     *Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _____
Personal Audio, LLC                                                      , who issues or requests this subpoena, are:

Jeremy S. Pitcock, 1501 Broadway, 12th Floor New York, NY 10036, jpitcock@pitcocklawgroup.com, (646) 571-2237
Papool S. Chaudhari, P.O. Box 1863, Wylie, TX 75098, papool@chaudharilaw.com, (214) 702-1150

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2:13-cv-13 consolidated ED Tex

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## **DEFINITIONS**

The following definitions apply to these deposition topics:

A.      "Personal Audio" shall mean and refer to Plaintiff Personal Audio, LLC.

B.       "'504 Patent" shall mean the patent-in-suit, U.S. Patent No. 8,112,504.

C.      "Defendants" shall refer to any potential or actual Defendants in any civil case regarding the '504 patent, including, but not limited to, Defendants Togi Entertainment, Inc., HowStuffWorks, NBCUniversal Media, LLC, CBS Corporation, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc., Adam Carolla, Donny Misraje, Kathee Schneider-Misraje, and Sandy Ganz, and also includes any agents, employees, counsel and/or attorneys thereof.  Potential Defendants include, without limitation, any person or entity that has received a licensing letter from Personal Audio concerning the '504 Patent and also includes any agents, employees, counsel and/or attorneys thereof.

D.      "EFF" and "You" shall mean and refer to the Electronic Frontier Foundation, any subsidiaries, affiliates, officers, employees and counsel thereto.

E.       "Person" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization or other legal entity.  The acts of a Person shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the Person's behalf.

F.       "Document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, files, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version).  By way of example, the term "document(s)" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; e-mails; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

G.      "Thing" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure.

H.     "Communication" shall mean any transmission of information in any context or situation by or between two or more persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including without limitation but not limited to conversations, correspondence, electronic mails, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda concerning written or oral communications, and any translation thereof.

I.      "Identify" and "Identity" shall each mean:

(a) as applied to an individual, to state the individual's full name, present or last known address and telephone number, present or last known employer, present or last known business address and telephone number, present and prior employment positions and corresponding dates of such positions, and a description of his present employment responsibilities;

(b) as applied to a Person other than a natural person (including without limitation, but not limited to, any business or other entity), to state the entity's full name, place and date of incorporation or formation, principal place of business or activity, and the identity of the natural persons within that entity having knowledge of the matter with respect to which that entity is named;

(c) as applied to a Document (whether or not any claim of privilege is made in respect thereof), to state the type of Document, the date of creation of the Document, the date of communication of the Document, the names and Identities of the individuals who drafted, authored, or signed the Document or a copy thereof was addressed or sent, a summary of the subject matter of the Document, the number of pages of the Document, the present whereabouts of the Document, including without limitation all originals and copies, and the name and address of the present or last-known custodian of the Document;

(d) as applied to a Thing, to state the date that the Thing was first introduced for sale, the date of the Thing's first sale, all versions, parts or revision numbers or codes, all product names, and all team names or project titles used in connection with the design, development, testing, or engineering of that product;

(e) as applied to a process, to state the date that the process was first used, the date the products or goods made by the process were first sold, all numbers or codes used to refer to the process, including but not limited to process revision numbers or codes, all process names, and all team names or project titles used in connection with the design, development, testing, or engineering of that process; or

(f) as applied to a Communication, to state the type of Communication, the date and the parties to such Communication, and if such Communication has been recorded in documentary form, to identify all Documents recording such Communication.

J.      "Information" shall mean information in any form, including but not limited to documentary, electronic, graphical, or tabular, and communicated by any means, including but not limited to orally, in writing, or via electronic communication.

K.      "Describe," when used in relation to an act, event, instance, occasion, transaction, conversation, or Communication, shall mean (1) to state the date and place thereof; (2) to identify the individual participants; (3) to summarize separately for each individual participant what was said or done; and (4) to identify each document used or prepared in connection therewith or making any reference thereto.

L.      "Date" shall mean the exact date, if known, or the closest approximation to the exact date as can be specified, including without limitation the year, month, week in a month, or part of a month.

M.      "Concerning" shall mean in whole or part constituting, containing, embodying, reflecting, concerning, referring to, describing, involving, supporting, contradicting, evidencing, stating, dealing with, relating to, or in any way pertaining to.

N.      As used herein, the singular form of a term shall be interpreted to include the plural and vice versa.

O.      As used herein, the masculine form of a term shall be interpreted to include the feminine and vice versa.

P.      Except where the context does not permit, the term "including" shall be without limitation.

Q.      Except where the context does not permit, the terms "and" and "or" shall be both conjunctive and disjunctive.

R.      Except where the context does not permit, the terms "each" and "any" shall mean any and all.

## <u>DEPOSITION TOPICS</u>

1.  Any communications between the EFF and Defendants Concerning the '504 patent.

2.  Any communications between the EFF and any actual or potential witness Concerning the '504 patent or prior art to the '504 patent.

3.  Any communications between the EFF and any third parties Concerning the '504 patent, including but not limited to any communications with the Cyberlaw Clinic at the Harvard University Berkman Center for Internet and Society, Julie Samuels, Mark Cuban, RPX, Article One Partners, Mark Lemley, Durie Tangri Page Lemley Roberts & Kent LLP, the Open Innovation Network, Google, Inc and/or their representatives, agents or counsel.

4.  Any communications regarding the prior art cited in any proceedings in the Patent and Trademark Office Concerning the '504 patent.

5. All fundraising activities in connection with the proceedings in the Patent and Trademark Office with respect to the '504 patent, including but not limited to the Identification of the names of all Persons who donated or contributed and Identification of the amounts contributed by each Person, as well as the Identification of any promised contributions which have not been received yet as well as the Persons who promised such contributions and the amount thereof.

6. All steps taken in order for the EFF to be "fully prepared" to take on Personal Audio.

7. Identification of any Information Concerning any prior art (whether or not included in any Patent and Trademark Office proceeding) that would tend to show either: (1) the art did not disclose any element of the claims of the '504 patent or (2) the art was not demonstrably available prior to any filing date of the '504 patent.

8. Any analysis or Communications Concerning the following: (1) the claims of the '504 patent; (2) any prior art to the '504 patent; and (3) the meaning or construction of any of the terms in the claims of the '504 patent.

# EXHIBIT 11

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Texas

| | |
|---|---|
| PERSONAL AUDIO, LLC | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   2:13-cv-13 consolidated ED Tex |
| TOGI ENTERTAINMENT, INC. ET AL. | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        ELECTRONIC FRONTIER FOUNDATION, 815 Eddy Street, San Francisco, CA 94109

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See attachment

| Place:  Veritext - San Francisco<br>101 Montgomery St., Suite 450<br>San Francisco, CA 94104 | Date and Time:<br><br>01/31/2014 9:00 am |
|---|---|

      The deposition will be recorded by this method:   Stenography and videotape

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/17/2014

                    *CLERK OF COURT*
                                                    OR
                                                         /s/ Jeremy S. Pitcock
      _____                    _____
      *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _____
Personal Audio, LLC                                   , who issues or requests this subpoena, are:

Jeremy S. Pitcock, 1501 Broadway, 12th Floor New York, NY 10036, jpitcock@pitcocklawgroup.com, (646) 571-2237
Papool S. Chaudhari, P.O. Box 1863, Wylie, TX 75098, papool@chaudharilaw.com, (214) 702-1150

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2:13-cv-13 consolidated ED Tex

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DEFINITIONS

The following definitions apply to these deposition topics:

A. "Personal Audio" shall mean and refer to Plaintiff Personal Audio, LLC.

B. "'504 Patent" shall mean the patent-in-suit, U.S. Patent No. 8,112,504.

C. "Defendants" shall refer to any potential or actual Defendants in any civil case regarding the '504 patent, including, but not limited to, Defendants Togi Entertainment, Inc., HowStuffWorks, NBCUniversal Media, LLC, CBS Corporation, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc., Adam Carolla, Donny Misraje, Kathee Schneider-Misraje, and Sandy Ganz, and also includes any agents, employees, counsel and/or attorneys thereof. Potential Defendants include, without limitation, any person or entity that has received a licensing letter from Personal Audio concerning the '504 Patent and also includes any agents, employees, counsel and/or attorneys thereof.

D. "EFF" and "You" shall mean and refer to the Electronic Frontier Foundation, any subsidiaries, affiliates, officers, employees and counsel thereto.

E. "Person" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization or other legal entity. The acts of a Person shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the Person's behalf.

F. "Document" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, files, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version). By way of example, the term "document(s)" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; e-mails; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

G. "Thing" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure.

1

H.     "Communication" shall mean any transmission of information in any context or situation by or between two or more persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including without limitation but not limited to conversations, correspondence, electronic mails, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda concerning written or oral communications, and any translation thereof.

I.      "Identify" and "Identity" shall each mean:

(a) as applied to an individual, to state the individual's full name, present or last known address and telephone number, present or last known employer, present or last known business address and telephone number, present and prior employment positions and corresponding dates of such positions, and a description of his present employment responsibilities;

(b) as applied to a Person other than a natural person (including without limitation, but not limited to, any business or other entity), to state the entity's full name, place and date of incorporation or formation, principal place of business or activity, and the identity of the natural persons within that entity having knowledge of the matter with respect to which that entity is named;

(c) as applied to a Document (whether or not any claim of privilege is made in respect thereof), to state the type of Document, the date of creation of the Document, the date of communication of the Document, the names and Identities of the individuals who drafted, authored, or signed the Document or a copy thereof was addressed or sent, a summary of the subject matter of the Document, the number of pages of the Document, the present whereabouts of the Document, including without limitation all originals and copies, and the name and address of the present or last-known custodian of the Document;

(d) as applied to a Thing, to state the date that the Thing was first introduced for sale, the date of the Thing's first sale, all versions, parts or revision numbers or codes, all product names, and all team names or project titles used in connection with the design, development, testing, or engineering of that product;

(e) as applied to a process, to state the date that the process was first used, the date the products or goods made by the process were first sold, all numbers or codes used to refer to the process, including but not limited to process revision numbers or codes, all process names, and all team names or project titles used in connection with the design, development, testing, or engineering of that process; or

(f) as applied to a Communication, to state the type of Communication, the date and the parties to such Communication, and if such Communication has been recorded in documentary form, to identify all Documents recording such Communication.

2

J.      "Information" shall mean information in any form, including but not limited to documentary, electronic, graphical, or tabular, and communicated by any means, including but not limited to orally, in writing, or via electronic communication.

K.      "Describe," when used in relation to an act, event, instance, occasion, transaction, conversation, or Communication, shall mean (1) to state the date and place thereof; (2) to identify the individual participants; (3) to summarize separately for each individual participant what was said or done; and (4) to identify each document used or prepared in connection therewith or making any reference thereto.

L.       "Date" shall mean the exact date, if known, or the closest approximation to the exact date as can be specified, including without limitation the year, month, week in a month, or part of a month.

M.      "Concerning" shall mean in whole or part constituting, containing, embodying, reflecting, concerning, referring to, describing, involving, supporting, contradicting, evidencing, stating, dealing with, relating to, or in any way pertaining to.

N.      As used herein, the singular form of a term shall be interpreted to include the plural and vice versa.

O.      As used herein, the masculine form of a term shall be interpreted to include the feminine and vice versa.

P.      Except where the context does not permit, the term "including" shall be without limitation.

Q.      Except where the context does not permit, the terms "and" and "or" shall be both conjunctive and disjunctive.

R.      Except where the context does not permit, the terms "each" and "any" shall mean any and all.

## DEPOSITION TOPICS

1.  Any communications between the EFF and Defendants specifically Concerning the '504 patent, including but not limited to the construction of any claim terms and any alleged prior art relevant to any claim of the patent.

2.  Any communications between the EFF and any actual or potential witness specifically Concerning the '504 patent or prior art to the '504 patent.

3.  Any communications between the EFF and any third parties specifically Concerning the '504 patent, including but not limited to any communications with the Cyberlaw Clinic at the Harvard University Berkman Center for Internet and Society, Julie Samuels, Mark Cuban, RPX, Article One Partners, Mark Lemley, Durie Tangri Page Lemley Roberts & Kent LLP, the Open Innovation Network, StackExchange, Google, Inc and/or their representatives, agents or counsel.

3

4.  Any non-privileged communications regarding the prior art cited in any proceedings in the Patent and Trademark Office Concerning the '504 patent.

5.  All fundraising activities in connection with the proceedings in the Patent and Trademark Office specifically Concerning the '504 patent, including but not limited to the Identification of the names of all Persons who donated or contributed and Identification of the amounts contributed by each Person, as well as the Identification of any promised contributions which have not been received yet as well as the Persons who promised such contributions and the amount thereof.

6.  All steps taken in order for the EFF to be "fully prepared" to take on Personal Audio with respect to the '504 patent.

7.  Identification of any Information Concerning any prior art (whether or not included in any Patent and Trademark Office proceeding) that would tend to show either: (1) the art did not disclose any element of the claims of the '504 patent or (2) the art was not demonstrably available prior to any filing date of the '504 patent.

8.  Any nonprivileged analysis or Communications Concerning the following: (1) the claims of the '504 patent; (2) any prior art to the '504 patent; and (3) the meaning or construction of any of the terms in the claims of the '504 patent.

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

---

|  |  |
|---|---|
| PERSONAL AUDIO, LLC, | ) |
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 2:13-cv-00013-JRG-RSP |
| TOGI ENTERTAINMENT, INC., | ) <u>LEAD CASE</u> |
| *Defendant.* | ) |

---

| PERSONAL AUDIO, LLC, | ) |
|---|---|
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 2:13-cv-00270-JRG-RSP |
|  | ) Jury Trial Demanded |
| CBS CORPORATION, | ) |
| *Defendant.* | ) |

---

| PERSONAL AUDIO, LLC, | ) |
|---|---|
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 2:13-cv-00271-JRG-RSP |
|  | ) Jury Trial Demanded |
| NBCUNIVERSAL MEDIA, LLC, | ) |
| *Defendant.* | ) |

---

1

_____  )
                                     )
PERSONAL AUDIO, LLC,                 )
                                     )
     *Plaintiff*,                       )
                                     )
     v.                               )   Civil Action No. 2:13-cv-00015-JRG-RSP
                                     )   Jury Trial Demanded
HOWSTUFFWORKS.COM,                   )
                                     )
     *Defendant*.                     )
_____  )

## DEFENDANTS' RESPONSES TO PERSONAL AUDIO, LLC'S
## <u>FIRST SET OF INTERROGATORIES</u>

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants

NBCUniversal Media, LLC and CBS Corporation (collectively, "Defendants"), by their

undersigned counsel, hereby respond to Plaintiff Personal Audio, LLC's ("Personal Audio" or

"Plaintiff") First Set of Interrogatories to Defendants as follows:

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Please identify and describe all communications between any or all Defendants and any

third party regarding the '504 patent and/or any potential or actual prior art, including all

communications with the EFF and any potential witness with testimony relating to prior art.

**RESPONSE:**

In addition to the general objections set forth below, which are incorporated herein by

reference, Defendants specifically object to this interrogatory on the grounds that requiring

identification of communications by Defendants' counsel to third parties as part of their

representation of Defendants in this litigation would be contrary to the work product immunity

and/or joint defense privilege.  In particular, Defendants' communications with third parties who

2

may have knowledge of or be potential witnesses with respect to prior art cannot be identified as sought in this interrogatory without revealing litigation counsel's mental impressions and otherwise disclosing work product relating directly to this litigation. *See In re Seagate Technology, LLC*, 497 F.3d 1360, 1375 (Fed. Cir. 2007) (en banc).

Defendants further object to this interrogatory on the grounds the identification and description of "all" communications with "any third party regarding the '504 patent and/or any potential or actual prior art" is overly broad and unduly burdensome, particularly to the extent that it is unclear what is encompassed by "regarding" the '504 patent and what is meant by "potential or actual prior art" and is unlimited in time.  In particular, the prior art in this matter includes commonly-used technologies and it would be unreasonable, *inter alia*, to ask that Defendants seek to identify any communications with any third party by any employee or agent of the Defendant relating to that art.  Also, it is unclear if communications "regarding" the '504 patent are intended to encompass any and all communications that mention this litigation or the '504 patent solely in the context of describing the litigation and, if so, is overbroad and unduly burdensome for this reason as well.  Defendants further object to this interrogatory on the grounds that communications between any or all Defendants and any "third party," including the EFF and any potential witnesses, relating to prior art is protected from disclosure under the attorney work-product doctrine, the attorney-client privilege, and/or any applicable joint defense privilege or is otherwise protected from disclosure.   Defendants further object to this interrogatory on the grounds that it seeks information that is neither relevant to any of the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence.

## GENERAL OBJECTIONS

1.     Defendants object to Plaintiff's interrogatories and the accompanying definitions and instructions to the extent that they exceed or conflict with Defendants' obligations under the applicable Federal Rules of Civil Procedure or the local rules for the Eastern District of Texas. Defendants specifically object to Instructions 1-5 to the extent they seek to exceed the requirements of the applicable rules.

2.     Defendants object to Plaintiff's interrogatories to the extent they seek information not in the possession, custody, or control of the Defendants.

3.     Defendants object to Plaintiff's interrogatories to the extent they seek information protected from discovery by reason of attorney-client privilege, work-product immunity, or other applicable privileges or protections, any documents or things prepared in anticipation of litigation, or any documents containing the mental impressions, conclusions, opinions, or legal theories of any attorney or representative of Defendants relating to this action.  Defendants will not produce such protected information, and any inadvertent disclosure of such protected information shall not be deemed a waiver of the applicable privilege or immunity.

4.     Defendants object to Plaintiff's interrogatories to the extent that they are overly broad, unduly burdensome, and are not relevant to the claims or defenses of any party or not reasonably calculated to lead to the discovery of admissible evidence.  By producing any of the information requested, Defendants do not concede the admissibility or relevance thereof to the subject matter of this litigation.  Defendants reserve the right to provide additional information as new information becomes available to Defendants, and failure to provide such information at this time shall not waive Defendants' rights to offer such information into evidence at trial or in other proceedings.

5.      Defendants object to Plaintiff's interrogatories to the extent they are vague and ambiguous.

6.      Defendants object to Plaintiff's interrogatories to the extent that they seek unrestricted access to information or documents protected from disclosure under any confidentiality obligation imposed by contract, statute, order, or understanding binding upon Defendants.

7.      Defendants object to Plaintiff's interrogatories to the extent that they seek information or identification of documents that are equally accessible to both parties or are a matter of public record.

8.      Defendants object to any interrogatory the answer to which is unreasonable, unduly burdensome, harassing, oppressive and/or expensive.

9.      Defendants object to any definition that purports to change the ordinary meaning of the term defined therein.  Defendants object to the definitions of the terms "Defendants" and "You" to include "any agents of Defendants and counsel of Defendants" as overly broad and improperly trying to seek discovery of litigation counsel.

10.      Defendants object to any interrogatory that is compound and/or contains subparts consisting of more than one interrogatory.

11.      Defendants object to any interrogatory that seeks information covered by a protective order in some other proceeding, or information designated confidential by third parties.

12.      No incidental or implied admissions are intended or made by the answers contained herein.

13.      Defendants object to these interrogatories to the extent they are not reasonably limited in time frame.

14.     Defendants incorporate all of the foregoing general objections into their specific responses to each of Plaintiff's interrogatories, whether or not each such general objection is expressly referred to in that specific response.  By setting forth specific objections, Defendants do not intend to limit or supersede these general objections.  Where a partial answer can be made to an interrogatory that is otherwise objectionable, such answer will be made without waiving any stated objection.

15.     Defendants reserve the right to modify, supplement, add to or amend the responses to these interrogatories to the extent required or permitted by the Federal Rules of Civil Procedure.  Defendants make these responses solely for the purpose of the above-entitled action and based upon the best information available to them at the time of the response.


Dated: January 21, 2014                         Respectfully submitted,

By:   /s/ *Sharon L. Davis*
Steven Lieberman
slieberman@rfem.com
Brian Rosenbloom
brosenbloom@rfem.com
Sharon Davis
sdavis@rfem.com
ROTHWELL, FIGG, ERNST & MANBECK, PC
607 14th St., N.W., Ste. 800
Washington, D.C.  20005
(202) 783-6040 (telephone)
(202) 783-6031 (facsimile)

Jennifer Parker Ainsworth
Texas State Bar No. 00784720
jainsworth@wilsonlawfirm.com
WILSON, ROBERTSON & CORNELIUS, PC
One American Center
909 ESE Loop 323, Suite 400
Tyler, TX 75701
(903) 509-5092 (telephone)
(703) 509-5092 (facsimile)

*Attorneys for Defendants*
*CBS Corporation and*
*NBCUniversal Media, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 21, 2014, a copy of the attached **DEFENDANTS' RESPONSES TO PERSONAL AUDIO, LLC'S FIRST SET OF INTERROGATORIES** was served on Plaintiff via electronic mail as follows:

**Jeremy S Pitcock**
The Pitcock Law Group
1501 Broadway, 12th Floor
New York, NY 10036
646-571-2237
Fax: 646-571-2001
Email: jpitcock@pitcocklawgroup.com

**Claire Abernathy Henry**
**Jack Wesley Hill**
**Thomas John Ward**
**Thomas John Ward , Jr**
Ward & Smith Law Firm
1127 Judson Road, Suite 220
Longview, TX 75606
903-757-6400
Fax: 903-757-2323
Email: claire@wsfirm.com
Email: wh@wsfirm.com
Email: tjw@wsfirm.com
Email: jw@wsfirm.com

**Papool S. Chaudhari**
Reyes Bartolomei Browne
5950 Berkshire Lane, Suite 410
Dallas, TX 75225
214-702-1150
Fax: 214-705-3775
Email: papool@chaudharilaw.com

*/s/ Nasri V. B. Hage* _____
Nasri V. B. Hage

8

# EXHIBIT 13

PATENTS   TRADEMARKS   IP LAW & POLICY   PRODUCTS & SERVICES   INVENTORS   NEWS & NOTICES   FA

# Message from Chief Judge James Donald Smith, Board of Patent Appeals and Interferences: USPTO Discusses Key Aspects of New Administrative Patent Trials

Thank you to the intellectual property community for your feedback thus far about our new administrative trial proposed rules for the inter partes review (IPR), post grant review (PGR), covered business method review, and derivation provisions of the America Invents Act.  From the comments we have received, a few issues have surfaced with some regularity.  For example, we have received questions and input regarding (i) the standards to trigger inter partes and post grant reviews, (ii) the real party in interest requirement for an IPR/PGR petitioner, (iii) timing for completion of the new trials, (iv) the pro hac vice admission of non-registered practitioners, and (v) the definition of the term "technological invention."  I thought it would be helpful to explain more about the Agency's rationale for the structure of the proposed rules on these topics, and hence, we have prepared a "blog extravaganza" for your consideration:

- Standards to Trigger an Inter Partes Review and Post Grant Review (http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-1)
- Real Party in Interest (http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-2)
- Timing to Complete an Inter Partes Review, Post Grant Review, and Covered Business Method Review (http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-3)
- Pro Hac Vice Admission to Practice before the Board for New Administrative Patent Trial (http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-4)
- Technological Invention Definition (http://www.uspto.gov/aia_implementation/smith-blog-extravaganza.jsp#heading-5)

Lastly, please note that the comment period for the new administrative trial proposed rules closes on April 9 and 10, 2012.  I encourage you to submit your positive feedback and constructive suggestions to the Agency by then; we are eager to hear from you.

## Standards to Trigger an Inter Partes Review and Post Grant Review

The Director statutorily may institute an inter partes review (IPR) and post grant review (PGR) proceeding where a petitioner meets the threshold requirements.  For an IPR, the petitioner must demonstrate a **reasonable likelihood** that he/she would prevail as to at least one of the claims challenged.  35 U.S.C. 314(a).  In contrast, for a PGR, the petitioner must demonstrate that it is **more likely than not** that at least one of the claims challenged is unpatentable.  35 U.S.C. 324(a).  Additionally, for a PGR, the petitioner may show a novel or unsettled legal question that is important to other patents or patent applications.  35 U.S.C. 324(b).

Comparing the two standards, the "reasonable likelihood" standard is lower than the "more likely than not" standard.  The reasonable likelihood standard allows for the exercise of discretion but encompasses a 50/50 chance whereas the "more likely than not" standard requires greater than a 50% chance of prevailing.

Petitioners are encouraged to clearly set forth the best ground of unpatentability as to each challenged claims to facilitate early resolution of the issues.  In instituting an IPR or PGR, the Board may take into account whether the same or substantially same prior art or arguments previously were presented to the Office.  35 U.S.C. 315(d) and 325(d).  Additionally, the Board may also go forward on challenged claims that are unpatentable based on obviousness where challenge is based on anticipation.

## Real Party in Interest

The Office proposed that the petitioner in one of the new administrative trial proceedings of inter partes review, post grant review, and covered business method review must identify the real party in interest.  Identification of the real party in interest is necessary for a couple different reasons.

First, it enables the Board to identify potential conflicts of interests.  A conflict typically would arise when an official has an investment in a company with a direct interest in an administrative trial proceeding.  Such a conflict can be avoided only if the parties promptly provide information necessary to identify potential conflicts.

Second, identification of the real party in interest alerts the Board of potential statutory bars to the proceeding.  For *inter partes* review (IPR) and post-grant review (PGR) proceedings, the petitioner (including any real party in interest or privy of the petitioner) is estopped by statute from re-litigating any ground that was raised or reasonably could have been raised in an earlier proceeding.  *See* 35 U.S.C. 315(e)(1) and 325(e)(1).  Thus, the petitioner must establish that he/she or its privy has not previously raised or had the opportunity to raise  the ground in dispute in a previous IPR or PGR proceeding.

To that end, the Office proposes that the petitioner must certify at the time of filing a petition that he/she is not estopped from requesting an IPR or PGR of the patent.  In turn, the Office proposes that the patent owner may file a preliminary patent owner response within two months from the docketing date of the petition setting forth reasons why no IPR or PGR should be instituted.  Normally, the patent owner would not be allowed to present new testimony evidence in his/her preliminary response.  However, where patent owner raises sufficient concerns regarding the petitioner's certification of standing, the patent owner may be granted additional discovery before filing the preliminary response and may submit any testimonial evidence obtained through the discovery.

Who constitutes a real party in interest or privy is a highly fact-dependent question, especially on the issue of whether a party who is not a named participant in a given proceeding nonetheless constitutes a "real party in interest" or "privy" to that proceeding.  Courts and commentators agree that there is no "bright-line test" for determining the necessary quantity or degree of participation to qualify as a "real party in interest" or "privy" based on the control concept.  *See Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994); *see also* Wright & Miller § 44512 ("The measure of control by a nonparty that justifies preclusion cannot be defined rigidly.").  Accordingly, the Office has not enumerated particular factors regarding a "control" theory of "real party in interest" or "privy" in the proposed rules.  Instead, to resolve a real party in interest or privy dispute that may arise during a proceeding, the Board plans to consider each case on its specific facts.

In sum, the USPTO believes the proposed rules provide (i) petitioners the ability to establish standing; (ii) patent owners the opportunity to challenge the petitioner's standing in appropriate situations; and (iii) the Board the flexibility to consider the specific facts and relevant case law in resolving a standing dispute.

## Timing to Complete an Inter Partes Review, Post Grant Review, and Covered Business Method Review

The USPTO is statutorily required to complete an inter partes review, post grant review, and covered business method review within one year from the date that the proceeding is instituted, except that the time may be extended up to six months for good cause.  *See, e.g.*, 35 U.S.C. 316(a)(11).  The USPTO also is required to consider the effect of any regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to complete proceedings in a timely manner.  35 U.S.C. 316(b) and 326(b).

The proposed rules lay out a framework for conducting the proceedings in such a way to streamline and converge the issues for decision within the one year statutory period.  Generally, the proceedings begin with the filing of a petition that identifies all of the claims challenged and the grounds and supporting evidence on a claim-by-claim basis.  Within two months of notification of a filing date, the patent owner may file a preliminary response to the petition, including a simple statement that patent owner elects not to respond to the petition prior to the institution of a review.  The patent owner may not present new testimony evidence in the preliminary response, and no discovery would be permitted, except in rare situations.  The two-month time period balances the overall timeliness of the proceeding with the patent owner's needs to prepare a preliminary response.

Within statutory time period of three months from the date the patent owner's preliminary response was due or was filed, whichever is first, the Board will determine whether to institute the requested proceeding.  *See, e.g.*, 35 U.S.C. 314(b).  The Board will enter a Scheduling Order concurrent with the decision to institute the proceeding.  The Scheduling Order will set due dates for the proceeding taking into account the complexity of the proceeding but ensuring that the trial is completed within one year of institution.  A representative timeline is provided below:



The representative timeline allocates four months for the patent owner to file a response to the Board's decision on the petition and motion to amend claims. This time frame balances the need to complete the proceeding in a timely manner with the patent owner's needs to prepare of a response supported by factual evidence and expert opinions. The remaining shorter time frames reflect the intended convergence of the issues. After reviewing the decision to institute and Scheduling Order, the parties would have an opportunity to request adjustments. An initial conference call will be held about one month from the date of institution to discuss the motions that the parties intend to file and to determine if any adjustment needs to be made to the Scheduling Order.

The USPTO believes that the proposed rules, consistent with the statutory mandates, would also provide cheaper and faster alternatives to patent infringement litigation.

## Pro Hac Vice Admission to Practice before the Board for New Administrative Patent Trial

The Office has proposed to allow for *pro hac vice* representation for non-registered practitioners before the Board in any of the four new administrative trial proceedings of inter partes review, post grant review, covered business method review, and derivation. In particular, the Board may recognize counsel *pro hac vice* during an administrative trial proceeding upon a showing of good cause, subject to conditions that the Board may impose, such as agreeing to be bound by the Office's Code of Professional Responsibility. The Office has proposed to permit *pro hac vice* admission for non-registered practitioners in the new administrative trial proceedings for a few different reasons.

First, the Board currently permits *pro hac vice* admission in matters before it. From the Board's experience, parties have found it helpful in certain circumstances to have a counsel that is experienced in handling expert testimony, cross examination, and other aspects of discovery.

Second, where a party has selected a non-registered practitioner to represent him/her in a patent infringement action and has expended significant financial or other resources in that infringement action, the Office recognizes that the party may wish to continue using the non-registered practitioner as one of the counsels in the new administrative trial proceedings.

Lastly, the Office proposes that the grant of a motion to appear *pro hac vice* be a discretionary action taking into account the specifics of the proceedings. In making this determination, the Board will consider the impact of granting *pro hac vice* admission on a party's ability to timely complete the trial proceeding, if instituted, within the statutory twelve month window and to effectively participate in the proceeding. Similarly, the Office proposes that the revocation of *pro hac vice* admission be a discretionary action taking into account various factors, including incompetence, unwillingness to abide by the Office's Rules of Professional Conduct, and incivility.

Accordingly, for these reasons, the Office believes that *pro hac vice* admission for non-registered patent practitioners in the new administrative trial proceedings balances the needs of clients to select their counsel against the desire for adequate safeguards for the USPTO, the profession, and the public.

## Technological Invention Definition

Section 18 of the Leahy-Smith America Invents Act (AIA) provides that the Director may institute a transitional proceeding only for a patent that is a "covered business method patent." Section 18(d)(1) of the AIA specifies that a "covered business method patent" is a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions. Section 18(d)(2) of the AIA provides that the Director will issue regulations for determining whether a

patent is for a technological invention.

Pursuant to § 18(d)(2) of AIA, the Office proposes that the following will be considered on a case-by-case basis to determine if a patent is for a "technological invention" solely for purposes of the transitional program for covered business method patents:

whether the claimed subject matter as a whole

(1) recites a technological feature that is novel and unobvious over the prior art;

and

(2) solves a technical problem using a technical solution.

Case-by-case means Board will consider specific facts presented with no one specific fact necessarily being dispositive. This is consistent with *Bilski v. Kappos*, 130 S. Ct. 3218 (2010), which recognized that there is no single test for patent eligibility under 35 U.S.C. 101. Further, the two identified factors (1) and (2) are consistent with the legislative history. *See* statements of Rep. Smith, 157 Cong. Rec. H4497 (daily ed. June 23, 2011); Sen. Schumer, 157 Cong. Rec. S1363-64 (daily ed. Mar. 8, 2011); and Sen. Kyl, 157 Cong. Rec. S1368, S1379 (daily ed. Mar. 8, 2011).

We are looking forward to the feedback from the patent community on this provision.

---

This page is owned by Patents.                              Last Modified: 5/21/2012 12:54:48 PM